IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| FRANK J. NAPOLITANO, JR. | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | NO. 07-CV-755 |
| | : | |
| vs. | : | |
| | : | |
| TOWN SPORTS INTERNATIONAL HOLDINGS INC. and TOWN SPORTS INTERNATIONAL, INC. | : | |
| | : | |
| Defendants. | : | |

**AFFIDAVIT OF PLAINTIFF FRANK J. NAPOLITANO, JR.**

Plaintiff Frank J. Napolitano, Jr., deposes and says:

1. I am an adult resident and citizen of Pennsylvania.

2. Defendant Town Sports International Holdings, Inc. (hereafter, "TSI Holdings") is a Delaware corporation with its principal place of business in the State of New York.

3. Defendant Town Sports International, Inc. (hereafter, "TSI") is a Delaware corporation with its principal place of business in the State of New York.

4. TSI Holdings and TSI operate one of the nation's largest chains of sports and health clubs, virtually all of which are located in the New York, Philadelphia, Boston and Washington metropolitan areas. The defendants' clubs in the New York area operate under the name "New York Sports Club"; the clubs in and near Philadelphia operate under the name "Philadelphia Sports Club"; the clubs in and near Washington, D.C., operate under the name "Washington Sports Club"; and

the clubs in and near Boston operate under the name "Boston Sports Club." All of the defendants' clubs share a similar logo.

5. I began work for TSI Highpoint, LLC (hereafter, "Highpoint"), a subsidiary of TSI, on January 6, 2000. From January, 2000 to January, 2001 I was employed by Highpoint and held the title of Vice President - Special Programs. From January, 2001 to sometime in 2004, I was employed by Highpoint and held the title of Vice President of Strategic Planning and Special Projects. From 2004 through June 8, 2006, I was employed by Highpoint and held the title of Senior Vice President for Strategic Planning and Special Projects.

6. During my employment with Highpoint, my responsibilities, generally, were to participate in strategic planning for the corporate group of which Highpoint was a part; to lead the strategic planning group; to design club-centered programs for children, youth and families and other special projects; and to oversee market research and product development aimed at expanding the market for the services of the corporate group. My office was in Chalfont, Pennsylvania. My salary was paid out of an account held by Highpoint, and my W-2's were issued by Highpoint. A copy of a W-2 from Highpoint for 2006 is attached hereto as Exhibit H. None of my cash compensation was paid directly by defendants TSI or TSI Holdings.

7. Many of my activities were centered upon, and directly benefitted, the Philadelphia Sports Club at Highpoint (owned by Highpoint), because it was that location which served, in effect, as a laboratory for many of the programs for children, youth and families which my colleagues at Highpoint and I were developing.

8. Beginning in 2000, I was offered and accepted options to purchase shares in TSI. Those options were offered pursuant to a stock option agreement dated May 31, 2000 (the "Original TSI Option"). I have not retained a copy of that option agreement, but a copy of a shareholders' agreement that acknowledges the existence of those options is attached hereto as Exhibit C.

9. The Original TSI Option included a vesting schedule that was highly dependent upon the earnings of TSI. The shares would vest sooner if earnings goals were met or exceeded; they were to vest more slowly if earnings fell short of

those goals.

      10. Under the Original TSI Option, I was granted the right to purchase 6,600 shares of class A common stock of TSI. In early 2004, the shareholders of TSI agreed to create a new holding company. We tendered our shares in TSI to TSI Holdings, in exchange for an equivalent number of newly-issued shares of TSI Holdings. In connection with that reorganization, my Original TSI Option (and similar options granted to others) were replaced by equivalent options to purchase shares of TSI Holdings. A copy of my new option (the "First TSI Holdings Option" or the "First Option"), dated February 4, 2004, is attached hereto as Exhibit A.

      11. Under the terms of the First TSI Holdings Option, I received the right to purchase 6,600 shares of TSI Holdings. Because TSI's earnings had exceeded the earnings goals set forth in the Original TSI Option, when the original options were converted to options to purchase shares of TSI Holdings, 3,960 of the 6,600 options were already vested. Under those vested options, now included within the First TSI Holdings Option, I received the right to purchase the 3,960 shares at $75.00 per share. See Exhibit E hereto, Memorandum of Richard Pyle, dated February 11, 2004.

      12. I received a second award of options on July 23, 2003. Under that option agreement (the "Second TSI Option"), I received the right to purchase 1,000 shares of TSI. A copy of the Second TSI Option is attached hereto as Exhibit D. Like the first group of options, the Second TSI Option was converted in February, 2004, into an option to purchase an equivalent number of shares of TSI Holdings. A copy of the substitute option agreement (the "Second TSI Holdings Option" or the "Second Option") is attached hereto as Exhibit B. Under the Second TSI Holdings Option I was granted the right to purchase 1,000 shares of TSI Holdings at $144.00 per share. Options to purchase 200 of those 1000 shares were vested and indefeasible as of February 11, 2004 (see Memorandum of Richard Pyle attached hereto as Exhibit E), and thus vested and indefeasible as of my separation from Highpoint in June, 2006.

