EXHIBIT E

**Memorandum**

| | |
|---|---|
| **To:** | Frank Napolitano |
| **From:** | Richard Pyle |
| **Subject:** | Reorganization of TSI |
| **Date:** | February 11, 2004 |

As you may be aware, Town Sports International, Inc. ("TSI") has recently completed a re-organization, in which TSI became a wholly owned subsidiary of its new parent, Town Sports International Holdings, Inc. ("TSI Holdings"), and all stockholders of TSI received equivalent stock of TSI Holdings. We wish to notify you that as a result, effective as of February 4, 2004, all options granted to you under the option plan of TSI and your option agreement(s) will become options to purchase common stock of TSI Holdings. All other terms and conditions of your options as set out in your option agreement(s), including the number of shares subject to your options have not changed and will be honored by TSI Holdings. You will shortly receive a new option agreement to be executed with TSI Holdings, which will reflect the options held by you in TSI Holdings. In addition, in connection with the reorganization, TSI Holdings has put into place debt financing in order to pay a dividend to all stockholders of record on March 15, 2004. The dividend payment will be made on March 17, 2004.

Attached is a schedule of shares and/or options to buy shares of TSI Holdings that you own, together with their vesting status.

Also attached is a description of how the transaction may affect the shares or options that you own. Please read this information carefully, as any actions that are required on your behalf must be taken on or before **March 12, 2004.**

We will coordinate a meeting on February 25, 2004 at 4:00PM in the main conference room at TSI's head office in New York to address any general questions you may have. If you are unable to attend in person, please feel free to dial-in on (800) 503-2899, access code 246 6700.

In addition please contact Robert Herbst with specific questions at (212) 246-6700, extension 357, IP extension 1230, or at Robert.herbst@town-sports.com.

|  | 2000 | 2003 |
|---|---|---|
|  | Common Options @ $75.00 | Common Options @ $144.00 |
| Napolitano, Frank | 6,600 | 1,000 |
| Percentage Vested | 60% | 20% |
| Percentage Unvested | 40% | 80% |
| Shares/Options vested | 3,960 | 200 |
| Options unvested | 2,640 | 800 |

EXHIBIT F

4325/73117-003 Current/8603638v5

# COMMON STOCK OPTION AGREEMENT

COMMON STOCK OPTION AGREEMENT dated as of September 12, 2006 (this "Agreement"), between TOWN SPORTS INTERNATIONAL HOLDINGS, INC., a Delaware corporation (the "Company"), and FRANK NAPOLITANO (the "Optionee"). Capitalized terms used but not otherwise defined herein shall have the respective meanings assigned to such terms in Section 1.

WHEREAS, in connection with the Optionee's resignation as an officer and employee of the Company, Town Sports International, Inc., a New York corporation ("TSI Inc."), and their respective parents, subsidiaries, affiliates and related entities pursuant to that certain Separation Agreement and General Release dated as of June 8, 2006 (the "Separation Agreement"), among the Company, TSI Inc. and the Optionee, the Company agreed to grant the Optionee an option to purchase shares of the Common Stock of the Company and this Agreement sets forth the terms and conditions of such new option;

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties to this Agreement hereby agree as follows:

1.    Definitions.  As used herein, the following terms shall have the following meanings:

"Agreement" has the meaning set forth at the head of this Agreement.

"Board" means the Board of Directors of the Company, as in effect from time to time.

"Code" means the Internal Revenue Code of 1986, as amended, and any successor statute.

"Committee" has the meaning ascribed to such term in the Plan.

"Common Stock" means the common stock, $0.001 par value per share, of the Company.

"Company" has the meaning set forth at the head of this Agreement.

"Exercise Price" has the meaning set forth in Section 2(a).

"Expiration Date" means June 1, 2010.

"Fair Market Value" has the meaning ascribed to such term in the Plan.

"Form" means those forms of the Internal Revenue Service used by taxpayers to file federal income tax returns or reports required under the Code or applicable Treasury Regulations promulgated thereunder.

4325/73117-003 Current/8603638v5

"Measurement Date" means the date on which any taxable income resulting from the exercise of the Option is determined under applicable federal income tax law.

"Notice" has the meaning set forth in Section 10(f).

"Option" has the meaning set forth in Section 2(a).

"Optionee" has the meaning set forth at the head of this Agreement.

"Option Price" has the meaning set forth in Section 2(c).

"Option Shares" has the meaning set forth in Section 2(a).

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, or a government entity (or any department, agency or political subdivision thereof).

"Plan" means the Company's 2004 Stock Option Plan, as the same may be amended, restated or modified from time to time.

"Securities Act" means the Securities Act of 1933, as amended.

"Separation Agreement" has the meaning set forth in the recitals to this Agreement.

"TSI Inc." has the meaning set forth in the recitals to this Agreement.

"Vested Option" means the Option after it has vested pursuant to Section 3.

2.    The Option.

(a)    Term of the Option. The Company hereby grants to the Optionee, as of the date hereof, an option (the "Option") to purchase up to 36,960 shares of the Company's Common Stock (the "Option Shares"), upon the terms and subject to the conditions set forth herein and in the Plan. The exercise price for the Option is $13.15 per Option Share (the "Exercise Price"). All rights of the Optionee as the holder of the Option issued hereunder shall be solely determined by the provisions of this Agreement. The Option will expire as provided in Section 4.

(b)    Form of the Option. The Option granted hereunder is not intended to be an "incentive stock option" within the meaning of Section 422 of the Code (or any successor or similar provision).

(c)    Payment of Exercise Price. Subject to Section 3, the Vested Option may be exercised in whole or in part upon payment of an amount (the "Option Price") equal to the product of (i) the Exercise Price multiplied by (ii) the number of Option Shares to be acquired. Payment shall be made in cash by a certified or official bank check payable to the Company or by other means acceptable to the Company.

3

4326/73117-003 Current/8603638v5

(d)    Procedure for Exercise.  The Optionee may exercise all or any portion of the Option, after it has become a Vested Option and to the extent it is outstanding, at any time and from time to time prior to its expiration as set forth in Section 4, by filing written notice of exercise to the Company, together with payment of the Option Price in accordance with the provisions of Section 2(c).

