# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

FRANK J. NAPOLITANO, JR.  :     CIVIL ACTION
                         :
        Plaintiff,  :     NO. 07-CV-755
                         :
      vs.  :
                         :
TOWN SPORTS INTERNATIONAL  :
HOLDINGS INC. and TOWN SPORTS  :
INTERNATIONAL, INC.  :
                         :
        Defendants.  :
                         :

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
## MOTION TO DISMISS OR TO TRANSFER

Richard G. Tuttle
Archer & Greiner, P.C
Suite 1620
One South Broad Street
Philadelphia, PA  19107
(215) 963-3300
rtuttle@archerlaw.com

Counsel for Plaintiff
Frank J. Napolitano, Jr.

April 24, 2007

# TABLE OF CONTENTS

Relevant Facts ................................................................................................. 1

A.    Defendants' Motion to Dismiss the plaintiff's claim for breach of contract
      against TSI Holdings ignores the language of the agreement, and should be
      denied. ................................................................................................ 3

B.    Defendant TSI's Motion to Dismiss for failure to allege a breach of contract
      by TSI must be denied ........................................................................ 9

C.    Defendant TSI Holdings is subject to personal jurisdiction in Pennsylvania,
      both under the doctrine of specific jurisdiction and that of general
      jurisdiction ........................................................................................ 13

      1.   Specific jurisdiction ................................................................. 13

      2.   General jurisdiction ................................................................. 18

D.    Venue is proper in this district .............................................................. 22

E.    The defendants have not demonstrated a basis for transfer to the Southern
      District of New York under 28 U.S.C. § 1404 ....................................... 23

CONCLUSION .............................................................................................. 27

CERTIFICATE OF SERVICE ......................................................................... 28

# TABLE OF AUTHORITIES

## Cases

*Aamco Automatic Transmissions, Inc. v. Tayloe*, 368 F. Supp. 1283, 1300 (E.D. Pa. 1973) ................................................................................................................... 20

*Atlantic Richfield Co. v. Stearns-Roger, Inc.*, 379 F. Supp. 869, 872 (E.D. Pa. 1974) ...................................................................................................................... 26

*Brooks v. Bacardi Rum Corp.*, 943 F. Supp. 559, 561 (E.D. Pa. 1996) ................. 22

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985) ..................................... 15-17

*Conley v. Gibson*, 355 U.S. 41,  45-46 (1957) ..................................................... 12

*Cresswell v. Walt Disney Productions*, 677 F. Supp. 284, 288 (M.D. Pa. 1987) ................................................................................................................................ 23

*Directory Dividends, Inc. v. SBC Communications, Inc.*, 2003 WL 21961448 *6 (E.D. Pa.) ............................................................................................................. 21

*General Elec. Co. v. Deutz AG*, 270 F.3d 144, 150 (3d Cir. 2001) .................. 13, 14

*H. Lewis Packaging LLC v. Spectrum Plastics, Inc.*, 296 F. Supp. 2d 234, 240 (D. Conn. 2003) .......................................................................................................... 19

*Haeberle v. Texas Intern. Airlines*, 497 F. Supp. 1294, 1299 (E.D. Pa. 1980) ...... 18

*Hathi v. Frischer*, 645 F. Supp. 360, 362 (E.D. Pa. 1986) .................................... 26

*Jamara v. State Farm Ins. Co.*, 55 F.3d 873, 879 (3d Cir. 1995) .......................... 24

*Leasco Data Processing Equip. Corp. v. Maxwell*, 468 F.2d 1326, 1341 (2d Cir. 1972) ...................................................................................................................... 20

*National Licorice Co. v. N.L.R.B.*, 309 U.S. 350, 363 (1940) ................................ 12

*Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255 (1981) ............................................. 24

*Plum Tree, Inc. v. Stockment*, 488 F.2d 754, 756 (3d. Cir. 1973) ........................ 24

*Sampson-Miller Assoc. Companies, Inc. v. Washington Homes, Inc.*, 303 F. Supp. 739, 744 (W.D. Pa. 1969) ................................................................................. 20

*Shutte v. Armco Steel Corp.*, 431 F.2d 22, 25 (3d Cir. 1970) ........................... 23, 25

*Simeone ex rel. Estate Of Albert Francis Simeone, Jr. v. Bombardier-Rotax GMBH*, 360 F. Supp. 2d 665, 675 (E.D. Pa. 2005) ................................................ 20

*Turrett Steel Corp. v. Manuel Int'l, Inc.*, 612 F. Supp. 387, 390 (W.D. Pa. 1985) ................................................................................................................. 26

*Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*, 751 F.2d 117, 120 (2d Cir.1984) ........................................................................................................ 22

## Statutes, Rules and Regulations

28 U.S.C. § 1391 ......................................................................................... 22, 23

28 U.S.C. § 1404 ......................................................................................... 23, 26

28 U.S.C. § 1406 ............................................................................................... 26

Fed. R. Civ. P. 12(b)(2) ................................................................................ 1, 27

Fed. R. Civ. P. 12(b)(3) ................................................................................ 1, 27

Fed. R. Civ. P. 12(b)(6) ............................................................................ 1, 12, 27

Fed. R. Civ. P. 19 ............................................................................................. 12

Plaintiff Frank J. Napolitano, Jr., through his undersigned counsel, submits this Memorandum of Law in opposition to defendants' motions to dismiss the plaintiff's claims under Fed. R. Civ. P. 12(b)(2), (3) and (6), or, in the alternative to transfer this action to the Southern District of New York.

## Relevant Facts

The defendants' motion is premised on a fundamental factual error concerning plaintiff's employment. The defendants swear, by affidavit, that the plaintiff was employed in New York by defendant Town Sports International, Inc. In fact, the plaintiff was employed in Pennsylvania by TSI Highpoint, LLC, and has the W-2's to prove it.