      13. As of the reorganization of TSI and the creation of TSI Holdings in February, 2004, the value of the shares subject to the First and Second Options already exceeded the exercise prices of those options.

14. During 2005, senior management of TSI Holdings formulated plans to conduct an initial public offering of the company's shares. In contemplation of that step, I had discussions with the Chief Executive Officer of TSI Holdings, Robert Giardina, concerning my anticipated role in the corporate group after the offering. Mr. Giardina made clear that my services were valued and desired, but we were unable to agree fully on a job description and compensation. I agreed, however, to stay in my job through the end of the anticipated public offering.

15. On or about June 2, 2006, under a plan of reorganization related to the initial public offering, the authorized shares of class A common stock of TSI Holdings were increased by a multiple of 14; that is, authorized shares of class A common stock of TSI Holdings were split, 14 to 1 (the "stock split").

16. By operation of paragraph 2(f) of the First Option ("Adjustments upon Changes in Capitalization"), and a similar paragraph 2(f) of the Second Option, and by confirmatory action of the board of directors of TSI Holdings, the First and Second Options were recalculated, both as to shares and price-per-share, to account for the stock split.

17. As of June 8, 2006 (the date of my separation from employment with Highpoint) I held vested options to purchase 55,440 shares of TSI Holdings under the First Option, at a price per share of $5.36. As of the same date, I held vested options to purchase 2,800 shares of TSI Holdings under the Second Option, at a price per share of $10.29.

18. On November 1, 2006, I provided notice by electronic mail that I desired to exercise the vested portions of the First and Second Options.

19. The defendants declined to sell shares of common stock of TSI Holdings in response to my notice of exercise, claiming that the notice was not received within 90 days of termination of my alleged employment with TSI Holdings.

20. I fully performed the services required of me under the First and Second Options, and have tendered to the defendants, by check, the full amount of the purchase price of shares subject to those options.

21. Shares of TSI Holdings are currently trading in public markets at prices per share substantially in excess of the prices at which I am entitled to purchase such shares under the two options.

22. The defendants were not harmed or prejudiced by any alleged delay in receiving my notice of exercise under the First and Second Options, because the shares subject to those options were fully reserved for that purpose, and the accounting effect of the discount had already been fully recorded. Option stock is sequestered and not available for sale to the public while options are outstanding

23. The First Option and the Second Option were granted to me as compensation for labor. In good faith, in reliance upon the compensation provided under the First and Second Options, and through substantial efforts as an employee over more than six years, I added value to the defendant corporations, and added value to the shares representing ownership of defendant TSI Holdings.

24. For the entire period from January 6, 2000 through June 8, 2006, my paychecks and year-end W-2 reports were issued by TSI Highpoint, LLC, a limited liability company based in Bucks County, Pennsylvania. My office in Pennsylvania was my principal place of work and employment during that entire period.

25. On September 12, 2006, I was issued additional options to purchase shares of defendant TSI Holdings. A copy of that option agreement is attached hereto as Exhibit F.

26. Attached hereto as Exhibit G is a copy of the "Town Sports International Holdings, Inc. 2004 Common Stock Option Plan," which was attached as Exhibit 10.7 to defendants TSI Holdings' Form S-4 filed with the Securities and Exchange Commission on April 5, 2004 (the "Plan").

27. Mark Smith, former CEO of TSI Holdings, is, according to the defendants' filings with the Securities and Exchange Commission, the holder of vested and unexercised options under the Plan, and he is not an employee of that company. He was however, an executive of TSI Holdings.

28. As in many corporate groups, employees of the affiliated companies

under the umbrella of TSI Holdings change jobs within the group.

29. As of February, 2004, I was bound by a covenant not to compete with TSI and TSI Holdings.

30. As of the date hereof, I remain bound by a covenant not to compete with TSI and TSI Holdings, and am contractually obliged to provide consulting services to TSI Holdings through June 30, 2007.

31. As a strategic planner for the corporate group, I worked with Mark Smith and Robert Giardina to evaluate and develop new lines of business, some of which would have been pursued, if at all, as joint ventures with companies outside the corporate group. That approach was a marked emphasis of the strategic planning group in which I participated within the corporate group.

32. Before joining Highpoint, I served as President of the International Health, Racquet and Sports Clubs Association. I frequently expressed to Mr. Smith a desire to return to operations, and Mr. Smith made clear, before 2004, that if a joint venture were formed with persons outside the TSI corporate group, I would be a natural choice to manage any venture that I helped conceive.

33. At the time the First and Second Options were prepared and executed, I had no discussions with anyone within the TSI Holdings corporate group concerning the presence of the 90-day clause (Section 4(a)) in those agreements, and no discussions with anyone about its meaning or applicability.

34. From January, 2000 through the present, Highpoint has typically employed more than 100 persons in Chalfont, Pennsylvania. At least one of those employees, other than myself, was, and currently is, a participant in the Plan.

I verify, under penalty of perjury, that the foregoing is true and correct.

Executed on April 24, 2006.

                                    Frank J. Napolitano, Jr.