(e)    Non-Transferability of Option.  The Option is personal to the Optionee and is not transferable by the Optionee other than by will or the laws of descent and distribution. During the Optionee's lifetime, only the Optionee may exercise the Option.  In the event of the Optionee's death, the Option may be exercised only (i) by the executor or administrator of the Optionee's estate or the Person or Persons to whom the Optionee's rights under the Option shall pass by will or the laws of descent and distribution (provided that such Person first shall have executed and delivered an undertaking in writing to be bound by the terms of this Agreement as the Optionee in form and substance acceptable to the Company), and (ii) to the extent that the Optionee was entitled to exercise such Option hereunder at the date of the Optionee's death.

3.    Vesting.  The Option shall vest on December 31, 2008.

4.    Expiration.  The Option shall expire on the Expiration Date.

5.    Securities Laws Matters.

(a)    Representations, Covenants, etc.  The Optionee hereby represents and warrants to the Company that, upon exercising the Option, the Optionee will be purchasing Option Shares for his own account and not on behalf of others.  The Optionee understands and acknowledges that federal and state securities laws govern and restrict the Optionee's right to offer, sell or otherwise dispose of any Option Shares unless such offer, sale or other disposition thereof is registered under the Securities Act and registered or qualified under any applicable state securities laws, or, in the opinion of the Company's counsel, such offer, sale or other disposition is exempt from registration or qualification thereunder.  The Optionee will not offer, sell or otherwise dispose of any Option Shares in any manner that would:  (i) require the Company to file any registration statement with the Securities and Exchange Commission (or to amend or supplement any such filing; or (ii) violate or cause the Company to violate the Securities Act, the rules and regulations promulgated thereunder or any other state or federal law.

(b)    Restricted Securities.  Unless a registration statement covering the Option Shares has been filed with the Securities and Exchange Commission pursuant to the Securities Act and is effective at the time of the issuance thereof, all Option Shares issued pursuant to the terms of this Agreement shall constitute "restricted securities", as that term is defined in Rule 144 promulgated by the Securities and Exchange Commission pursuant to the Securities Act, and may not be transferred except in compliance with the registration requirements of the Securities Act or an exemption therefrom.

(c)    Listing, Registration, and Legal Compliance.  If at any time the Committee, in its discretion, determines that the listing, registration or qualification of the Option Shares upon any securities exchange or under any state or federal securities or other law or

4

4325/73117-003 Current/8603636v5

regulation, or the consent or approval of any governmental regulatory body, is reasonably required as a condition to or in connection with the granting of the Option or the purchase or issuance of any Option Shares, the Option may not be granted or exercised, in whole or in part, unless such listing, registration, qualification, consent or approval shall have been effected or obtained free of any conditions not acceptable to the Committee. The Optionee agrees to supply the Company with such certificates, representations and information as the Company shall request and shall otherwise cooperate with the Company in obtaining such listing, registration, qualification, consent or approval. The Company will make all such filings and registrations as reasonably required to effectuate the terms of this Agreement. In the case of officers and other Persons subject to Section 16(b) of the Securities Exchange Act of 1934, as amended, the Committee may impose, at any time, any limitations upon the exercise of the Option that, in the Committee's discretion, are necessary or desirable in order to comply with such Section 16(b) and the rules and regulations thereunder.

6.    Amendment and Waiver.    The Committee may amend the Option; provided, however, that no such amendment shall impair the rights of the Optionee in any material respect without the consent of the Optionee.

7.    Non-Compete; Nonsolicitation, etc.    The Optionee hereby acknowledges the existence and applicability of the covenants, agreements and restrictions set forth in Sections 4, 5, and 8 through 14 (inclusive) of the Separation Agreement and the provisions of such Sections of the Separation Agreement hereby are incorporated herein by reference herein as if fully set forth herein.

8.    Withholding Tax Requirements.

(a)    Amount of Withholding.    It shall be a condition to the exercise of the Option that the Optionee make appropriate payment or other provision acceptable to the Company with respect to any withholding tax requirement arising under applicable statutes or regulations from such exercise. The amount of withholding tax required by statute or regulation, if any, with respect to any exercise of the Option (the "Withholding Amount") shall be determined by the Company, and the Optionee shall furnish such information as the Company may request to make such determination.

(b)    Withholding Procedure.    If the Company determines that withholding tax is required by statute or regulation with respect to any exercise of the Option, then the Company shall notify the Optionee of the Withholding Amount and the Optionee shall pay to the Company an amount not less than the Withholding Amount. In lieu of making such payment, the Optionee may pay the Withholding Amount by either (i) delivering to the Company a number of Shares having an aggregate Fair Market Value as of the Measurement Date less than or equal to the Withholding Amount, or (ii) directing the Company to withhold and not deliver or issue to the Optionee a number of Option Shares, otherwise issuable upon the exercise of the Option, having an aggregate Fair Market Value as of the Measurement Date less than or equal to the Withholding Amount. Any shortfall between the Withholding Amount and the Fair Market Value of Option Shares delivered or withheld under the preceding sentence shall be paid by the Optionee in cash. All amounts paid to or withheld by the Company and the value of all Option Shares delivered to or withheld by the Company pursuant to this Section 8 shall be deposited in

5

4325/73117-003 Current/8603638v5

accordance with applicable law by the Company as withholding tax for the Optionee's account. If the Company determines that no withholding tax is required with respect to any exercise of the Option, but it is determined subsequently that the exercise resulted in taxable income as to which withholding is required (as a result of a disposition of any Option Shares or otherwise), then the Optionee shall promptly, upon being notified of the withholding requirement, pay to the Company (in cash by means acceptable to the Company) the amount required to be withheld, and the Company may, at its election, condition any transfer of Option Shares issued upon exercise of the Option upon receipt of such payment.

(c)     Notification of Inquiries and Agreements. The Optionee shall notify the Company in writing within ten days after the date the Optionee: (i) first obtains knowledge of any Internal Revenue Service inquiry, audit, assertion, determination, investigation, or question relating in any manner to the value of the Option granted hereunder; (ii) includes or agrees (including, without limitation, in any settlement, closing, or other similar agreement) to include in gross income with respect to the Option granted under this Agreement (A) any amount in excess of the amount reported on Form 1099 or Form W-2 to the Optionee by the Company, or (B) if the Optionee received no such Form, any amount; or (iii) sells, disposes or otherwise transfers Option Shares acquired pursuant to this Agreement. Upon request, the Optionee shall provide to the Company any information or document relating to any event described in the preceding sentence which the Company (in its sole discretion) requires in order to calculate and substantiate any change in the Company's tax liability as a result of such event.