The issue of who employed the plaintiff is not subject to serious dispute, and the plaintiff presumes that the defendants will either correct their affidavit or notify the plaintiff and the Internal Revenue Service that the plaintiff's W-2's were wrong for six years. Failing that, the plaintiff will presume, for present purposes, that there is no dispute that the plaintiff was employed by TSI Highpoint, LLC. ("Highpoint"), a Delaware limited liability company, which, as defendants concede, owns and operates a large health and sports club in Chalfont, Pennsylvania. See Memorandum of Law in Support of Defendants' Motion to Dismiss ("Defendants' Memorandum"), at 4.

1

Other key facts asserted by the defendants, however, seem very much in dispute, and the witnesses who can resolve those disputes are in Pennsylvania. The defendants aver that "plaintiff spent between 20-50% of his time working out of the office space at the Highpoint Club . . ." The plaintiff will testify, and will ask other employees of Highpoint to testify, that the correct figure over six years was closer to 70% Highpoint and 30% elsewhere, including New York. See Exhibit A hereto, Affidavit of Frank J. Napolitano, Jr. ("Napolitano Affid.") ¶ 3.

Before joining Highpoint, the plaintiff was a principal owner and manager of Highpoint Athletic Club (HAC). Napolitano Affid. ¶ 4. The plaintiff and his business partner sold HAC to Highpoint in 1999, and plaintiff's employment with Highpoint began after that transaction in early 2000. *Id.* The reason that the parties agreed that the plaintiff would work at Highpoint, in Pennsylvania, was that a major focus of his duties was to design and create programs for family and children, for which the Highpoint club (uniquely among the defendants' many properties) was ideally suited. Id. ¶ 6. Highpoint was used as a laboratory for those programs. *Id.* It is entirely inaccurate for the defendants to suggest that "Plaintiff's decision to work in Pennsylvania was his own" (Defendants' Memorandum at 16), as if the defendants had no input into that decision.

The defendants' arguments concerning the jurisdictional contacts of

defendant Town Sports International Holdings, Inc. (hereafter, "TSI Holdings")

fail to address TSI Holdings' purposeful contractual relations in the

Commonwealth (including contracts with the plaintiff at issue in this case), or TSI

Holdings' presence here in the form of frequent visits by its executive officers to

consult with the plaintiff. To avoid repetition, the plaintiff will address those (and

other) facts in context, in connection with the arguments to which they relate.

The defendants have not argued or suggested that defendant Town Sports

International, Inc. (hereafter, "TSI") is not subject to personal jurisdiction in

Pennsylvania. Significantly, TSI is a predecessor corporation of defendant TSI

Holdings, and its relevant Pennsylvania contacts are imputed to its successor, a

point that the plaintiff will likewise amplify below.

The plaintiff begins, however, by addressing the defendants' two motions to

dismiss on the merits.

**A.    Defendants' Motion to Dismiss the plaintiff's claim for breach of contract against TSI Holdings ignores the language of the agreement, and should be denied.**

The plaintiff's complaint seeks specific performance of two "Common Stock

Option Agreements" (Exhibits A and C to the complaint, and hereafter the "Stock

Option Agreements") by which plaintiff was granted rights to purchase shares of

defendant TSI Holdings. The plaintiff also seeks damages for breaches of those

3

agreements. The two agreements are essentially identical, except as to numbers of shares covered and the price at which the options may be exercised.

Mixing principles of substantive contract law and pleading requirements, the defendants argue that the plaintiff's complaint does not properly allege plaintiff's compliance with the Stock Option Agreements (which, according to defendants, is a precondition to recovery), because plaintiff has not alleged that he tendered a certified check for shares of stock. Defendants' Memorandum at 8. That argument entirely misconstrues the contracts at issue, and the defendants' application of their terms in the real world.

Notably, the plaintiff's complaint includes the only relevant averments necessary in a federal notice pleading. At paragraph 45 of his complaint, the plaintiff alleges that "Plaintiff has fully and faithfully provided all of the consideration and performance required of him under the [Stock Option Agreements] as an employee of Highpoint and consultant to defendant TSI Holdings." Plaintiff also alleges, at paragraph 47 of his complaint, that "Plaintiff timely, fully and substantially performed the [Stock Option Agreements]."

The defendants reject the sufficiency of those averments and insist (in a talking demurrer inappropriately bolstered by affidavit), that the plaintiff should have tendered a certified check with his attempted exercise, and then explicitly

4

alleged in his complaint that he had done so. Defendants' Memorandum at 7-8. The problem with the defendants' argument is that it relies solely upon paragraph 2(c) of the Stock Option Agreements while neglecting to address Section 8 of those agreements. The defendants have essentially substituted lawyers' arguments about the meaning of one paragraph, while neglecting to address company management's (correct) interpretation of the agreement in practice, including, especially, the procedures set forth in Section 8.

When an executive of defendant TSI Holdings provides notice to the company that he or she is exercising stock options, essentially nothing can happen until the company performs a federal tax withholding calculation and provides the executive with an amount owed in federal, state or local tax withholding. Napolitano Affid. ¶ 7. The value of the option must be determined both at the time of issuance and at the time of exercise to determine the amount of income which the issuing company will (1) declare to the Internal Revenue Service as compensation to the option holder, and (2) use as the basis for federal tax withholding.[1]

---

[1]  Valuation of stock options is a highly sophisticated science. Many public companies use the Black Scholes Model, developed by Robert Merton, Felix Black and Niles Scholes. See generally www.danparlagreco.com/FIN476Week5.pdf. The equations used to perform a "Black Scholes" calculation are "complex" (id.), and involve many variables. Plaintiff has no specific information about how TSI Holdings calculated option values, but there is no reason to believe the process was simple.