9.     Representations and Warranties of the Optionee. As an inducement to the Company to enter into this Agreement and grant the Option, the Optionee hereby represents and warrants to the Company as follows:

(a)     Capacity and Power. The Optionee has full capacity, power and authority to execute and deliver this Agreement, to perform his or her obligations under this Agreement and to consummate the transactions contemplated hereby. This Agreement has been duly executed and delivered by the Optionee and constitutes a valid and binding agreement, enforceable against him or her in accordance with its terms, subject to applicable bankruptcy, insolvency and other similar laws affecting the enforceability of creditors' rights generally, general equitable principles and the discretion of courts in granting equitable remedies.

(b)     No Conflict. The execution, delivery and performance by the Optionee of this Agreement and the transactions contemplated hereby and the fulfillment by him or her of and compliance by him or her with the terms and conditions of this Agreement do not and will not, violate or conflict with any terms or provisions of (i) any contract, deed, lease or other agreement to which he or she is a party or by which any of his or her assets are subject, or (ii) any judgment, decree, order, statute, rule or regulation applicable to him or to any of his or her assets, except for such violations which could not reasonably be expected to materially impair or delay his or her ability to consummate the transactions contemplated hereby. No consent, approval, order or authorization of, or registration, declaration or filing with, any governmental agency or public or regulatory unit, agency, body or authority with respect to him or her is required in connection with his or her execution, delivery or performance of this Agreement or the consummation of the transactions contemplated hereby other than any of the foregoing, the failure of which to receive or make, as the case may be, could not reasonably be

4325/73117-003 Current/8603638v5

expected to materially impair his or her ability to consummate the transactions contemplated hereby.

10.    Miscellaneous.

(a)    Administration.  Any action taken or decision made by the Company, the Board or the Committee arising out of or in connection with the construction, administration, interpretation or effect of this Agreement shall lie within its reasonable discretion, as the case may be, and, subject to Section 6, shall be final, conclusive and binding on the Optionee and all Persons claiming under or through the Optionee.  By accepting this grant, the Optionee and each Person claiming under or through the Optionee shall be conclusively deemed to have indicated acceptance and ratification of, and consent to, any action taken by the Company, the Board or the Committee or any of their respective delegatees with respect to this Agreement.

(b)    Rights of the Optionee.  Except as otherwise provided herein, unless and until a certificate or certificates representing Option Shares shall have been issued to the Optionee, the Optionee shall not be a stockholder or have any of the rights or privileges of a stockholder of the Company with respect to shares of Common Stock acquired upon exercise of the Option.

(c)    Indemnification.  In addition to such other rights of indemnification as they may have as members of the Board or the Committee, each of the members of the Board or the Committee shall be indemnified by the Company from and against all costs and expenses reasonably incurred by him or her in connection with any action, suit or proceeding to which he or she may be party by reason of any action taken or failure to act under or in connection with this Agreement or the Option granted hereunder, and against all amounts paid by him or her in settlement thereof (provided such settlement is approved by independent legal counsel selected by the Company) or paid by him or her in satisfaction of a judgment in any such action, suit or proceeding; provided, however, that (i) any such Board or Committee member shall be entitled to the indemnification rights set forth in this Section 10(c) only if such member has acted in good faith and in a manner that such member reasonably believed to be in or not opposed to the best interests of the Company and, with respect to any criminal action or proceeding, had no reasonable cause to believe that such conduct was unlawful, and (ii) upon the institution of any action, suit or proceeding such Board or Committee member shall give the Company written notice thereof and an opportunity, at its own expense, to handle and defend the same before such Board or Committee member undertakes to handle and defend it on his or her own behalf.

(d)    Severability.  Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or any other jurisdiction, but this Agreement shall be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein.

(e)    Entire Agreement, etc.  This Agreement, the Plan and the Separation Agreement embody the complete agreement and understanding among the parties hereto with

respect to the subject matter hereof and preempt any prior understandings, agreements or representations by or among the parties, written or oral, which may have related to the subject matter hereof in any way. This Agreement is subject to all the terms, conditions and provisions of the Plan, including, without limitation, the amendment provisions thereof, and to such rules, regulations and interpretations relating to the Plan as may be adopted by the Committee and as may be in effect from time to time. The Plan is incorporated herein by reference. If and to the extent that this Agreement conflicts or is inconsistent with the terms, conditions and provisions of the Plan, the Plan shall control, and this Agreement shall be deemed to be modified accordingly.

(f)    Successors and Assigns.    Except as otherwise provided herein, this Agreement shall bind and inure to the benefit of, and be enforceable by, the parties hereto and their respective successors, legal representatives and assigns.

(g)    Counterparts.    This Agreement may be executed (including by facsimile transmission) with counterpart signature pages or in separate counterparts each of which shall be an original and all of which taken together shall constitute one and the same agreement.

(h)    Remedies.    The parties hereto shall be entitled to enforce their rights under this Agreement specifically to recover damages by reason of any breach of any provision of this Agreement and to exercise all other rights existing in their favor. The parties hereto agree and acknowledge that (i) money damages may not be an adequate remedy for any breach of the provisions of this Agreement, and (ii) each of the Company and the Optionee may in its or his or her sole discretion apply to any court of law or equity of competent jurisdiction for specific performance and/or injunctive relief (without posting a bond or other security) in order to enforce or prevent any violation of the provisions of this Agreement.

(i)    Notices.    All notices, demands or other communications (each a "Notice") to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be (i) delivered personally, (ii) mailed by certified or registered mail, return receipt requested and postage prepaid, (iii) sent via a nationally recognized overnight courier, or (iv) sent via facsimile to the recipient (provided that in the case of this clause (iv) such Notice also is given contemporaneously by one of the other methods specified above).  Such Notices will be sent to the address indicated below:

If to the Optionee:

The address for the Optionee listed on the signature page hereto.