The plaintiff is not, and does not claim to be, a professional in corporate finance, and neither he nor any other option holder was expected to perform the necessary calculations in connection with option valuation and federal tax withholding. TSI Holdings, however, routinely performed that calculation in valuing the outstanding options of its option holders. Napolitano Affid. ¶ 7.

Paragraph 8(a) of the Stock Option Agreements provides in relevant part as follows (emphasis added):

> *It shall be a condition to the exercise of any Option* that Executive make appropriate payment or other provision acceptable to the Company with respect to any withholding tax requirement arising under applicable statutes or regulations from such exercise. *The amount of withholding tax required* by statute or regulation, if any, with respect to any Option exercise (the "Withholding Amount") *shall be reasonably determined by the Treasurer or other appropriate officer of the Company*, and Executive shall furnish such information as such officer requests to make such determination.

Additionally, the Stock Option Agreements afford the option holder the unfettered choice to pay the withholding by accepting fewer shares, or tendering back shares, rather than by cash payment to the company (emphasis added):

> (b) Withholding Procedure. If the Company determines that withholding tax is required by statute or regulation with respect to any Option exercise, the Company shall notify the Executive of the Withholding Amount, and Executive shall pay to the Company an amount not less than the Withholding Amount. *In lieu of making such payment, the Executive may pay the Withholding Amount by either (i) delivering to the Company a number of Option Shares having an aggregate Fair Market Value as of the Measurement Date less than or*

6

*equal to the Withholding Amount, or (ii) directing to the Company to withhold and not deliver or issue to the Executive a number of Option Shares, otherwise issuable upon the exercise of the Option,* having an aggregate Fair Market Value as of the Measurement Date less than or equal to the Withholding Amount. Any shortfall between the Withholding Amount and the Fair Market Value of Option Shares delivered or withheld under the preceding sentence shall be paid by Executive in cash.

In plainer English, the agreements say that the option holder may pay the company a net amount for shares and withholding that is equal to, more than, or less than, the exercise price of vested options, depending entirely upon how he or she wishes to handle withholding. Payment for the shares, net of withholding, can be made all in cash (in essence, "grossing up" the exercise price by the amount of the tax); partly in cash and partly by causing the company not to issue shares subject to the exercised option; or partly in cash and partly in shares issued pursuant to the exercised option.

To make any of those elections, however (all of which are afforded and created, as a matter of right, in the contracts), the option holder must first know what the withholding amount will be, and the withholding amount must be calculated by the *company*, not the option holder.

The procedure contemplated by the contracts, therefore, is that the option holder will provide notice to the company that he or she wishes to exercise options; the company will calculate the withholding amount; and the option holder will then

7

determine (as is his or her right) what mix of shares and cash he or she will use to complete the purchase. *Only then* will the option holder and the company know the amount that should be included upon any certified check.

Here, the company short-circuited that procedure after the first step. It rejected the plaintiff's notice of exercise, and refused to calculate a withholding amount or to proceed any further with the issuance of shares. Thus, it is the company (not the plaintiff) that is refusing to perform the contracts it wrote, exactly as plaintiff alleges in his complaint.

The plaintiff's tender of a post-dated personal check (an action for which the defendants apparently fault him) was *more* than the contracts required at that stage of the process. The plaintiff was saying to TSI Holdings, in essence, "You can cash this check on September 5, 2006, and we'll apply the collected funds toward the final accounting for shares and withholding." Nothing about that performance violates the contracts (there is no prohibition of a payment on account toward the purchase of option shares), and the defendants' suggestion that it does merely reflects a misconstruction of their own agreements.

Count I of the plaintiff's complaint demands specific performance of the Stock Option Agreements. If and when the Court grants that application, the company will, presumably, finish calculating the proper withholding, and the

plaintiff will elect his preferred method for handling withholding and will proffer a

certified check for any amount required by the agreements. But that point has not

yet been reached.

In short, the plaintiff has not failed to take any step required by the Stock

Option Agreements, and the defendants' motion to dismiss TSI Holdings, based

upon the argument that plaintiff has failed to take a step that it is not yet required,

must be denied.

**B.      Defendant TSI's Motion to Dismiss for failure to allege a breach
of contract by TSI must be denied.**

The defendants concede that TSI is a party to the Stock Option Agreements

(Defendants' Memorandum at 5), and then, curiously, argue that TSI "has no rights

or obligations under them." *Id.* That is a peculiar argument coming from the

parties who drafted the contracts in question – it is difficult to imagine a reason

that the drafters of the contracts would have included TSI as a party other than to

create rights or obligations for TSI. Nevertheless, the reason that TSI is a party to

the contracts is apparent from the face of the contracts, and that reason favors the

plaintiff's claims.

The parties agree that the Stock Option Agreements replaced two earlier

agreements (executed in 2000 and 2003) under which the plaintiff was granted

options to purchase shares of TSI, then the parent company of the defendants'

corporate group. Those options were intended to incentivize the plaintiff to provide services to the group.

The Stock Option Agreements recite that the plaintiff "was previously granted options (the 'TSI Options') to purchase 6,600 shares of the Class A Common Stock" and also recite that TSI notified the plaintiff that his options "would be exchanged for options to purchase an equal number of shares of Class A Common Stock of [TSI Holdings]."

Those recitals are followed by perhaps the most important clause in any contract – the agreement clause – which provides (emphasis added):

> NOW, ***THEREFORE, in consideration of*** the mutual covenants contained herein and ***other good and valuable consideration*** . . . the ***parties*** to this Agreement hereby ***agree as follows***:

The defendants have, in essence, skipped over the most important sentence in their agreements. That sentence, quoted above, explains in clear terms why TSI was a party to the two contracts. In exchanging TSI options for options issued by TSI Holdings, the plaintiff was modifying valuable vested rights, converting them to rights which depended, to a great extent, upon the solvency of TSI Holdings, a newly-created entity. Had TSI Holdings been defectively incorporated, or had there arisen some other challenge to its ability to issue shares upon exercise of vested options, the shareholders of TSI should hardly have been obliged to shrug

10

their shoulders and declare, "C'est la vie." The presence of TSI in the Stock Option Agreements gave the option holder recourse against the entity (TSI) against which his option rights had first vested.