If to the Company, to:

Town Sports International Holdings, Inc.
888 Seventh Avenue (25th Floor)
New York, New York 10106
Attention: Richard Pyle
Facsimile No.: (212) 246-8422

4325/73117-003 Current/8603638v5

4325/73117-003 Current/8603638v5

with a copy to:

Town Sports International Holdings, Inc.
888 Seventh Avenue (25th Floor)
New York, New York 10106
Attention: Robert Herbst, General Counsel
Facsimile No.: (212) 246-8422

; or such other address or to the attention of such other Person as a party shall have specified by prior Notice to the other party.  Each Notice will be deemed given and effective upon actual receipt (or refusal of receipt).

(j)    Waiver of Jury Trial.    EACH OF THE PARTIES HERETO WAIVES ANY RIGHT IT MAY HAVE TO TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED ON, ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY COURSE OF CONDUCT, COURSE OF DEALING, VERBAL OR WRITTEN STATEMENT OR ACTION OF ANY PARTY HERETO.

(k)    Governing Law.    All questions concerning the construction, validity and interpretation of this Agreement and the exhibits hereto will be governed by and construed in accordance with the domestic laws of the State of New York, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York.

(l)    Time if of the Essence; Computation of Time.    Time is of the essence for each and every provision of this Agreement.  Whenever the last day for the exercise of any privilege or the discharge of any duty hereunder shall fall upon a Saturday, Sunday or any date on which banks in New York, New York are authorized to be closed, the party having such privilege or duty may exercise such privilege or discharge such duty on the next succeeding day that is a regular business day.

(m)    Descriptive Headings.    The descriptive headings of this Agreement are inserted for convenience only and do not constitute a part of this Agreement.

*        *        *        *        *

[Signature Page Follows]

IN WITNESS WHEREOF, the Company and the Optionee have executed this Common Stock Option Agreement as of the date first above written.

The Company:

TOWN SPORTS INTERNATIONAL
HOLDINGS, INC.

By:

Name: R. G. Deal

Title: CFO

The Optionee:

_____
Frank Napolitano

Address:   1237 Hoffman Road
Ambler, Pennsylvania 19002

Facsimile No.

# EXHIBIT G

http://www.hoovers.com/free/co/secdoc.xhtml?ID=58026&cpage=2882706-1562095-1596008   4/5/2007

Home

Return to Town Sports International Holdings, Inc.

# TOWN SPORTS INTERNATIONAL HOLDINGS INC
### S-4 filed on 04/05/2004

Printer Friendly Format

**Outline**

<< Previous Page    |    View Header    |    Entire Filing    |    Next Page >>

**EXHIBIT 10.7**

**FINAL**

**TOWN SPORTS INTERNATIONAL HOLDINGS, INC.**

**2004 COMMON STOCK OPTION PLAN**

**ARTICLE I**

**Purpose of Plan**

The 2004 Common Stock Option Plan (the "Plan") of TOWN SPORTS INTERNATIONAL HOLDINGS, INC., a Delaware corporation (the "Company"), adopted by the board of directors of the Company on February 4, 2004, for executive and other key employees of the Company and its Subsidiaries, is intended to advance the best interests of the Company by providing those persons who have a substantial responsibility for its management and growth with additional incentives by allowing them to acquire an ownership interest in the Company and thereby encouraging them to contribute to the success of the Company and to remain in its employ. The availability and offering of stock options under the Plan also increases the Company's ability to attract and retain individuals of exceptional managerial talent upon whom, in large measure, the sustained progress, growth and profitability of the Company depends. The Plan is a compensatory benefit plan within the meaning of Rule 701 of the Securities Act (as defined below) and, unless and until the Common Stock is publicly traded, the issuance of the options and the Common Stock pursuant to the Plan is intended to qualify for the exemption from registration under the Securities Act provided by such Rule 701.

**ARTICLE II**

**Definitions**

For purposes of the Plan, except where the context clearly indicates otherwise, the following

terms shall have the meanings set forth below:

"Board" shall mean the board of directors of the Company.

"Business Day-" means any day other than a Saturday or Sunday or a day on which commercial banks are required or authorized to close in New York, New York.

"Cause" means any of the following with respect to the Participant: (i) a material breach of the Participant's covenants under this Agreement or any other agreement with the Company or its Subsidiaries (including, without limitation, the Option Agreement, the Stockholders Agreement and the Registration Rights Agreement) not cured within 15 days after delivery of written notice of such breach by the Company; (ii) the commission by the Participant of a felony, a crime involving moral turpitude or other act causing material harm to the standing and reputation of the Company or any of its Subsidiaries; (iii) the Participant's repeated and deliberate failure to comply with the lawful and reasonable written directives of the Board; or (iv) theft or embezzlement of a material amount of money or property of the Company or any of its Subsidiaries, perpetration of fraud, or participation in a fraud, on the Company or any of its Subsidiaries.

"Certificate of Incorporation" means the Company's Certificate of Incorporation as in effect as of the date of adoption hereof, as the same may be amended, restated or modified from time to time.

"Code" means the Internal Revenue Code of 1986, as amended, and any successor statute.

"Committee" shall mean the compensation committee of the Board which may be designated by the Board to administer the Plan or, if for any reason the Board has not designated such a committee, the Board. The Committee, if other than the Board, shall be composed of two or more directors as appointed from time to time by the Board.

"Common Stock" means the Company's Class A Common Stock, par value $0.001 per share (the "Class A Common"), and the Company's Class B Common Stock, par value $0.001 per share (the "Class B Common"), or if such outstanding Common Stock is hereafter changed into or exchanged for different securities of the Company, such other securities.

"Disability" means the inability, due to illness, accident, injury, physical or mental incapacity or other disability, of the Participant to carry out his duties and obligations to the Company or to participate actively in the management of the Company or a Subsidiary of the Company for a period of at least 90 consecutive days or for shorter periods aggregating at least 120 days (whether or not consecutive)during any twelve-month period, as determined by the Board in good faith.

"Executive Stock Agreement" has the meaning set forth in Section 6.2 hereof.