To their credit, the defendants did not ask their executives to give up rights against TSI in exchange for the new options (there is no such language in the Stock Option Agreements), and the agreements plainly reflect that decision. The agreements recite that the plaintiff gives up vested rights to purchase shares of TSI, and that "therefore" the "parties" – including TSI -- agree that he will be issued new shares in TSI Holdings upon exercise of those vested options. TSI may not have been able to issue those shares itself, but it plainly agreed – promised – that such issuance would happen. That promise is a perfectly reasonable exchange for the plaintiff's agreement to convert his vested options from rights to purchase shares in TSI to shares in TSI Holdings.

TSI's presence as a party to the Stock Option Agreements, therefore, is analogous to that of a guarantor. When TSI Holdings breached its covenant to issue shares (as alleged by plaintiff), TSI breached its concomitant promise and agreement that the shares would be issued. TSI is answerable in damages for that breach under Count II of the complaint. And, of course, TSI's susceptibility to suit for breach of contract is eminently reasonable, because TSI accepted four years of

labor from the plaintiff (rendered to TSI's subsidiary, Highpoint), partly in exchange for TSI options that later vested. It is hardly unreasonable to require TSI to respond in damages where it has been benefitted by the consideration which the plaintiff has rendered.

The defendants also argue that TSI is an "improper party" to this action (Defendants' Memorandum at 11). They cite no authority for that assertion, which is not surprising. The United States Supreme Court long ago declared the general rule that "where the rights involved in litigation arise upon a contract, courts refuse to adjudicate the rights of some of the parties to the contract if the others are not before it." *National Licorice Co. v. N.L.R.B.*, 309 U.S. 350, 363 (1940). The plaintiff would have invited a motion to dismiss from the defendants under Fed. R. Civ. P. 19 for failure to join an indispensable party had plaintiff *failed* to name TSI.

In sum, the plaintiff has properly named TSI as a defendant, for reasons amply supported by the contracts at issue and applicable law. Defendant TSI has not remotely satisfied the essential standards for a motion to dismiss under Rule 12(b)(6), namely, that a claim should not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). The

scope and effect of TSI's promises, as set forth in the Stock Option Agreements, remain to be determined on the merits.

**C.    Defendant TSI Holdings is subject to personal jurisdiction in Pennsylvania, both under the doctrine of specific jurisdiction and that of general jurisdiction.**

### 1. Specific jurisdiction.

Defendant TSI Holdings argues that it is not subject to personal jurisdiction in connection with a claim alleging a breach of contract to be performed in Pennsylvania. The defendant's motion, however, simply "wishes away" numerous inconvenient facts and obvious bases for personal jurisdiction, proffering instead conclusory averments that the activities of TSI Holdings in Pennsylvania are not sufficient for personal jurisdiction. In fact, those activities are more than sufficient for such jurisdiction to attach.

Initially, the plaintiff agrees that *General Elec. Co. v. Deutz AG*, 270 F.3d 144, 150 (3d Cir. 2001), concisely states the controlling principles for any inquiry into personal jurisdiction by operation of "specific jurisdiction." Indeed, plaintiff agrees with the applicability of the quotation from *General Electric* that was chosen by the defendants (Defendants' Memorandum at 12) to support their motion: "Specific jurisdiction is established when a non-resident defendant has purposefully directed his activities at a resident of the forum and injury arises from

13

or is related to those activities." *Id.* at 150.

Equally pertinent is the following additional comment from the Third Circuit in *General Electric*:

> Parties who 'reach out beyond [their] state and create continuing relationships and obligations with citizens of another state' are subject to the regulations of their activity in that undertaking. *Burger King*, 471 U.S. at 473 (quotations omitted).

*General Electric*, 270 F.3d at 150.

Here, TSI Holdings has "reach[ed] out beyond its state and create[d] continuing relationships and obligations with [a] citizen of another state," *i.e.*, long-term stock incentive agreements with the plaintiff. The plaintiff was employed by a remote subsidiary of TSI Holdings in Pennsylvania; he paid all of his state income tax to Pennsylvania for the period in question (2000 to 2006); and his efforts in Pennsylvania directly benefitted defendant TSI Holdings. The plaintiff was a Pennsylvania resident, and worked primarily in Pennsylvania, for the entire period from the execution of the Stock Option Agreements to the present. Napolitano Affid. ¶¶ 2, 3, 8.

TSI Holdings, of course, knew all of those facts, because it owned Highpoint (directly or remotely) and dealt with the plaintiff through its senior executives, including Mark Smith, Robert Giardina and Richard Pyle. Napolitano Affid. ¶ 8. The senior executives of Highpoint and TSI Holdings, respectively, were largely

14

the same people (per the "Search for a Business" search engine at the Pennsylvania Department of State, http://www.dos.state.pa.us). Additionally, the defendants' home office in New York issued W-2's to plaintiff which clearly showed plaintiff's Pennsylvania residence and the withholding of Pennsylvania state income tax. *Id.* ¶ 2; see also, Exhibit H to Affidavit of Frank J. Napolitano, Jr. in support of plaintiff's motion for summary judgment. The plaintiff's residence and place of work in Pennsylvania were well known to senior management of TSI Holdings when the Stock Option Agreements were executed in February, 2004. *Id.* ¶ 8.