"Fair Market Value" means, as of any date of determination,

(i) for each share of Common Stock, the average of the closing per share prices of the sales of the Common Stock on all securities exchanges on which the Common Stock may at the time be listed, or, if there have been no sales on any such exchange on any day, the average of the highest bid and lowest asked prices on all such exchanges at the end of such day, or, if on any day the Common Stock is not so listed, the average of the representative bid and asked per share prices quoted in the NASDAQ National Market System as of 4:00 P.M., New York time, or, if on any day the Common Stock is not quoted in the NASDAQ National Market System, the average of the highest bid and lowest asked per share prices on such day in the domestic over-the-counter market as reported by the NASDAQ National Quotation Bureau, Incorporated, or any similar successor organization, in each such case averaged over a period of 21 trading days consisting of the day as of which the Fair Market Value is being determined and the 20 consecutive trading days prior to such day. If at any time the Common Stock is not so listed on any securities exchange or quoted in the NASDAQ National Market System or the domestic over-the-counter market, the Fair Market Value will be the fair value of the Common Stock as determined in good faith by the Board and set forth in a written notice to the Participant; provided, that if the Participant objects to such determination in writing within 10 days of receipt of such determination from the Board, the Fair Market Value shall be determined by an independent investment banking firm mutually selected by the Board and the Participant; and the costs of such investment banking firm shall be borne by

2

the party whose determination is farthest from the determination of such investment banking firm.

"Option Agreement" has the meaning set forth in Section 6.2 hereof.

"Option Shares" means, collectively, (i) all shares of Class A Common issued or issuable upon the exercise of an Option, and (ii) any shares of the Company's capital stock issued with respect to the shares of Common Stock set forth in clause (i) by way of merger, consolidation, reclassification, stock split, reverse stock split, stock dividend or other recapitalization. Option Shares shall continue to be Option Shares in the hands of any holder other than the Participant to whom the related Options were granted (including, without limitation, any Permitted Transferee of such Participant), except for the Company, any Person specified in the related Option Agreement or any transferee in an underwritten public offering registered under the Securities Act. Except as otherwise provided herein, each other holder of Option Shares will succeed to the rights and obligations attributable to the Participant as a holder of Option Shares hereunder.

"Options" shall have the meaning set forth in Article IV hereof.

"Participant" shall mean any executive or other key employee of the Company who has been selected to participate in the Plan by the Committee or the Board.

"Permitted Transferee" means, as to any Person, the "Permitted Transferees" (as defined in the Stockholders Agreement) of such Person.

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization and a governmental entity or any department, agency or political subdivision thereof.

"Registration Rights Agreement" means the Registration Rights Agreement, dated as of February 4, 2004 by and among the Company and certain stockholders of the Company, from time to time party thereto, as the same may be amended, restated or modified from time to time.

"Securities Act" means the Securities Act of 1933, as amended.

"Stockholders Agreement" means the Stockholders Agreement dated as of February 4, 2004 by and among the Company and certain stockholders of the Company from time to time party thereto, as the same may be amended, restated or modified from time to time.

"Subsidiary" means, with respect to any Person, any corporation, partnership, limited liability company association or other business entity of which (i) if a corporation or a limited liability company, a majority of the total voting power of securities entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (ii) if a partnership, association or other business entity, a majority of the partnership or other similar ownership

3

interest thereof is at the time owned or controlled, directly or indirectly, by any Person or one or more Subsidiaries of that Person or a combination thereof. For purposes hereof, a Person or Persons shall be deemed to have a majority ownership interest in a partnership, association or other business entity if such Person or Persons shall be allocated a majority of partnership, association or other business entity gains or losses or shall be or control the managing director or general partner of such partnership, association or other business entity.

### ARTICLE III
### Administration

The Plan shall be administered by the Committee; provided, that if for any reason the Committee shall not have been appointed by the Board, all authority and duties of the Committee under the Plan shall be vested in and exercised by the Board. Subject to the limitations of the Plan, the Committee shall have the sole and complete authority to: (i) select Participants, (ii) grant Options to Participants in such forms and amounts as it shall determine,

(iii) impose such limitations, restrictions and conditions upon such Options as it shall deem appropriate, (iv) interpret the Plan and adopt, amend and rescind administrative guidelines and other rules and regulations relating to the Plan,

(v) correct any defect or omission or reconcile any inconsistency in the Plan or in any Option granted hereunder, and (vi) make all other determinations and take all other actions necessary or advisable for the implementation and administration of the Plan. The Committee's determinations on matters within its authority shall be conclusive and binding upon the Participants, the Company and all other Persons. All expenses associated with the administration of the Plan shall be borne by the Company. The Committee may, as approved by the Board and to the extent permissible by law, delegate any of its authority hereunder to such persons as it deems appropriate.

### ARTICLE IV
### Limitation on Aggregate Shares

The number of shares of Common Stock with respect to which options may be granted under the Plan (the "Options") and which may be issued upon the exercise thereof shall not exceed, in the aggregate 162,759 shares; provided, that (i) the type and the aggregate number of shares which may be subject to Options shall be subject to adjustment in accordance with the provisions of Section 6.9 below, and (ii) to the extent any Options expire unexercised or are canceled, terminated or forfeited in any manner without the issuance of Common Stock thereunder, or if any Options are exercised and the shares of Common Stock issued thereunder are repurchased by the Company, such shares shall again be available under the Plan. The 162,759 shares of Common Stock available under the Plan may be either authorized and unissued shares, treasury shares or a combination thereof, as the Committee shall determine.

### ARTICLE V
### Awards

Section 5.1 Options. The Committee may grant Options to Participants in accordance with this Article V.

4

Section 5.2 Form of Option. Options granted under this Plan may be "nonqualified" stock options or "incentive stock options" within the meaning of Section 422 of the Code or any successor provision as specified by the Committee; provided, than no incentive stock option may be granted to any Person who owns more than 10% of the combined voting power of all classes of capital stock of the Company (a "Ten Percent Holder") except subject to the limitations set forth in Sections 5.3, 5.4, and 5.7 below and such other statutory requirements as the Committee determines may be applicable.

Section 5.3 Exercise Price. The Option exercise price per share of Common Stock (the "Exercise Price") shall be fixed by the Committee.