As noted, senior executives of TSI Holdings were also the senior executives of Highpoint from 1999 onward, so their knowledge of the fact that Highpoint owned and operated a Pennsylvania facility, and the fact that it employed the plaintiff in doing so, were also facts necessarily known to TSI Holdings. Moreover, the Stock Option Agreements themselves were intended to benefit TSI Holdings as well as plaintiff. There can be no question, therefore, that TSI Holdings' contacts with Pennsylvania were advertent, not inadvertent, and that it purposefully directed its activities (incentivization of work in Pennsylvania through the making of stock option agreements) toward a forum resident.

As the Supreme Court emphasized in *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473 (1985) (citations and quotations omitted):

15

> We have noted several reasons why a forum legitimately may exercise
> personal jurisdiction over a nonresident who purposefully directs his
> activities toward forum residents. A State generally has a manifest
> interest in providing its residents with a convenient forum for
> redressing injuries inflicted by out-of-state actors.

Stated differently, the plaintiff's election to file suit in his own district, the

district in which the breach of contract has its effect, is not only not prohibited but

directly encouraged by Supreme Court precedent. Pennsylvania has a manifest

interest in providing the plaintiff with a convenient forum for redressing the

injuries inflicted by defendant TSI Holdings from New York.

Significantly, *Burger King* upheld jurisdiction in Florida where suit was

based upon special jurisdiction arising from a contract. In that case, it was the

plaintiff who was a multi-state business, and the defendant who was an individual.

The Supreme Court nevertheless had no trouble concluding that jurisdiction

existed over a Michigan individual who had never set foot in Florida in connection

with the transaction. *Burger King*, 471 U.S. at 479.

TSI Holdings alleges that it "maintains no offices in Pennsylvania"

(Defendants' Memorandum at 13), and that the agreements "were negotiated in

New York" (a fact that plaintiff disputes, see Napolitano Affid. ¶ 9), and "signed

by Holdings in New York," Defendants' Memorandum at 15. As it happens, those

are almost exactly the arguments that the Supreme Court rejected in *Burger King* :

16

> Jurisdiction in these circumstances may not be avoided merely because the defendant did not physically enter the forum State. Although territorial presence frequently will enhance a potential defendant's affiliation with a State and reinforce the reasonable foreseeability of suit there, it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted. So long as a commercial actor's efforts are "purposefully directed" toward residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there.

*Burger King*, 471 U.S. at 476.

In all events, TSI Holdings often conducted its business with plaintiff in Pennsylvania. Mark Smith, former CEO of TSI Holdings, visited the plaintiff in Pennsylvania before and after execution of the Stock Option Agreements in 2004, and those visits involved discussions of TSI Holdings' plans and strategies for future operations, including the operations of its subsidiaries in Pennsylvania. Napolitano Affid. ¶ 10. Thus, to the extent that an actual presence by TSI Holdings in connection with its business dealings with plaintiff were required, that requirement is plainly satisfied in this case.

Moreover, TSI Holdings may not unilaterally erase its predecessor's Pennsylvania contacts and declare them irrelevant. TSI Holdings is the lawful successor to TSI, a fact that the defendants essentially admit. Defendants Memorandum at 4. Where a predecessor corporation engages in forum-related

17

activities, and those activities later become important to the jurisdictional analysis,
the predecessor's forum-related conduct will be imputed to the successor.

*Haeberle v. Texas Intern. Airlines*, 497 F. Supp. 1294, 1299 (E.D. Pa. 1980).  Were
the rule otherwise, a business enterprise could avoid suit in other states through the
simple expedient of reorganizing itself periodically in different "quiet"
jurisdictions with no connection to its previous activities.

Here, TSI was subject to both general and specific jurisdiction in
Pennsylvania during the period from 2000 to 2004, and it was during that period
that plaintiff provided a large part of the performance that resulted in his owning
vested stock options in 2004.  Those options, in turn, were converted into options
to purchase shares in TSI Holdings.  TSI Holdings is bound by TSI's having
purposefully directed its activities toward plaintiff in Pennsylvania during 2000-
2004.

## 2.  General jurisdiction.

Because specific jurisdiction is clear and essentially indisputable on the
present record, the Court need not decide whether TSI Holdings is subject to
general jurisdiction in Pennsylvania.  Should the Court conclude, however, that the
issue has become material, the plaintiff should be afforded the opportunity to
present evidence at hearing of the defendant's substantial contacts with this forum.

18

TSI Holdings entered into a stock option agreement with at least one other Pennsylvania resident who, like plaintiff, worked for Highpoint. Napolitano Affid. ¶ 11. That person worked for Highpoint throughout the period from February 4, 2004 (the date on which the options were granted), through the present. That person has always worked at Highpoint, and there is no conceivable suggestion that she is doing so for her own "convenience." Id.

Stated differently, in the recent past, TSI Holdings has incentivized at least two full-time employees of Highpoint to add value to TSI Holdings through their work in Pennsylvania, and continues to do so through one of those two. TSI Holdings therefore clearly has a presence sufficient for a finding of "minimum contacts" in Pennsylvania. *See H. Lewis Packaging LLC v. Spectrum Plastics, Inc.*, 296 F. Supp. 2d 234, 240 (D. Conn. 2003)(held, one full time agent is enough for "minimum contacts"). Granting that minimum contacts and "continuous and systematic contacts" (the basis for general jurisdiction) are slightly different concepts, by either analysis, TSI Holdings was subject to personal jurisdiction. It was causing at least two full time agents to help operate and promote its business and interests in Pennsylvania during the period 2004 to 2006, and that conduct far exceeds the minimum standards for general jurisdiction.