Section 5.4 Exercisability; Vesting. Options shall be exercisable (i) at such time or times as the Committee shall determine at or subsequent to grant, and (ii) only to the extent such Options shall have vested; provided, that any Option intended to be an incentive stock option shall be treated as such only to the extent that the aggregate Fair Market Value of the Common Stock (determined as of the date of the Option grant) with respect to which incentive stock options (but not non-qualified options) are exercisable for the first time by any Participant during any calendar year (under all stock option plans of the Company and its Subsidiaries) does not exceed $100,000. Unless otherwise specified in the Option Agreement or as determined by the Committee, Options will vest on the ninth anniversary of the date of such grant. Any Options which shall have so vested are referred to as "Vested Options", and any Options which have not vested are referred to as the "Unvested Options". In addition, Options shall vest on an accelerated or decelerated basis as the Committee shall determine as specified in any Option Agreement.

Section 5.5 Exercise Procedure. Options shall be exercised in whole or in part by written notice to the Company (to the attention of the Company's Secretary) accompanied by a statement of the Participant that the Participant has read and has been afforded an opportunity to ask questions of management of the Company regarding all financial and other information provided to the participant regarding the Company together with payment in full of an amount (the "Option Price")equal to the product of (i) the applicable Exercise Price for the applicable Options multiplied by (ii) the number of Option Shares to be acquired. Payment of the Exercise Price may be made (i) in cash (including certified check, bank draft or money order or the equivalent thereof acceptable to the Company), (ii) if approved by the Committee prior to exercise (in the case of an incentive stock option, if approved by the Committee in the grant), by delivery of a full recourse promissory note of the Participant bearing interest at a rate not less than the applicable federal rate determined pursuant to Section 1274 of the Code as of the date of purchase or exercise, (iii) by the delivery of shares of Common Stock valued at their Fair Market Value as of the date of exercise as provided in Section 5.6 below, or (iv) in a combination of the foregoing. Unless otherwise specified in the Option grant or as determined by the Committee, no Option may be exercised for a fraction of a share of Common Stock.

Section 5.6 Exchange of Previously Acquired Stock. The Committee, in its discretion and subject to such conditions as the Committee may determine, may permit the Exercise Price for the shares being acquired to be paid, in full or in part, by the delivery to the Company of a number of shares of Common Stock having an aggregate Fair Market Value as of the date of exercise equal to the Exercise Price for the shares being acquired. In the case of incentive stock

5

options, the Committee shall specify in the Option grant whether the option holder may satisfy the Exercise Price with respect to shares of Common Stock purchased upon exercise of such Option by delivering to the Company shares of previously acquired Common Stock.

Section 5.7 Terms of Options. The Committee shall determine the term of each Option, which term shall in no event exceed ten (10) years from the date of grant. Notwithstanding the foregoing, any Option granted to any Ten Percent Holder shall expire no later than five (5) years from the date on which such Option was granted. In addition, each Option shall be subject to early termination in accordance with Section 6.6 below.

## ARTICLE VI
## General Provisions

Section 6.1 Conditions and Limitations on Exercise. Options may be made exercisable in one or more installments, upon the happening of certain events, upon the passage of a specified period of time, upon the fulfillment of certain conditions or upon the achievement by the Company of certain performance goals, and subject to such other terms and conditions as the Committee shall decide in each case when the Options are granted.

Section 6.2 Written Agreement. Each Option granted hereunder to a Participant shall be embodied in a written agreement (an "Option Agreement") which shall be signed by the Participant and by the Chairman, the President or the Chief Financial Officer of the Company for and in the name and on behalf of the Company and shall be subject to the terms and conditions of the Plan prescribed in the Option Agreement. In addition, each Participant shall also be required, to the extent not already a party thereto, to execute a joinder to the Stockholders Agreement and the Registration Rights Agreement, and an executive stock agreement (an "Executive Stock Agreement"), which shall collectively provide, among other things, (i) the right of the Company and such other Persons as the Committee shall designate ("Designees") to repurchase from each Participant, and such Participant's transferees, all shares of Common Stock issued or issuable to such Participant on the exercise of an Option in the event of such Participant's termination of employment, (ii) rights of first refusal granted to the Company and Designees, (iii) holdback and other registration right restrictions in the event of a public registration of any equity securities of the Company and (iv) any other terms and conditions which the Committee shall deem necessary and desirable.

Section 6.3 Listing, Registration and Compliance with Laws and Regulations. Options shall be subject to the requirement that if at any time the Committee shall determine, in its discretion, that the listing, registration or qualification of the shares subject to the Options upon any securities exchange or under any state or federal securities or other law or regulation, or the consent or approval of any governmental regulatory body, is reasonably required as a condition to or in connection with the granting of the Options or the issuance or purchase of shares thereunder, no Options may be granted or exercised, in whole or in part, unless such listing, registration, qualification, consent or approval shall have been effected or obtained free of any conditions not acceptable to the Committee. The holders of such Options shall supply the Company with such certificates, representations and information as the Committee shall request and shall otherwise cooperate with the Company in obtaining such listing, registration,

6

qualification, consent or approval. In the case of officers and other Persons subject to Section 16 (b) of the Securities Exchange Act of 1934, as amended, the Committee may at any time impose any limitations upon the exercise of an Option that, in the Committee's discretion, are necessary or desirable in order to comply with such Section 16(b) and the rules and regulations thereunder. To the extent specified in any Option Agreement, if the Company, as part of an offering of securities or otherwise, finds it desirable because of federal or state regulatory requirements to reduce the period during which any Options may be exercised, the Committee, may, in its discretion and without the Participant's consent, so reduce such period on not less than fifteen (15) days written notice to the holders thereof.

Section 6.4 Nontransferability. Options may not be transferred other than by will or the laws of descent and distribution and, during the lifetime of the Participant to whom they were granted, may be exercised only by such Participant (or his legal guardian or legal representative). In the event of the death of a Participant, exercise of Options granted hereunder shall be made only: (i) by the executor or administrator of the estate of the deceased Participant or the Person or Persons to whom the deceased Participant's rights under the Option shall pass by will or the laws of descent and distribution (provided that each beneficiary shall execute and deliver such instruments, documents, agreements or undertakings as the Company shall request); and (ii) to the extent that the deceased Participant was entitled thereto at the date of such Participant's death, unless otherwise provided by the Committee in such Participant's Option Agreement.