TSI Holdings also "pitched" its shares of common stock, at the time of its

19

initial public offering of shares in 2006, to persons in Pennsylvania. Napolitano

Affid. ¶ 12. That conduct has been held to be a particularly important indication of

sufficient contacts for jurisdiction. *Leasco Data Processing Equip. Corp. v.*

*Maxwell*, 468 F.2d 1326, 1341 (2d Cir. 1972); *Sampson-Miller Assoc. Companies,*

*Inc. v. Washington Homes, Inc.*, 303 F. Supp. 739, 744 (W.D. Pa. 1969). That is

especially true here, if TSI Holdings has no purpose other than to be the "publicly

traded parent of [TSI]." Defendants' Memorandum at 4. If, as defendants

contend, issuing shares is all it does, then the places it sells those shares are the

places where it does business. One of those places is Pennsylvania.

Along the same lines, Pennsylvania courts have been highly reluctant to

excuse out-of-state conglomerates from personal jurisdiction in Pennsylvania

where their reason for claiming exemption from jurisdiction is that they operated

solely through subsidiaries. This Court has described and applied a ten-factor test[2]

---

[2] Those factors are: (1) ownership of all or most of the stock of the subsidiary; (2) common officers and directors; (3) a common marketing image; (4) common use of a trademark or logo; (5) common use of employees; (6) an integrated sales system; (7) interchange of managerial and supervisory personnel; (8) performance of business functions by the subsidiary which the principal corporation would normally conduct through its own agents or departments; (9) marketing by the subsidiary on behalf of the principal corporation, or as the principal's exclusive distributor; and (10) receipt by the officers of the subsidiary corporation of instruction from the principal corporation. *Simeone ex rel. Estate Of Albert Francis Simeone, Jr. v. Bombardier-Rotax GMBH*, 360 F.Supp.2d 665, 675 (E.D. Pa. 2005) (held, subsidiary subject to personal jurisdiction as alter ego of parent doing business here). Significantly, alter-ego analysis applies whether the parent is sought to be brought in by reason of activities by its subsidiary, or vice versa. *Aamco Automatic Transmissions, Inc. v. Tayloe*, 368 F. Supp. 1283, 1300 (E.D. Pa. 1973).

20

to determine whether a corporation affiliated with a company operating in Pennsylvania should be required to respond to claims in Pennsylvania. All of those factors favor jurisdiction in this case. Napolitano Affid. ¶ 13.

The commonality of management, logos, cross-incentivization of employees, use of subsidiaries to control operations, and "from the top" management from New York, combined with TSI Holdings' direct and indirect ownership of all of the shares of TSI, Highpoint and their affiliates, all strongly indicate that TSI Holdings operates directly in Pennsylvania through subsidiaries. The accounting for all of TSI Holdings' subsidiaries is consolidated; employment policies and other business practices are highly standardized throughout the corporate group; and all of the companies operate under similar names and logos. Napolitano Affid. ¶ 14. In sum, TSI Holdings directs a great deal of business in Pennsylvania, through seven "Philadelphia Sports Clubs," including Highpoint.[3] *Id.* It derives substantial profit from those activities. Under any reasonable test for substantial contacts, it has continuous and systematic contacts here. *Directory Dividends, Inc. v. SBC Communications, Inc.*, 2003 WL 21961448 *6 (E.D. Pa.); *Simeone v. Bombardier-Rotax GMBH, supra.*

---

[3]  Per the "Search for a Business" search engine at the Pennsylvania Department of State, http://www.dos.state.pa.us, "TSI Rittenhouse, LLC," "TSI Society Hill, LLC," and "TSI Highpoint, LLC" share common officers with TSI Holdings.

21

Plaintiff has thus made a prima facie showing that TSI Holdings is subject to general jurisdiction, *Brooks v. Bacardi Rum Corp.*, 943 F. Supp. 559, 561 (E.D. Pa. 1996), and, should general jurisdiction prove to be the determinative question, the Court should hold a hearing to determine whether the facts support such jurisdiction. *Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*, 751 F.2d 117, 120 (2d Cir.1984).   As a practical matter, specific jurisdiction based upon purposeful activities which resulted in the contracts sued upon is plainly established by the undisputed facts, and the Court will likely not need to reach the issue of general jurisdiction.  But should the Court decide to do so, the facts will show that it exists.

### D.    Venue is proper in this district.

The defendants do not argue that venue is improper if jurisdiction exists (Defendants Memorandum at 19), so the plaintiff, in addressing venue, need not add a great deal to his arguments, *supra*, concerning personal jurisdiction.

The applicable federal venue statute, 28 U.S.C. § 1391, provides that the plaintiff may sue the defendants in any district "in which a substantial part of the events or omissions giving rise to the claim occurred."  Here, the plaintiff provided six years' of labor in the Eastern District of Pennsylvania in exchange for stock option rights.  The plaintiff expressly argues that the consideration that he provided

22

in the form of labor in this district is highly relevant to, indeed a legal basis for, his entitlement to specific performance under Count I of the complaint. *See* Plaintiff's Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment, pp. 22-31. See also Complaint ¶¶ 34, 43. If such allegations are not sufficient to identify this district as "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred," it is difficult to imagine a cause of action that would satisfy that standard. If venue under Section 1391 is proper anywhere, it is proper here.

### E.   The defendants have not demonstrated a basis for transfer to the Southern District of New York under 28 U.S.C. § 1404.

The defendants' request to transfer this litigation to the Southern District of New York under 28 U.S.C. § 1404 is not supported by the facts or applicable law. The defendants bear the burden of persuasion on transfer, *Cresswell v. Walt Disney Productions*, 677 F. Supp. 284, 288 (M.D. Pa. 1987), and have simply not made the showing of relative inconvenience that would require or justify such an order.