Section 6.5 Expiration of Options.

(a) Normal Expiration. In no event shall any part of any Option be exercisable after the date of expiration thereof (the "Expiration Date"), as determined by the Committee pursuant to Section 5.7 above.

(b) Early Expiration Upon Termination of Employment. Except as otherwise provided by the Committee in the applicable Option Agreement pursuant to which Options are granted to any Participant, any portion of a Participant's Option that was not vested and exercisable on the date of the termination of such Participant's employment shall expire and be forfeited as of such date, and any portion of a Participant's Option that was vested and exercisable on the date of the termination of such Participant's employment shall expire and be forfeited 90 days after such date.

Section 6.6 Withholding Tax Requirements. It shall be a condition of the exercise of any Option that the Participant exercising the Option make appropriate payment or other provision acceptable to the Company with respect to any withholding tax requirement arising from such exercise. The amount of withholding tax required, if any, with respect to any Option exercise (the "Withholding Amount") shall be reasonably determined by the Treasurer or other appropriate officer of the Company, and the Participant shall furnish such information as such officer requires to make such determination. If the Company determines that withholding tax is required with respect to any Option exercise, the Company shall notify the Participant of the Withholding Amount, and the Participant shall pay to the Company an amount not less than the Withholding Amount. In lieu of making such payment, the Participant may elect to pay the Withholding Amount by either (i) delivering to the Company a number of Option Shares having an aggregate Fair Market Value as of the "measurement date" (as hereinafter defined) not less

7

than the Withholding Amount or (ii) directing the Company to withhold (and not to deliver or issue to the Participant) a number of Option Shares otherwise issuable upon the exercise of the Option having an aggregate Fair Market Value as of the measurement date not less than the Withholding Amount. In addition, if the Committee approves, a Participant may elect pursuant to the prior sentence to deliver or direct the withholding of Option Shares having an aggregate Fair Market Value in excess of the minimum Withholding Amount but not in excess of the Participant's applicable highest marginal combined federal income and state income tax rate, as estimated in good faith by such Participant. Any fractional share interests resulting from the delivery or withholding of Option Shares to meet withholding tax requirements shall be settled in cash. All amounts paid to or withheld by the Company and the value of all Option Shares delivered to or withheld by the Company pursuant to this Section 6.6 shall be deposited in accordance with applicable law by the Company as withholding tax for the Participant's account. If the Treasurer or other appropriate officer of the Company determines that no withholding tax is required with respect to the exercise of any Option (because such Option is an incentive stock option or otherwise), but subsequently it is determined that the exercise resulted in taxable income as to which withholding is required (as a result of a disposition of shares or otherwise), the Participant shall promptly, upon being notified of the withholding requirement, pay to the Company by means acceptable to the Company the amount required to be withheld; and at its election the Company may condition any transfer of shares issued upon exercise of an incentive stock option upon receipt of such payment. The term "measurement date" as used in this

Section 6.6 shall mean the date on which any taxable income resulting from the exercise of an Option is determined under applicable federal income tax law.

Section 6.7 Notification of Inquiries and Agreements. Each Participant and each permitted transferee shall notify the Company in writing within ten (10) days after the date such Participant or permitted transferee (i) first obtains knowledge of any Internal Revenue Service inquiry, audit, assertion, determination, investigation, or question relating in any manner to the value of Options granted hereunder; (ii) includes or agrees (including, without limitation, in any settlement, closing or other similar agreement)to include in gross income with respect to any Option granted under this Plan (A) any amount in excess of the amount reported on Form 1099 or Form W-2 to such Participant by the Company, or (B) if no such Form was received, any amount; and (iii) exercises, sells, disposes of, or otherwise transfers an Option acquired pursuant to this Plan. Upon request, a Participant or permitted transferee shall provide to the Company any information or document relating to any event described in the preceding sentence which the Company (in its sole discretion)requires in order to calculate and substantiate any change in the Company's tax liability as a result of such event.

Section 6.8 Adjustments. Except as otherwise provided in any Option Agreement, in the event of a reorganization, recapitalization, stock dividend or stock split, or combination or other change in the shares of Common Stock, the Board or the Committee may or may not, in its discretion, make such adjustments in the number and type of shares authorized by the Plan, the number and type of shares covered by outstanding Options and the Exercise Prices specified therein as may be determined to be appropriate and equitable. The issuance by the Company of shares of stock of any class, or options or securities exercisable or convertible into shares of stock of any class, for cash or property, or for labor or services either upon direct sale, or upon the exercise of rights or warrants to subscribe therefor, or upon exercise or conversion of other

8

securities, shall not affect, and no adjustment by reason thereof shall be made with respect to, the number or price of shares of Common Stock then subject to any Options.

Section 6.9 Employment. Nothing contained in this Plan or in any Option Agreement shall interfere with or limit in any way the right of the Company to terminate any Participant's employment at any time (with or without Cause), nor confer upon any Participant any right to continue in the employ of the Company for any period of time or to continue his present (or any other) rate of compensation, and except as otherwise provided under this Plan or by the Committee in the Option Agreement, in the event of any Participant's termination of employment (including, but not limited to, the termination by the Company without Cause) any portion of such Participant's Option that was not previously vested and exercisable shall expire and be forfeited as of the date of such termination. No employee shall have a right to be selected as a Participant or, having been so selected, to be selected again as a Participant.

Section 6.10 No Rights as Stockholder. No Participant by reason of holding any Option shall have rights as a stockholder with respect to shares of Common Stock subject to Options prior to the date of exercise of such Options and payment in full of the Exercise Price.

Section 6.11 Amendment, Suspension and Termination of Plan. The Board or the Committee may suspend or terminate the Plan or any portion thereof at any time and may amend it from time to time in such respects as the Board or the Committee may deem advisable; provided that no such amendment shall be made without stockholder approval to the extent such approval is required by law, agreement or the rules of any exchange upon which the Common Stock is listed, and no such amendment, suspension or termination shall impair the rights of any Participant under outstanding Options without the consent of such Participant unless Participants holding a majority of the aggregate number of Options (based upon the number of Option Shares to be obtained upon exercise) granted by the Company pursuant to this Plan consent to such amendment in writing and such amendment affects all holders similarly. No Options shall be granted hereunder after the tenth anniversary of the adoption of the Plan.