For years, the Third Circuit has been strict in protecting the plaintiff's choice of forum, and transfer is not liberally granted. For example, in *Shutte v. Armco Steel Corp.*, 431 F.2d 22, 25 (3d Cir. 1970), the court granted a writ of mandamus vacating a transfer order entered by the district court, observing,

It is black letter law that a plaintiff's choice of a proper forum is a

23

paramount consideration in any determination of a transfer request, and that choice '. . . should not be lightly disturbed.' *Ungrund v. Cunningham Brothers, Inc.*, 300 F.Supp. 270, 272 (S.D.Ill.1969). In accord with that sound doctrine, one district court recently correctly observed: 'The decision to transfer is in the court's discretion, but a transfer is not to be liberally granted.' *Handlos v. Litton Industries, Inc.*, 304 F. Supp. 347, 352 (E.D.Wisc.1969). The burden is on the moving party to establish that a balancing of proper interests weigh in favor of the transfer, *Everprest, Inc. v. Phillips-Van Heusen Corp.*, 300 F.Supp. 757 (M.D. Ala.1969), and '. . . unless the balance of convenience of the parties is strongly in favor of defendant, the plaintiff's choice of forum should prevail.' *Owatonna Manufacturing Company v. Melroe Company*, 301 F. Supp. 1296, 1307 (D.Minn.1969). (Emphasis supplied.)

In *Plum Tree, Inc. v. Stockment*, 488 F.2d 754, 756 (3d. Cir. 1973) and again in *Jamara v. State Farm Ins. Co.*, 55 F.3d 873, 879 (3d Cir. 1995), the Third Circuit emphasized that the party seeking transfer bears the burden of establishing the need for transfer. And, of course, there is "ordinarily a strong presumption in favor of the plaintiff's choice of forum." *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255 (1981); see also *Jamara, supra,* 55 F.3d at 879 (plaintiff's choice of venue should not be lightly disturbed).

Here, the defendants' motion utterly fails to carry their burden as defined by the Third Circuit. Philadelphia and New York are separated by only 90 miles, a train ride of a little over an hour. There will be little inconvenience for any New York witnesses who may have to appear for depositions or hearings in Philadelphia, and no significant inconvenience for any of the parties.

24

Moreover, the defendants have created an important factual issue concerning the amount of time that the plaintiff spent at the offices at Highpoint, in Pennsylvania, as opposed to the defendants' offices in New York. The defendants' motion contends that the plaintiff spent as much as 80% of his time in New York (Defendants' Memorandum at 4); the plaintiff will show that he spent about 70% of his time in Pennsylvania. A key substantive issue in the case is whether the plaintiff was in the "employment" of TSI Holdings rather than Highpoint (*see* Plaintiff's Memorandum in Support of Plaintiff's Motion for Summary Judgment, Part II). Plaintiff will show, through a variety of witnesses based in Pennsylvania, that his employment with Highpoint in Pennsylvania was continuous, often closely related to programs developed at Highpoint, and carried out with the substantial assistance of staff at Highpoint. Napolitano Affid. ¶¶ 2, 4, 6. The defendants seek to inconvenience the plaintiff's witnesses at Highpoint, while benefitting (probably fewer) witnesses in New York. Transfer under Section 1404 requires a balance of convenience "strongly in favor of defendants" (*Shutte v. Armco Steel Corp., supra*), and that showing has not remotely been made here.

Nor is it particularly significant that the case will be decided under New York law. This Court is fully able to determine and apply New York law, and "little weight" should be attached to the fact that foreign law controls disposition of

25

the case. *Atlantic Richfield Co. v. Stearns-Roger, Inc.*, 379 F. Supp. 869, 872 (E.D. Pa. 1974). Choice of law is not identified as a consideration in the text of Section 1404 itself, and is simply not a controlling factor. *See Turrett Steel Corp. v. Manuel Int'l, Inc.*, 612 F. Supp. 387, 390 (W.D. Pa. 1985)(district courts "regularly apply" the laws of other states).

In *Hathi v. Frischer*, 645 F. Supp. 360, 362 (E.D. Pa. 1986), this Court refused to transfer a breach of contract action to the Southern District of New York, noting that it would not be "costly or time-consuming to bring witnesses to the plaintiff's chosen forum, two hours from Foley Square," and "this court has the power to subpoena witnesses within 100 miles under Fed. R. Civ. P. 45(e)(1) so that some of the . . . New York witnesses other than defendant might be within the subpoena power of the court." The Court also noted that the plaintiff's choice of forum is the "paramount consideration in any determination of a transfer request." *Id.*

For all of those reasons, transfer under Section 1404 would contravene the criteria for transfer set forth in the statute. Because the defendants have not shown that this is an improper venue, the plaintiff need not address the applicability of 28 U.S.C. § 1406, which permits transfer to a proper district when venue in the district chosen by the plaintiff is improper.

26

**CONCLUSION.**

For the foregoing reasons, the defendants' motions to dismiss the plaintiff's claims under Fed. R. Civ. P. 12(b)(2), (3) and (6), or, in the alternative to transfer this action to the Southern District of New York, should be denied.

Respectfully submitted,

Richard G. Tuttle
Archer & Greiner, P.C
Suite 1620
One South Broad Street
Philadelphia, PA  19107
(215) 963-3300

Counsel for Plaintiff
Frank J. Napolitano, Jr.