Section 6.12 Amendment, Modification and Cancellation of Outstanding Options. The Committee may amend or modify any Option in any manner to the extent that the Committee would have had the authority under the Plan initially to grant such Option; provided, that no such amendment or modification shall impair the rights of any Participant under any Option without the consent of such Participant unless Participants holding a majority of the aggregate number of Options (based upon the number of Option Shares to be obtained upon exercise) granted by the Company pursuant to this Plan consent to such amendment in writing and such amendment affects all holders similarly. With the Participant's consent, the Committee may cancel any Option and issue a new Option to such Participant.

Section 6.13 Indemnification. In addition to such other rights of indemnification as they may have as members of the Board or the Committee, the members of the Board shall be indemnified by the Company against all costs and expenses reasonably incurred by them in connection with any action, suit or proceeding to which they or any or them may be party by reason of any action taken or failure to act under or in connection with the Plan or any Option granted thereunder, and against all amounts paid by them in settlement thereof (provided such settlement is approved by independent legal counsel selected by the Company) or paid by them

9

http://www.hoovers.com/free/co/secdoc.xhtml?ID=5802&cpage=2882706-15620951-15960... 4/5/2007

in satisfaction of a judgment in any such action, suit or proceeding; provided, that (i) any such Board member shall be entitled to the indemnification rights set forth in this Section 6.13 only if such member has acted in good faith and in a manner that such member reasonably believed to be in or not opposed to the best interests of the Company and, with respect to any criminal action or proceeding, had no reasonable cause to believe that such conduct was unlawful, and (ii) upon the institution of any such action, suit or proceeding a Board member shall give the Company written notice thereof and an opportunity, at its own expense, to handle and defend the same before such Board member undertakes to handle and defend it on his own behalf.

* * * * *

10

Powered by:

EXHIBIT H

# 2006 W-2 and EARNINGS SUMMARY



This blue Earnings Summary section is included with your W-2 to help describe portions in more detail.
The reverse side includes general information that you may also find helpful.

1. The following information reflects your final 2006 pay stub plus any adjustments submitted by your employer.

| | Gross Pay | Social Security Tax Withheld Box 4 of W-2 | PA State Income Tax Box 17 of W-2 | PA State Wages, CHLFNT B Local Wages, Tips, Etc. Box 18 of W-2 |
|---|---|---|---|---|
| Gross Pay | 188582.28 | 5840.40 | | 5777.28 |
| | | | Local Income Tax Box 19 of W-2 | |
| Fed. Income Tax Withheld Box 2 of W-2 | 45275.74 | Medicare Tax Withheld Box 6 of W-2 | 2728.67 | 1881.84 |
| | | | SUI/SDI Box 14 of W-2 | 169.72 |

2. Your Gross Pay was adjusted as follows to produce your W-2 Statement.

| | Wages, Tips, other Compensation Box 1 of W-2 | Social Security Wages Box 3 of W-2 | Medicare Wages Box 5 of W-2 | PA State Wages, Tips, Etc. Box 16 of W-2 | Local Wages, Tips, Etc. Box 18 of W-2 |
|---|---|---|---|---|---|
| Gross Pay | 188,582.28 | 188,582.28 | 188,582.28 | 188,582.28 | 188,582.28 |
| Less 401(k) (D-Box 12) | 7,516.21 | N/A | N/A | N/A | N/A |
| Less Other Cafe 125 | 398.28 | 398.28 | 398.28 | 398.28 | 398.28 |
| Wages Over Limit | N/A | 93,984.00 | N/A | N/A | N/A |
| Reported W-2 Wages | 180,667.79 | 94,200.00 | 188,184.00 | 188,184.00 | 188,184.00 |

3. Employee W-4 Profile. To change your Employee W-4 Profile information, file a new W-4 with your payroll dept.

FRANK J NAPOLITANO
1237 HOFFMAN ROAD
AMBLER PA 19002-5017

Social Security Number: 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
Taxable Marital Status: SINGLE
Exemptions/Allowances:
FEDERAL: 3
STATE: 3
LOCAL: 3

---

Safe, accurate, FAST! Use

IRS **e~file**

Visit the IRS Web Site
at www.irs.gov/efile.

**W-2** Wage and Tax Statement

Employee Reference Copy

**2006**

OMB No. 1545-0008

Copy C for employee's records.

| c Employer's name, address, and ZIP code | | | |
|---|---|---|---|
| Control number 000436 73/747 | Dept. 825105 | Corp. T | Employer use only 288 |

Employer's name, address, and ZIP code
TSI HIGHPOINT LLC
PHILADELPHIA SPORTS CLUB
888 7TH AVE 25TH FL
NEW YORK NY 10106-2599

Batch #02794

| e Employee's name, address, and ZIP code | | |
|---|---|---|
| FRANK J NAPOLITANO | | |
| 1237 HOFFMAN ROAD | | |
| AMBLER PA 19002-5017 | | |

| d Employer's FED ID number 22-3757356 | a Employee's SSA number 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 | |
|---|---|---|
| 1 Wages, tips, other comp. 180,667.79 | 2 Federal Income tax withheld 45275.74 | |
| 3 Social security wages 94200.00 | 4 Social security tax withheld 5840.40 | |
| 5 Medicare wages and tips 188184.00 | 6 Medicare tax withheld 2728.67 | |
| 7 Social security tips | 8 Allocated tips | |
| 9 Advance EIC payment | 10 Dependent care benefits | |
| 11 Nonqualified plans | 12a See instructions for box 12 D 7516.21 | |
| 13 Stat emp Ret. plan 3rd party sick pay X | 12b | |
| | 12c | |
| 14 Other 169.72 SUI | 12d | |
| 15 State Employer's state ID no. PA 9083 7639 | 16 State wages, tips, etc. 188184.00 | |
| 17 State income tax 5777.28 | 18 Local wages, tips, etc. 188184.00 | |
| 19 Local income tax 1881.84 | 20 Locality name CHLFNT B | |

© 2006 AUTOMATIC DATA PROCESSING, INC.

← Fold and Detach Here →