April 30, 2007

27

# CERTIFICATE OF SERVICE

Richard G. Tuttle, counsel for the plaintiff in the within matter, hereby certifies that, on April 30, 2004, he served true and correct copies of Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss, with an Affidavit of Frank J. Napolitano, Jr., in support thereof, on the following persons by ECF transmittal through the Court's ECF system, and by First Class Mail sent on said date:

Brian T. Feeney, Esquire
Bryan L. Norton, Esquire
Greenberg Traurig, LLP
2700 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103

Jordan Stern, Esquire
Jesse T. Conan, Esquire
Becker, Glynn, Melamed & Muffly, LLP
299 Park Avenue
New York, NY 10171

Attorneys for Defendants

28

# EXHIBIT A

## AFFIDAVIT OF FRANK J. NAPOLITANO, JR.

### (follows)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

FRANK J. NAPOLITANO, JR.          :     CIVIL ACTION
                                  :
          Plaintiff,              :     NO. 07-CV-755
                                  :
     vs.                          :
                                  :
TOWN SPORTS INTERNATIONAL         :
HOLDINGS INC. and TOWN SPORTS     :
INTERNATIONAL, INC.               :
                                  :
          Defendants.             :


## AFFIDAVIT OF PLAINTIFF FRANK J. NAPOLITANO, JR.


Plaintiff Frank J. Napolitano, Jr., deposes and says:

    1. I am an adult resident and citizen of Pennsylvania.

    2. I was employed by TSI Highpoint, LLC ("Highpoint") from January, 2000 to June, 2006. My Form W-2 issued to me by Highpoint for 2006 is attached as Exhibit H to my initial affidavit in this case, submitted in support of my motion for summary judgment. My W-2's from Highpoint, issued from New York, showed my Pennsylvania residence and the withholding of Pennsylvania state income tax.

    3. During the more than six years that I worked for Highpoint, I spent approximately 70% of my work time at Highpoint and 20% at the offices of its corporate parents in New York City.

    4. Before joining Highpoint, I was a principal owner and manager of Highpoint Athletic Club (HAC). My business partner and I sold HAC to Highpoint effective January 1, 2000. My employment with Highpoint began shortly after that transaction. Highpoint was formed as a subsidiary of defendant

Town Sports International, Inc. ("TSI").

5. Mark Smith was Chief Executive Officer of TSI when Highpoint purchased HAC, and he negotiated the purchase agreement with me.

6. The reason that Mr. Smith and I agreed that I would work at Highpoint, in Pennsylvania, was that my duties, to a significant extent, were to design and create programs for family and children, for which the Highpoint club (uniquely among the defendants' many properties) was ideally suited. Highpoint was used as a laboratory for those programs.

7. When an executive of defendant Town Sports International Holdings, Inc. ("TSI Holdings") provides notice to the company that he or she is exercising stock options, the company first performs a federal tax withholding calculation and provides the executive with an amount owed in federal, state or local tax withholding.

8. I was a Pennsylvania resident, and worked primarily in Pennsylvania, for the entire period from the execution of the stock option agreements at issue in this case to the present. TSI Holdings was aware of that fact because it owned Highpoint (directly or remotely) and dealt with me through its executive officers. Mark Smith, Robert Giardina, and Richard Pyle were executive officers of TSI Holdings and Highpoint. My residence and place of work in Pennsylvania were well known to senior management of TSI Holdings when the stock option agreements at issue in this case were executed in February, 2004 (those agreements are attached as Exhibits A and C to the complaint, and are referred to hereafter as the "Stock Option Agreements").

9. The Stock Option Agreements were form documents, and not negotiated as to terms. To the extent that I had discussions with Mark Smith about the options in the form initially issued by TSI in 2000 and 2003, those discussions occurred by telephone and in person, and both in Pennsylvania and New York.

10. Mark Smith, former CEO of TSI Holdings, visited me in Pennsylvania before and after execution of the Stock Option Agreements in 2004, and those visits involved discussions of TSI Holdings' plans and strategies for future operations, including the operations of its subsidiaries in Pennsylvania.

11. TSI Holdings entered into a stock option agreement with at least one other Pennsylvania resident who, like me, worked for Highpoint. Upon

information and belief, that person worked for Highpoint throughout the period from February 4, 2004 (the date on which the options were granted), through the present. That person has always worked primarily at Highpoint, and she did so, during my tenure, at the demand of Highpoint and TSI Holdings. She was not working at Highpoint for her own convenience.

12. In 2006, TSI Holdings, at or about the time of its initial public offering of common stock, promoted a stock purchase plan for employees of subsidiaries in Pennsylvania (among other states), and promoted those purchases here.

13. At the request of my counsel, I have evaluated the relationship of TSI Holdings and its subsidiaries in Pennsylvania (those subsidiaries operate sports clubs) in light of the following ten factors: (1) ownership of all or most of the stock of the subsidiary; (2) common officers and directors; (3) a common marketing image; (4) common use of a trademark or logo; (5) common use of employees; (6) an integrated sales system; (7) interchange of managerial and supervisory personnel; (8) performance of business functions by the subsidiary which the principal corporation would normally conduct through its own agents or departments; (9) marketing by the subsidiary on behalf of the principal corporation, or as the principal's exclusive distributor; and (10) receipt by the officers of the subsidiary corporation of instruction from the principal corporation. Of those ten factors, all apply to TSI Holdings' operation of its Pennsylvania subsidiaries.

14. The accounting for all of TSI Holdings' subsidiaries is consolidated; employment policies and other business practices are highly standardized throughout the corporate group; and all of the companies operate under similar names and logos. TSI Holdings directs a substantial amount of business in Pennsylvania, through seven "Philadelphia Sports Clubs," including Highpoint.

I verify, under penalty of perjury, that the foregoing is true and correct.

Executed on April 24, 2006.

Frank J. Napolitano, Jr.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| FRANK J. NAPOLITANO, JR. | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | NO. 07-CV-755 |
| | : | |
| vs. | : | |
| | : | |
| TOWN SPORTS INTERNATIONAL | : | |
| HOLDINGS INC. and TOWN SPORTS | : | |
| INTERNATIONAL, INC. | : | |
| | : | |
| Defendants. | : | |

## O R D E R

AND NOW, this _____ day of _____,

2007, upon consideration of defendants' motion to dismiss the plaintiff's claims

under Fed. R. Civ. P. 12(b)(2), (3) and (6), or, in the alternative to transfer this

action to the Southern District of New York, it is hereby ORDERED that said

Motion is DENIED.

BY THE COURT:

_____

John R. Padova, J.