# EXHIBIT A

**Execution Copy**

## NEW 2000 COMMON STOCK OPTION AGREEMENT

NEW 2000 COMMON STOCK OPTION AGREEMENT, dated as of February 4, 2004, by and among TOWN SPORTS INTERNATIONAL HOLDINGS, INC., a Delaware corporation (the "Company"), TOWN SPORTS INTERNATIONAL, INC., a New York Corporation ("TSI"), and FRANK NAPOLITANO (the "Executive"). Capitalized terms used but not otherwise defined herein shall have the meanings assigned to such terms in Section 1.

WHEREAS, the Executive was previously granted options (the "TSI Options") to purchase 6,600 shares of the Class A Common Stock, par value $.001 per share (the "TSI Class A Common"), of TSI pursuant to that certain Common Stock Option Agreement, dated as of May 31, 2000, by and among TSI and the Executive (the "Existing Option Agreement");

WHEREAS, TSI, the Company, the Executive and certain other stockholders of TSI (the "Stockholders") entered into a Restructuring Agreement, dated as of February 4, 2004 (the "Restructuring Agreement"), pursuant to which TSI was reorganized as a wholly owned subsidiary of the Company and all Stockholders contributed and exchanged all of their respective shares of capital stock in TSI for an equal number of shares of capital stock in the Company (the "Restructuring");

WHEREAS, in connection with the Restructuring, TSI notified the Executive that effective as of the closing date of the Restructuring, all TSI Options issued pursuant to the Town Sports International, Inc. 1996 Option Plan, as amended and embodied in the Executive's TSI Option Agreement would be exchanged for options to purchase an equal number of shares of Class A Common Stock of the Company and this Agreement sets forth the terms and conditions of such new options; and

WHEREAS, TSI, the Executive has executed the Stockholders Agreement (or a joinder thereto), which contains certain transfer restrictions on the Option Shares), and the Company, the Investors and the Executive have entered into an Executive Stock Agreement (as amended, restated or modified from time to time, the "Executive Stock Agreement"), which contains certain repurchase provisions with respect to the Option Shares and any other shares of Common Stock held by the Executive.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties to this Agreement hereby agree as follows:

1.      Definitions. As used herein, the following terms shall have the following meanings:

"Acceleration Date" has the meaning set forth in Section 3(b).

"Achieved Equity Value" means, with respect to any Acceleration Date, (a) the Actual EBITDA for the Fiscal Year immediately prior to such Acceleration Date multiplied by

5.5 minus (b) the sum of (i) all outstanding Indebtedness of the Company and its Subsidiaries, less cash and cash equivalents held by the Company and its Subsidiaries, as of the Acceleration Date, and (ii) the aggregate Liquidation Value (as defined in the Certificate of Incorporation) of all Preferred Stock (plus all accrued and unpaid dividends thereon) outstanding as of such Acceleration Date.

"Actual EBITDA" means the Consolidated EBITDA of the Company and its Subsidiaries for any particular Fiscal Year, derived from the Company's audited consolidated financial statements for such Fiscal Year.

"Board" means the Board of Directors of the Company, as in effect from time to time.

"Cause" means any of the following with respect to the Executive: (i) a material breach of Executive's covenants under this Agreement or any other agreement with the Company or its Subsidiaries (including, without limitation, the Executive Stock Agreement, the Stockholders Agreement and the Registration Rights Agreement) not cured within 15 days after receipt of written notice of such breach from the Company; (ii) the commission by Executive of a felony, a crime involving moral turpitude or act causing material harm to the standing and reputation of the Company or any of its Subsidiaries; (iii) the Executive's repeated and deliberate failure to comply with the lawful and reasonable written directives of the Board; or (iv) theft or embezzlement of a material amount of money or property of the Company or any of its Subsidiaries, perpetration of fraud, or participation in a fraud, on the Company or any of its Subsidiaries.

"Certificate of Incorporation" means the Company's Certificate of Incorporation as in effect on the date hereof, as the same may be amended, restated or modified from time to time.

"Class A Common" means the Company's Class A Common Stock, par value $.001 per share.

"Code" means the Internal Revenue Code of 1986, as amended, and any successor statute.

"Committee" means the Compensation Committee or such other committee of the Board as the Board may designate or, if for any reason the Board has not designated such a committee, the Board. The Committee, if other than the Board, shall be composed of two or more directors as appointed from time to time by the Board, pursuant to the terms of the Stockholders Agreement.

"Common Stock" means the Class A Common, the Company's Class B Common Stock, par value $.001 per share, and any other class of common stock of the Company or if such outstanding Common Stock is hereafter changed into or exchanged for different securities of the Company, such other securities.

"Consolidated EBITDA" means, for any period, (a) the sum of (i) net income of the Company and its Subsidiaries for such period taken as a single accounting period determined

2

in conformity with GAAP, (ii) provisions for cash taxes based on income, (iii) total interest expense, (iv) amortization or write-off of deferred financing costs to the extent included in net income, (v) depreciation expense, (vi) amortization expense, (vii) deferred rent expenses, (viii) without duplication, all other non-cash charges included in determining net income for such period, (ix) losses on sales of assets (excluding sales in the ordinary course of business) and other extraordinary or nonrecurring losses, minus (b) the amount for such period of gains on sales of assets (excluding sales in the ordinary course of business) and other extraordinary or nonrecurring gains, all as determined on a consolidated basis in accordance with GAAP.

"Disability" means the inability, due to illness, accident, injury, physical or mental incapacity or other disability, of the Executive to carry out his duties and obligations to the Company or to participate in the management of the Company or a Subsidiary of the Company for a period of at least 90 consecutive days or for shorter periods aggregating at least 120 days (whether or not consecutive) during any twelve-month period, as determined by the Board in good faith.

"Expiration Date" means June 1, 2010, subject to earlier expiration as provided in Section 4.

"Fair Market Value" means, for each share of Common Stock, the average of the closing per share prices of the sales of the Common Stock on all securities exchanges on which the Common Stock may at the time be listed, or, if there have been no sales on any such exchange on any day, the average of the highest bid and lowest asked prices on all such exchanges at the end of such day, or, if on any day the Common Stock is not so listed, the average of the representative bid and asked per share prices quoted in the NASDAQ National Market System as of 4:00 P.M., New York time, or, if on any day the Common Stock is not quoted in the NASDAQ National Market System, the average of the highest bid and lowest asked per share prices on such day in the domestic over-the-counter market as reported by the NASDAQ National Quotation Bureau, Incorporated, or any similar successor organization, in each such case averaged over a period of 21 trading days consisting of the day as of which the Fair Market Value is being determined and the 20 consecutive trading days prior to such day. If at any time the Common Stock is not so listed on any securities exchange or quoted in the NASDAQ National Market System or the domestic over-the-counter market, the Fair Market Value, will be the fair value of the Common Stock as determined in good faith by the Board and set forth in a written notice to the Executive; provided, that if the Executive objects to such determination in writing within 10 days of receipt of such determination from the Board, the Fair Market Value shall be determined by an independent investment banking firm mutually selected by the Board and the Executive; and the costs of such investment banking firm shall be borne by the party whose determination is farthest from the determination of such investment banking firm.

"Fiscal Year" means, for the Company, the calendar year ending on December 31 of each year.

"Form" means those forms of the Internal Revenue Service used by taxpayers to file federal income tax returns or reports required under the Code or applicable Treasury Regulations promulgated thereunder.

"GAAP" means generally accepted accounting principles in the United States of America as in effect on the date hereof, consistently applied.

"Indebtedness" means all indebtedness of the Company or any of its Subsidiaries determined on a consolidated basis including, without limitation, (i) all obligations for borrowed money or evidenced by bonds, debentures, notes, letters of credit or other similar instruments, (ii) obligations as lessee under capital leases, (iii) obligations to pay the deferred purchase price of property or services, except accounts payable arising in the ordinary course of business and (iv) all indebtedness of other Persons guaranteed or otherwise supported by the Company or any of its Subsidiaries to the extent classified as debt in accordance with GAAP, it being understood that all obligations with respect to any items listed in clauses (i) through (iv) above include, without limitation, obligations for interest, principal, prepayment penalties, premiums, fees, expenses, indemnities and breakage or similar charges.

"Investors" has the meaning set forth in the Executive Stock Agreement.

"Measurement Date" means the date on which any taxable income resulting from the exercise of an Option is determined under applicable federal income tax law.

"Option" has the meaning set forth in Section 2(a).

"Option Agreements" means, collectively, this Agreement and each of the other Common Stock Option Agreements, by and between the Company and each of certain management employees of the Company, in each case as the same may be amended, restated or modified from time to time.

"Option Shares" means, collectively, (i) all shares of Class A Common issued or issuable upon the exercise of an Option, and (ii) any shares of the Company's capital stock issued with respect to the shares of Common Stock set forth in clause (i) by way of merger, consolidation, reclassification, stock split, reverse stock split, stock dividend or other recapitalization. Option Shares shall continue to be Option Shares in the hands of any holder other than Executive (including, without limitation, any Permitted Transferee of the Executive), except for the Company, the Investor or any transferee in an underwritten public offering registered under the Securities Act. Except as otherwise provided herein, each other holder of Option Shares will succeed to the rights and obligations attributable to the Executive as a holder of Option Shares hereunder.

"Permitted Transferee" means, as to any Person, the "Permitted Transferees" (as defined in the Stockholders Agreement) of such Person.

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, or a government entity (or any department, agency or political subdivision thereof.)

"Plan" means the company's 2004 Stock Option Plan, a copy of which is attached hereto as Exhibit A, as the same may be amended, restated or modified from time to time.

4

"Preferred Stock" means, collectively, the Company's Series A Preferred Stock, par value $1.00 per share, the Company's Series B Preferred Stock, par value $1.00 per share, and any other class or series of the Company's preferred stock, or if such outstanding Preferred Stock is hereafter changed into or exchanged for different securities of the Company, such other securities.

"Registration Rights Agreement" means the Registration Rights Agreement, dated as of February 4, 2004, by and among the Company and certain stockholders of the Company, as the same may be amended, restated or modified from time to time.

"Sale of the Company" means the sale of the Company, in a single transaction or a series of related transactions, to an Unaffiliated Third Party pursuant to which such Unaffiliated Third Party acquires all of the outstanding Common Stock (whether by merger, consolidation, recapitalization, reorganization, purchase of the outstanding Common Stock or otherwise) or all or substantially all of the consolidated assets of the Company.

"Securities Act" means the Securities Act of 1933, as amended.

"Stockholders Agreement" means the Stockholders Agreement, dated as of February 4, 2004, by and among the Company and certain stockholders of the Company, as the same may be amended, restated or modified from time to time.

"Subsidiary" means, with respect to any Person, any corporation, partnership, limited liability company association or other business entity of which (i) if a corporation or a limited liability company, a majority of the total voting power of securities entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (ii) if a partnership, association or other business entity, a majority of the partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by any Person or one or more Subsidiaries of that Person or a combination thereof.  For purposes hereof, a Person or Persons shall be deemed to have a majority ownership interest in a partnership, association or other business entity if such Person or Persons shall be allocated a majority of partnership, association or other business entity gains or losses or shall be or control the managing director or general partner of such partnership, association or other business entity.

"Termination Date" means the date upon which Executive's employment with the Company terminates, including, without limitation, by reason of death or Disability.

"Unaffiliated Third Party" means any Person who, immediately prior to the contemplated transaction (i) does not own in excess of 5% of the Common Stock on a fully diluted basis (a "5% Owner"), (ii) is not controlling, controlled by or under common control with any such 5% Owner and (iii) is not the spouse or descendent (by birth or adoption) of any such 5% Owner or a trust for the benefit of such 5% Owner and/or such other Persons.

5

2.    The Options.

(a)    Term of the Options.  Subject to the Executive executing and delivering to the Company the Stockholders Agreement and the Executive Stock Agreement (to the extent not already so executed and delivered), the Company hereby grants to Executive, as of the date hereof, an option (the "Option") to purchase up to 6,600 shares of the Company's Class A Common subject to the terms and conditions set forth herein.  The exercise price for (i) 60% of the Option Shares issuable upon exercise of the Option (the "Tranche I Option") is $75.00 per Option Share (the "Tranche I Exercise Price") and (ii) 40% of the Option Shares issuable upon exercise of the option (the "Tranche II Option") is $22.50 per Option Share (the "Tranche II Exercise Price," and together with the Tranche I Exercise Price, the "Exercise Price").  All rights of the Executive as the holder of the Options issued hereunder shall be solely determined by the provisions of this Agreement.  The Executive's Options will expire as provided in Section 4 hereof.

(b)    Form of the Options.  The Options granted hereunder are not "incentive stock options" within the meaning of Section 422 of the Code (or any successor provision).  The Options granted hereunder qualify for the exemption from registration under the Securities Act pursuant to Rule 701 promulgated thereunder.

(c)    Payment of Exercise Price.  Subject to Section 3 below, the Options may be exercised in whole or in part upon payment of an amount (the "Option Price") equal to the product of (i) the applicable Exercise Price for the applicable Options multiplied by (ii) the number of Option Shares to be acquired.  Payment shall be made in cash by a certified or official bank check payable to the Company (or the equivalent thereof acceptable to the Committee).

(d)    Procedure for Exercise.  The Executive may exercise all or any portion of the Options, to the extent they have vested and are outstanding, at any time and from time to time prior to their expiration as set forth in Section 4, by filing written notice of exercise to the Company, accompanied by a statement of the Executive that he has read and has been afforded an opportunity to ask questions of management of the Company regarding all financial and other information provided to him regarding the Company, together with payment of the Option Price in accordance with the provisions of Section 2(c) above.  As a condition to any exercise of any Option, the Executive will permit the Company to deliver to him all financial and other information regarding the Company (if any) it believes necessary to enable the Executive to make an informed investment decision, and the Executive will make all customary investment representations which the Company requires.

(e)    Non-Transferability of Options.  The Executive's Options are personal to the Executive and are not transferable by the Executive other than by will or the laws of descent and distribution.  During the Executive's lifetime, only the Executive  may exercise the Options.  In the event of the Executive's death, the Options may be exercised only (i) by the executor or administrator of the Executive's estate or the Person or Persons to whom the Executive's rights under the Options shall pass by will or the laws of descent and distribution (provided that each beneficiary shall execute and deliver an undertaking in writing to be bound by the terms of this Agreement, the Stockholders Agreement and the Executive Stock Agreement in form and

substance acceptable to the Committee) and (ii) to the extent that the Executive was entitled to exercise such Options hereunder at the date of the Executive's death.

    (f)    <u>Adjustments upon Changes in Capitalization</u>.  If and to the extent specified by the Committee, the number of shares of Class A Common which may be issued pursuant to the exercise of Options shall be equitably adjusted for any stock dividend, stock split, recapitalization, merger, consolidation or other recapitalization; <u>provided</u>, that any Options to purchase fractional shares of Class A Common resulting from any such adjustment shall be rounded to the nearest whole share.  Adjustments under this <u>Section 2(f)</u> shall be made by the Committee in its reasonable discretion, whose determination as to what adjustments shall be made, and the extent thereof, shall be final, binding and conclusive.

    3.    <u>Vesting</u>.

    (a)    <u>Normal Vesting</u>.  The Tranche I Options are fully vested as of the date hereof.  The Tranche II Options shall vest on December 31, 2008 (the "<u>Vesting Date</u>").  Options which have vested pursuant to the terms hereof shall be referred to as "<u>Vested Options</u>", and any Options which have not vested pursuant to the terms hereof shall be referred to as "<u>Unvested Options</u>".

    (b)    <u>Accelerated Vesting</u>.

    (i)    Notwithstanding anything contained in <u>Section 3(a)</u> to the contrary, in the event that, prior to December 31, 2004, a Sale of the Company is consummated and the aggregate gross consideration to be received in connection with such sale by the holders of the Company's Common Stock equals or exceeds the Equity Value Target for the Acceleration Date immediately preceding the date of such Sale of the Company, the portion of the Options which has not vested as of such date shall be deemed to have been immediately vested and exercisable as of the consummation of such Sale of the Company and such holders shall be given an opportunity to exercise such Options and be treated as a holder of Common Stock in connection with such transaction.

    (ii)    Notwithstanding anything contained in <u>Section 3(a)</u> to the contrary, if, as of the date listed below (the "<u>Acceleration Date</u>"), the Achieved Equity Value with respect to the Acceleration Date (i) equals or exceeds 90% of the target for the Achieved Equity Value set forth below for the Acceleration Date (such target, as equitably adjusted by the Committee in good faith to reflect material acquisitions consummated by the Company after the date hereof, an "<u>Equity Value Target</u>"), then 25% of the total Tranche II Options shall vest, or (ii) equals or exceeds the applicable Equity Value Target, then 100% of the total Tranche II Options shall vest:

| <u>Acceleration Date</u> | <u>Equity Value Target</u> |
|---|---|
| December 31, 2004 | $181,919,000 |

4.    <u>Expiration</u>.

(a)    <u>Expiration of Vested Options</u>.  Except as set forth in <u>Section 4(b)</u>, Vested Options not exercised as of the Termination Date shall expire on the earliest to occur of (i) the date which is 90 days after termination of the Executive's employment with the Company for any reason (other than death or Disability in which case the Options shall expire on the date which is 120 days after the date of such termination), (ii) the consummation of a Sale of the Company, subject to <u>Section 3(b)</u> above and (iii) the Expiration Date.

(b)    <u>Expiration of Unvested Options</u>.  In the event that the Executive's employment with the Company is terminated for any reason, all Unvested Options as of the Termination Date shall automatically and immediately terminate and be permanently forfeited.

(c)    <u>Expiration Upon Termination for Cause</u>.  Notwithstanding anything contained in this Agreement to the contrary, all Vested Options and Unvested Options granted to the Executive shall immediately expire and cease to be exercisable and all rights granted under this Agreement shall immediately expire in the event that the Executive is terminated for Cause by the Company at any time.

5.    <u>Restrictions on Option Shares; Securities Laws Matters</u>.

(a)    <u>Right to Repurchase Option Shares</u>.  In the event Executive's employment with the Company is terminated for any reason (including death or Disability), the Option Shares actually issued (whether held by Executive or one or more Permitted Transferees and including any Option Shares acquired subsequent to such termination of employment) will be subject to repurchase by the Company and the Investors pursuant to the terms and conditions of the Executive Stock Agreement.

(b)    <u>Restrictions on Transfer</u>.  The Executive hereby acknowledges and agrees that the Executive is a party to the Stockholders Agreement which governs and restricts the Executive's ability to transfer any Option Shares and other matters relating to the Executive as a stockholder of the Company.

(c)    <u>Securities Law Matters</u>.  The Executive hereby represents that upon exercising an Option, the Executive will be purchasing Option Shares for his own account and not on behalf of others.  The Executive hereby understands and acknowledges that federal and state securities laws govern and restrict the Executive's right to offer, sell or otherwise dispose of any Option Shares unless such offer, sale or other disposition thereof is registered under the Securities Act and state securities laws, or in the opinion of the Company's counsel, such offer, sale or other disposition is exempt from registration or qualification thereunder.  The Executive will not offer, sell or otherwise dispose of any Option Shares in any manner which would: (i) require the Company to file any registration statement with the Securities and Exchange Commission (or any similar filing under state law) or to amend or supplement any such filing or (ii) violate or cause the Company to violate the Securities Act, the rules and regulations promulgated thereunder or any other state or federal law.

(d)    <u>Restricted Securities</u>.  All Option Shares issued pursuant to the terms of this Agreement shall constitute "restricted securities," as that term is defined in Rule 144

promulgated by the Securities and Exchange Commission pursuant to the Securities Act, and may not be transferred except in compliance with the registration requirements of the Securities Act or an exemption therefrom. The certificates representing the Option Shares will bear the legend set forth in Section 6(a) of the Executive Stock Agreement and Section 7 of the Stockholders Agreement.

(e)    Listing, Registration, and Legal Compliance.    If at any time the Committee, in its discretion, determines that the listing, registration, or qualification of the Option Shares upon any securities exchange or under any state or federal securities or other law or regulation, or the consent, or approval of any governmental regulatory body, is reasonably required as a condition to or in connection with the granting of Options or the purchase or issuance of Option Shares thereunder, no Options may be granted or exercised, in whole or in part, unless such listing, registration, qualification, consent, or approval shall have been effected or obtained free of any conditions not acceptable to the Committee. The Executive agrees to supply the Company with such certificates, representations, and information as the Company shall request and shall otherwise cooperate with the Company in obtaining such listing, registration, qualification, consent, or approval. The Company hereby agrees to make all such filings and registrations as reasonably required to effectuate the terms of this Agreement. In the case of officers and other Persons subject to Section 16(b) of the Securities Exchange Act of 1934, as amended, the Committee may impose, at any time, any limitations upon the exercise of Options that, in the Committee's discretion, are necessary or desirable in order to comply with such Section 16(b) and the rules and regulations thereunder.

6.    Amendment and Waiver.    The Committee may amend or modify any Option; provided, that no amendment or modification shall impair the rights of Executive without the consent of Executive unless the holders of a majority of the aggregate number of Options (based upon the number of Option Shares to be obtained upon exercise) granted by the Company pursuant to all Option Agreements consent to such amendment in writing and such amendment affects all such holders similarly.

7.    Non-Compete; Nonsolicitation.

(a)    Noncompetition.

(i)    As an inducement to the Company to enter into this Agreement and grant the Options hereunder, the Executive agrees that, (A) during his period of employment with the Company and (B) in the event that the Executive resigns or Executive's employment is terminated by the Company for any reason, during the period which the Company is paying the Executive severance compensation (which shall be at a rate and an amount equal to the Executive's salary and all health and other insurance benefits received by the Executive immediately prior to the Termination Date), such period not to exceed one year (the "Noncompete Period"), he shall not directly or indirectly own, manage, control, participate in, consult with, render services for, or in any manner engage in, any business competing directly or indirectly with the business as now or hereafter conducted by the Company which are logical extensions of the Company's current business, within any metropolitan area in which the Company or any of its Subsidiaries engages or has definitive plans to engage in such business; provided, that (x) the Executive shall not be precluded from purchasing or holding publicly-

9

traded securities of any such entity so long as the Executive shall hold less than 2% of the outstanding units of any such class of securities and has no active participation in the business of such entity and (y) the Company shall have notified the Executive of its agreement to provide such severance compensation (1) in the event of resignation, within five days of the Termination Date or (2) in the event of termination, on or before the Termination Date. Notwithstanding anything contained herein to the contrary, the Executive's agreement set forth in clause (B) above shall not apply in the event that the Termination Date occurs after the fifth anniversary of the date of this Agreement.

(ii)    During the Noncompete Period, the Executive shall not directly or indirectly through another entity (i) induce or attempt to induce any employee of the Company or any of its Subsidiaries to leave the employ of the Company or any of its Subsidiaries, or in any way interfere with the relationship between the Company or any of its Subsidiaries and any employee thereof, (ii) hire any person who was an employee of the Company or any of its Subsidiaries at any time during Executive's employment period except for such employees who have been terminated for at least six months or (iii) induce or attempt to induce any customer, supplier, licensee, franchisor or other business relation of the Company or any of its Subsidiaries to cease doing business with such member, or in any way interfere with the relationship between any such customer, supplier, licensee, franchisor or business relation, on the one hand, and the Company or any of its Subsidiaries, on the other hand.

(iii)    The provisions of this Section 7(a) shall survive any termination of this Agreement.

(iv)    If, at the time of enforcement of this Section 7(a), a court of competent jurisdiction shall hold that the duration, scope or area restrictions stated herein are unreasonable under circumstances then existing, the parties hereto agree that the maximum duration, scope or area reasonable under such circumstances shall be substituted for the stated duration, scope or area and that such court shall be allowed to revise the restrictions contained herein to cover the maximum period, scope and area permitted by law.

(b)    Confidential Information. The Executive acknowledges that he may have access to certain confidential, non-public and proprietary information (the "Confidential Information"), concerning the Company and its Subsidiaries and their respective officers, directors, stockholders, employees, agents and representatives and agrees that: (i) unless pursuant to prior written consent by the Company, the Executive shall not disclose any Confidential Information or the provisions of this Agreement or knowledge of this Agreement's existence to any Person for any purpose whatsoever unless compelled by court order of subpoena; (ii) the Executive shall treat as confidential all Confidential Information and shall take reasonable precautions to prevent unauthorized access to the Confidential Information; (iii) the Executive shall not use the Confidential Information in any way detrimental to the Company or any of its Subsidiaries and shall use the Confidential Information for the exclusive purpose of effecting his duties of employment with the Company; and (iv) the Executive agrees that the Confidential Information obtained during his employment with the Company shall remain the exclusive property of the Company, and the Executive shall promptly return to the Company all material which incorporates, or is derived from, all such Confidential Information upon termination of his employment with the Company. The Executive shall be responsible for any breach of the terms

of this Section 7(b) by any holder of the Option Shares.  It is hereby agreed that Confidential Information does not include information generally available and known to the public or obtained from a source not bound by a confidentiality agreement with the Company.

(c)    Inventions and Patents.  The Executive hereby agrees that all inventions, innovations or improvements in the method of conducting the business (including improvements, ideas and discoveries, whether patentable or not) of the Company or any of its Subsidiaries whether prior to the date hereof or thereafter, in each case conceived or made by him in the course of his employment with the Company, belong to the Company and its Subsidiaries, except for such inventions, innovations and improvements that have become part of the public domain and are not entitled to statutory or common law protection.  The Executive will promptly disclose such inventions, innovation or improvements to the Board and perform all actions reasonably requested by the Board to establish and confirm such ownership by the Company or any of its Subsidiaries.

8.    Withholding Tax Requirements.

(i)    Amount of Withholding.  It shall be a condition to the exercise of any Option  that Executive make appropriate payment or other provision acceptable to the Company with respect to any withholding tax requirement arising under applicable statutes or regulations from such exercise.  The amount of withholding tax required by statute or regulation, if any, with respect to any Option exercise (the "Withholding Amount") shall be reasonably determined by the Treasurer or other appropriate officer of the Company, and Executive shall furnish such information as such officer requests to make such determination.

(b)    Withholding Procedure.  If the Company determines that withholding tax is required by statute or regulation with respect to any Option exercise, the Company shall notify Executive of the Withholding Amount, and Executive shall pay to the Company an amount not less than the Withholding Amount.  In lieu of making such payment, the Executive may pay the Withholding Amount by either (i) delivering to the Company a number of Option Shares having an aggregate Fair Market Value as of the Measurement Date less than or equal to the Withholding Amount, or (ii) directing the Company to withhold and not deliver or issue to the Executive a number of Option Shares, otherwise issuable upon the exercise of the Option, having an aggregate Fair Market Value as of the Measurement Date less than or equal to the Withholding Amount.  Any shortfall between the Withholding Amount and the Fair Market Value of Option Shares delivered or withheld under the preceding sentence shall be paid by Executive in cash.  All amounts paid to or withheld by the Company and the value of all Option Shares delivered to or withheld by the Company pursuant to this Section 8 shall be deposited in accordance with applicable law by the Company as withholding tax for Executive's account.  If the Treasurer or other appropriate officer of the Company determines that no withholding tax is required with respect to the exercise of any Option, but it is determined subsequently that the exercise resulted in taxable income as to which withholding is required (as a result of a disposition of the Option Shares or otherwise), Executive shall promptly, upon being notified of the withholding requirement, pay to the Company (by means acceptable to the Company) the amount required to be withheld, and the Company may, at its election, condition any transfer of Option Shares issued upon exercise of the Option upon receipt of such payment.

11

(c)    <u>Notification of Inquiries and Agreements</u>. Executive and each Permitted Transferee of the Executive shall notify the Company in writing within ten (10) days after the date Executive or any such Permitted Transferee (i) first obtains knowledge of any Internal Revenue Service inquiry, audit, assertion, determination, investigation, or question relating in any manner to the value of Options granted hereunder; (ii) includes or agrees (including, without limitation, in any settlement, closing, or other similar agreement) to include in gross income with respect to any Option granted under this Agreement (A) any amount in excess of the amount reported on Form 1099 or Form W-2 to the Executive by the Company, or (B) if the Executive received no such Form, any amount; or (iii) sells, disposes, or otherwise transfers Option Shares acquired pursuant to this Agreement. Upon request, Executive or any such Permitted Transferee shall provide to the Company any information or document relating to any event described in the preceding sentence which the Company (in its sole discretion) requires in order to calculate and substantiate any change in the Company's tax liability as a result of such event.

9.    <u>Representations and Warranties of the Executive</u>. As an inducement to the Company to enter into this Agreement and grant the Options, the Executive hereby represents and warrants to the Company as follows:

(a)    <u>Capacity and Power</u>. The Executive has full capacity, power and authority to execute and deliver this Agreement, to perform his or her obligations under this Agreement and to consummate the transactions contemplated hereby. This Agreement has been duly executed and delivered by the Executive and constitutes a valid and binding agreement, enforceable against him or her in accordance with its terms, subject to applicable bankruptcy, insolvency and other similar laws affecting the enforceability of creditors' rights generally, general equitable principles and the discretion of courts in granting equitable remedies.

(b)    <u>No Conflict</u>. The execution, delivery and performance by the Executive of this Agreement and the transactions contemplated hereby and the fulfillment by him or her of and compliance by him or her with the terms and conditions of this Agreement do not and will not, violate or conflict with any terms or provisions of (i) any contract, deed, lease or other agreement to which he or she is a party or to which any of his or her assets are subject or (ii)any judgment, decree, order, statute, rule or regulation applicable to, him or her or any of his or her assets, except for such violations which could not reasonably be expected to materially impair or delay his or her ability to consummate the transactions contemplated hereby. No consent, approval, order or authorization of, or registration, declaration or filing with, any government agency or public or regulatory unit, agency, body or authority with respect to him or her is required in connection with his or her execution, delivery or performance of this Agreement or the consummation of the transactions contemplated hereby other than any of the foregoing, the failure of which to receive or make, as the case may be, could not reasonably be expected to materially impair or delay his or her ability to consummate the transactions contemplated hereby.

10.    <u>Miscellaneous</u>.

(a)    <u>Administration</u>. Any action taken or decision made by the Company, the Board, or the Committee arising out of or in connection with the construction, administration, interpretation or effect of this Agreement shall lie within its reasonable discretion, as the case may be, and subject to <u>Section 6</u>, shall be final, conclusive, and binding on Executive and all

Persons claiming under or through Executive. By accepting this grant, Executive and each Person claiming under or through Executive shall be conclusively deemed to have indicated acceptance and ratification of, and consent to, any action taken by the Company, the Board, or the Committee or its delegates with respect to this Agreement.

(b)     Rights of Executive. Nothing in this Agreement shall interfere with or limit in any way the right of the Company or any Subsidiary to terminate Executive's employment at any time (with or without Cause), or to confer upon Executive any right to continue in the employ of the Company or any Subsidiary for any period of time, or to continue to receive Executive's current (or other) rate of compensation. Except as otherwise provided herein, unless and until a certificate or certificates representing the Option Shares shall have been issued to Executive, Executive shall not be a stockholder or have any of the rights or privileges of a stockholder of the Company with respect to shares of Common Stock acquired upon exercise of the Option.

(c)     Indemnification. In addition to such other rights of indemnification as they may have as members of the Board, the members of the Board shall be indemnified by the Company against all costs and expenses reasonably incurred by them in connection with any action, suit or proceeding to which they or any of them may be party by reason of any action taken or failure to act under or in connection with this Agreement or any Option granted hereunder, and against all amounts paid by them in settlement thereof (provided such settlement is approved by independent legal counsel selected by the Company) or paid by them in satisfaction of a judgment in any such action, suit or proceeding; provided, that (i) any such Board member shall be entitled to the indemnification rights set forth in this Section 10(c) only if such member has acted in good faith and in a manner that such member reasonably believed to be in or not opposed to the best interests of the Company and, with respect to any criminal action or proceeding, had no reasonable cause to believe that such conduct was unlawful, and (ii) upon the institution of any action, suit or proceeding a Board member shall give the Company written notice thereof and an opportunity, at its own expense, to handle and defend the same before such Board member undertakes to handle and defend it on his own behalf.

(d)     Severability. Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or any other jurisdiction, but this Agreement shall be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein.

(e)     Entire Agreement. Except as otherwise expressly set forth herein, this Agreement, the Plan, the Stockholders Agreement, the Executive Stock Agreement, and the Registration Rights Agreement embody the complete agreement and understanding among the parties hereto with respect to the subject matter hereof and supersede and preempt any prior understandings, agreements or representations by or among the parties, written or oral, which may have related to the subject matter hereof in any way. The parties hereto agree that, upon execution hereof, the Existing Option Agreement shall be cancelled in it entirety and be given no force and effect.

13

(f) <u>Successors and Assigns</u>. Except as otherwise provided herein, this Agreement shall bind and inure to the benefit of and be enforceable by the parties hereto and their respective successors and assigns.

(g) <u>Counterparts</u>. This Agreement may be executed in separate counterparts each of which shall be an original and all of which taken together shall constitute one and the same agreement.

(h) <u>Remedies</u>. The parties hereto shall be entitled to enforce their rights under this Agreement specifically to recover damages by reason of any breach of any provision of this Agreement and to exercise all other rights existing in their favor. The parties hereto agree and acknowledge that money damages may not be an adequate remedy for any breach of the provisions of this Agreement and that the Company and the Executive may in its sole discretion apply to any court of law or equity of competent jurisdiction for specific performance and/or injunctive relief (without posting a bond or other security) in order to enforce or prevent any violation of the provisions of this Agreement.

(i) <u>Notices</u>. All notices, demands or other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be deemed to have been given when delivered personally, mailed by certified or registered mail, return receipt requested and postage prepaid, or sent via a nationally recognized overnight courier, or sent via facsimile to the recipient. Such notices, demands and other communications will be sent to the address indicated below:

<u>If to the Executive</u>:

The Address for the Executive listed on the signature page hereto.

<u>If to the Company, to</u>:

Town Sports International Holdings, Inc.
888 Seventh Avenue, Suite 1801
New York, New York 10106
Attention: Richard Pyle
Facsimile No.: (212) 246-8422

With copies to (which shall not constitute notice to the Company):

Bruckmann, Rosser, Sherrill & Co., Inc.
126 East 56th Street, 29th Floor
New York, New York 10022
Attention: Rice Edmonds
Facsimile No.: (212) 521-3799

Kirkland & Ellis
Citicorp Center
153 East 53rd Street
New York, NY 10022-4675
Attention: Eunu Chun, Esq.

14

Facsimile No.: (212) 446-4900

Town Sports International Holdings, Inc.
888 Seventh Avenue, Suite 1801
New York, New York 10106
Attention: General Counsel
Facsimile No.: (212) 246-8422

or such other address or to the attention of such other Person as the recipient party shall have specified by prior written notice to the sending party.

(j)    <u>Waiver of Jury Trial</u>.  Each of the parties hereto waives any right it may have to trial by jury in respect of any litigation based on, arising out of, under or in connection with this agreement or any course of conduct, course of dealing, verbal or written statement or action of any party hereto.

(k)    <u>Governing Law</u>.  All questions concerning the construction, validity and interpretation of this Agreement and the exhibits hereto will be governed by and construed in accordance with the domestic laws of the State of New York, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York.

(l)    <u>Time if of the Essence; Computation of Time</u>.  Time is of the essence for each and every provision of this Agreement.  Whenever the last day for the exercise of any privilege or the discharge of any duty hereunder shall fall upon a Saturday, Sunday, or any date on which banks in New York, New York are authorized to be closed, the party having such privilege or duty may exercise such privilege or discharge such duty on the next succeeding day which is a regular business day.

(m)    <u>Descriptive Headings</u>.  The descriptive headings of this Agreement are inserted for convenience only and do not constitute a part of this Agreement.

*    *    *    *    *

15

IN WITNESS WHEREOF, the Company and Executive have executed this New Common Stock Option Agreement as of the date first above written.

TOWN SPORTS INTERNATIONAL HOLDINGS, INC.

BY: _____
    Name: RICHARD PYLE
    Title: CFO

TOWN SPORTS INTERNATIONAL, INC.

BY: _____
    Name: ROBERT S. HERBST
    Title: VICE PRESIDENT


_____
EXECUTIVE

Name:

Address: _____
            _____
            _____

IN WITNESS WHEREOF, the Company and Executive have executed this New 2000 Common Stock Option Agreement as of the date first above written.

TOWN SPORTS INTERNATIONAL
HOLDINGS, INC.

By: _____
       Name:
       Title:

TOWN SPORTS INTERNATIONAL, INC.

By: _____
       Name:
       Title:

_____
EXECUTIVE

Name:      Frank Napolitano

Address:

# EXHIBIT B

## NEW 2003 COMMON STOCK OPTION AGREEMENT

      NEW 2003 COMMON STOCK OPTION AGREEMENT, dated as of February 4, 2004, by and among TOWN SPORTS INTERNATIONAL HOLDINGS, INC., a Delaware corporation (the "Company"), TOWN SPORTS INTERNATIONAL, INC., a New York Corporation ("TSI"), and FRANK NAPOLITANO (the "Executive"). Capitalized terms used but not otherwise defined herein shall have the meanings assigned to such terms in Section 1.

      WHEREAS, the Executive was previously granted options (the "TSI Options") to purchase 1,000 shares of the Class A Common Stock, par value $.001 per share (the "TSI Class A Common"), of TSI pursuant to that certain Common Stock Option Agreement, dated as of July 23, 2003, by and among TSI and the Executive (the "Existing Option Agreement");

      WHEREAS, TSI, the Company, the Executive and certain other stockholders of TSI (the "Stockholders") entered into a Restructuring Agreement, dated as of February 4, 2004 (the "Restructuring Agreement"), pursuant to which TSI was reorganized as a wholly owned subsidiary of the Company and all Stockholders contributed and exchanged all of their respective shares of capital stock in TSI for an equal number of shares of capital stock in the Company (the "Restructuring");

      WHEREAS, in connection with the Restructuring, TSI notified the Executive that effective as of the closing date of the Restructuring, all TSI Options issued pursuant to the Town Sports International, Inc. 1996 Option Plan, as amended and embodied in the Executive's TSI Option Agreement would be exchanged for options to purchase an equal number of shares of Class A Common Stock of the Company and this Agreement sets forth the terms and conditions of such new options; and

      WHEREAS, the Executive has executed the Stockholders Agreement (or a joinder thereto), which contains certain transfer restrictions on the Option Shares and the Company, the Investors and the Executive have entered into an Executive Stock Agreement (as amended, restated or modified from time to time, the "Executive Stock Agreement") which contains certain repurchase provisions with respect to the Option Shares and any other shares of Common Stock hold by the Executive.

      NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties to this Agreement hereby agree as follows:

      1.    Definitions. As used herein, the following terms shall have the following meanings:

      "Achieved Equity Value" means, with respect to any Valuation Date, (a) the Actual EBITDA for the Fiscal Year immediately prior to such Acceleration Date multiplied by 6.0 minus (b) the sum of (i) all outstanding Indebtedness of the Company and its Subsidiaries, less cash and cash equivalents held by the Company and its Subsidiaries, as of the Valuation Date and (ii) the aggregate Liquidation Value (as defined in the Certificate of Incorporation) of

all Preferred Stock (plus all accumulated, accrued and unpaid dividends thereon) outstanding as of such Valuation Date.

"Actual EBITDA" means the Consolidated EBITDA of the Company and its Subsidiaries for any particular Fiscal Year, derived from the Company's audited consolidated financial statements for such Fiscal Year.

"Board" means the Board of Directors of the Company, as in effect from time to time.

"Cause" means any of the following with respect to the Executive:  (i)a material breach of Executive's covenants under this Agreement or any other agreement with the Company or its Subsidiaries (including, without limitation, the Executive Stock Agreement, the Stockholders Agreement and the Registration Rights Agreement) not cured within 15 days after receipt of written notice of such breach from the Company; (ii) the commission by Executive of a felony, a crime involving moral turpitude or act causing material harm to the standing and reputation of the Company or any of its Subsidiaries; (iii) the Executive's repeated and deliberate failure to comply with the lawful and reasonable written directives of the Board; or (iv) theft or embezzlement of a material amount of money or property of the Company or any of its Subsidiaries, perpetration of fraud, or participation in a fraud, on the Company or any of its Subsidiaries.

"Certificate of Incorporation" means the Company's Certificate of Incorporation as in effect on the date hereof, as the same may be amended, restated or modified from time to time.

"Class A Common" means the Company's Class A Common Stock, par value $.001 per share.

"Code" means the Internal Revenue Code of 1986, as amended, and any successor statute.

"Committee" means the Compensation Committee or such other committee of the Board as the Board may designate or, if for any reason the Board has not designated such a committee, the Board.  The Committee, if other than the Board, shall be composed of two or more directors as appointed from time to time by the Board, pursuant to the terms of the Stockholders Agreement.

"Common Stock" means the Class A Common, the Company's Class B Common Stock, par value $.001 per share, and any other class of common stock of the Company or if such outstanding Common Stock is hereafter changed into or exchanged for different securities of the Company, such other securities.

"Consolidated EBITDA" means, for any period, (a) the sum of (i) net income of the Company and its Subsidiaries for such period taken as a single accounting period determined in conformity with GAAP, (ii) provisions for cash taxes based on income, (iii) total interest expense, (iv) amortization or write-off of deferred financing costs to the extent included in net income, (v) depreciation expense, (vi) amortization expense, (vii) deferred rent expenses, (viii)

2

without duplication, all other non-cash charges included in determining net income for such period, (ix) losses on sales of assets (excluding sales in the ordinary course of business) and other extraordinary or nonrecurring losses, minus (b) the amount for such period of gains on sales of assets (excluding sales in the ordinary course of business) and other extraordinary or nonrecurring gains, all as determined on a consolidated basis in accordance with GAAP.

"Current Valuation Date" has the meaning set forth in Section 3(b)(ii).

"Disability" means the inability, due to illness, accident, injury, physical or mental incapacity or other disability, of the Executive to carry out his duties and obligations to the Company or to participate in the management of the Company or a Subsidiary of the Company for a period of at least 90 consecutive days or for shorter periods aggregating at least 120 days (whether or not consecutive) during any twelve-month period, as determined by the Board in good faith.

"Equity Value Target" means the amounts corresponding to the Valuation Dates set below (as equitably adjusted by the Committee in good faith to reflect material acquisitions consummated by the Company after the date hereof):

| Valuation Date | Equity Value Target |
|---|---|
| December 31, 2004 | $150,037,000 |
| December 31, 2005 | $189,846,000 |
| December 31, 2006 | $251,347,000 |
| December 31, 2007 | $334,327,000 |

"Expiration Date" means July 23, 2013, subject to earlier expiration as provided in Section 4.

"Fair Market Value" means, for each share of Common Stock, the average of the closing per share prices of the sales of the Common Stock on all securities exchanges on which the Common Stock may at the time be listed, or, if there have been no sales on any such exchange on any day, the average of the highest bid and lowest asked prices on all such exchanges at the end of such day, or, if on any day the Common Stock is not so listed, the average of the representative bid and asked per share prices quoted in the NASDAQ National Market System as of 4:00 P.M., New York time, or, if on any day the Common Stock is not quoted in the NASDAQ National Market System, the average of the highest bid and lowest asked per share prices on such day in the domestic over-the-counter market as reported by the NASDAQ National Quotation Bureau, Incorporated, or any similar successor organization, in each such case averaged over a period of 21 trading days consisting of the day as of which the Fair Market Value is being determined and the 20 consecutive trading days prior to such day. If at any time the Common Stock is not so listed on any securities exchange or quoted in the NASDAQ National Market System or the domestic over-the-counter market, the Fair Market Value, will be the fair value of the Common Stock as determined in good faith by the Board and set forth in a written notice to the Executive; provided, that if the Executive objects to such determination in writing within 10 days of receipt of such determination from the Board, the Fair Market Value shall be determined by an independent investment banking firm mutually selected by the Board and the Executive; and the costs of such investment banking firm shall be borne by

3

the party whose determination is farthest from the determination of such investment banking firm.

"Fiscal Year" means, for the Company, the calendar year ending on December 31 of each year.

"Form" means those forms of the Internal Revenue Service used by taxpayers to file federal income tax returns or reports required under the Code or applicable Treasury Regulations promulgated thereunder.

"GAAP" means generally accepted accounting principles in the United States of America as in effect on the date hereof, consistently applied.

"Indebtedness" means all indebtedness of the Company or any of its Subsidiaries determined on a consolidated basis including, without limitation, (a) all obligations for borrowed money or evidenced by bonds, debentures, notes, letters of credit or other similar instruments, (b) obligations as lessee under capital leases, (c) obligations to pay the deferred purchase price of property or services, except accounts payable arising in the ordinary course of business and (d) all indebtedness of other Persons guaranteed or otherwise supported by the Company or any of its Subsidiaries to the extent classified as debt in accordance with GAAP, it being understood that all obligations with respect to any items listed in clauses (a) through (d) above include, without limitation, obligations for interest, principal, prepayment penalties, premiums, fees, expenses, indemnities and breakage or similar charges.

"Investors" has the meaning set forth in the Executive Stock Agreement.

"Measurement Date" means the date on which any taxable income resulting from the exercise of an Option is determined under applicable federal income tax law.

"Option" has the meaning set forth in Section 2(a).

"Option Agreements" means, collectively, this Agreement and each of the other Common Stock Option Agreements, by and between the Company and each of certain management employees of the Company, in each case as the same may be amended, restated or modified from time to time.

"Option Shares" means, collectively, (i) all shares of Class A Common issued or issuable upon the exercise of an Option, and (ii) any shares of the Company's capital stock issued with respect to the shares of Common Stock set forth in clause (i) by way of merger, consolidation, reclassification, stock split, reverse stock split, stock dividend or other recapitalization. Option Shares shall continue to be Option Shares in the hands of any holder other than Executive (including, without limitation, any Permitted Transferee of the Executive), except for the Company, the Investor or any transferee in an underwritten public offering registered under the Securities Act. Except as otherwise provided herein, each other holder of Option Shares will succeed to the rights and obligations attributable to the Executive as a holder of Option Shares hereunder.

4

"Permitted Transferee" means, as to any Person, the "Permitted Transferees" (as defined in the Stockholders Agreement) of such Person.

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, or a government entity (or any department, agency or political subdivision thereof).

"Plan" means the company's 2004 Stock Option Plan, a copy of which is attached hereto as Exhibit A, as the same may be amended, restated or modified from time to time.

"Preferred Stock" means, collectively, the Company's Senior Preferred Stock, par value $1.00 per share, the Company's Series A Preferred Stock, par value $1.00 per share, the Company's Series B Preferred Stock, par value $1.00 per share, and any other class or series of the Company's preferred stock, or if such outstanding Preferred Stock is hereafter changed into or exchanged for different securities of the Company, such other securities.

"Registration Rights Agreement" means the Registration Rights Agreement, dated as of February 4, 2004, by and among the Company and certain stockholders of the Company, as the same may be amended, restated or modified from time to time.

"Sale of the Company" means the sale of the Company, in a single transaction or a series of related transactions, to an Unaffiliated Third Party pursuant to which such Unaffiliated Third Party acquires all of the outstanding Common Stock (whether by merger, consolidation, recapitalization, reorganization, purchase of the outstanding Common Stock or otherwise) or all or substantially all of the consolidated assets of the Company.

"Securities Act" means the Securities Act of 1933, as amended.

"Stockholders Agreement" means the Stockholders Agreement, dated as of February 4, 2004, by and among the Company and certain stockholders of the Company, as the same may be amended, restated or modified from time to time.

"Subsidiary" means, with respect to any Person, any corporation, partnership, limited liability company association or other business entity of which (i) if a corporation or a limited liability company, a majority of the total voting power of securities entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (ii) if a partnership, association or other business entity, a majority of the partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by any Person or one or more Subsidiaries of that Person or a combination thereof. For purposes hereof, a Person or Persons shall be deemed to have a majority ownership interest in a partnership, association or other business entity if such Person or Persons shall be allocated a majority of partnership, association or other business entity gains or losses or shall be or control the managing director or general partner of such partnership, association or other business entity.

"Termination Date" means the date upon which Executive's employment with the Company terminates, including, without limitation, by reason of death or Disability.

"Unaffiliated Third Party" means any Person who, immediately prior to the contemplated transaction (i) does not own in excess of 5% of the Common Stock on a fully diluted basis (a "5% Owner"), (ii) is not controlling, controlled by or under common control with any such 5% Owner and (iii) is not the spouse or descendent (by birth or adoption) of any such 5% Owner or a trust for the benefit of such 5% Owner and/or such other Persons.

"Valuation Date" means the dates set forth in the table in the definition of "Equity Value Target" set forth herein.

2.    The Options.

(a)    Term of the Options.  Subject to the Executive executing and delivering to the Company the Stockholders Agreement and the Executive Stock Agreement (to the extent not already so executed and delivered), the Company hereby grants to Executive, as of the date hereof, an option (the "Option") to purchase up to 1,000 shares of the Company's Class A Common, subject to the terms and conditions set forth herein.  The exercise price for (i) 20% of the Option Shares issuable upon exercise of the option (the "Tranche I Option") is $144.00 per Option Share (the "Tranche I Exercise Price"), and (ii) 80% of the Option Shares issuable upon exercise of the Option (the "Tranche II Option") is $91.50 per Option Share (the "Tranche II Exercise Price," and together with the Tranche I Exercise Price, the "Exercise Price").  All rights of the Executive as the holder of the Options issued hereunder shall be solely determined by the provisions of this Agreement.  The Executive's Options will expire as provided in Section 4 hereof.

(b)    Form of the Options.  The Options granted hereunder are not "incentive stock options" within the meaning of Section 422 of the Code (or any successor provision). The Options granted hereunder qualify for the exemption from registration under the Securities Act pursuant to Rule 701 promulgated thereunder.

(c)    Payment of Exercise Price.  Subject to Section 3 below, the Options may be exercised in whole or in part upon payment of an amount (the "Option Price") equal to the product of (i) the applicable Exercise Price for the applicable Options multiplied by (ii) the number of Option Shares to be acquired.  Payment shall be made in cash by a certified or official bank check payable to the Company (or the equivalent thereof acceptable to the Committee).

(d)    Procedure for Exercise.  The Executive may exercise all or any portion of the Options, to the extent they have vested and are outstanding, at any time and from time to time prior to their expiration as set forth in Section 4, by filing written notice of exercise to the Company, accompanied by a statement of the Executive that he has read and has been afforded an opportunity to ask questions of management of the Company regarding all financial and other information provided to him regarding the Company, together with payment of the Option Price in accordance with the provisions of Section 2(c) above.  As a condition to any exercise of any Option, the Executive will permit the Company to deliver to him all financial and other information regarding the Company (if any) it believes necessary to enable the Executive to make an informed investment decision, and the Executive will make all customary investment representations which the Company requires.

6

(e)   <u>Non-Transferability of Options</u>.  The Executive's Options are personal to the Executive and are not transferable by the Executive other than by will or the laws of descent and distribution.  During the Executive's lifetime, only the Executive may exercise the Options. In the event of the Executive's death, the Options may be exercised only (i) by the executor or administrator of the Executive's estate or the Person or Persons to whom the Executive's rights under the Options shall pass by will or the laws of descent and distribution (provided that each beneficiary shall execute and deliver an undertaking in writing to be bound by the terms of this Agreement, the Stockholders Agreement and the Executive Stock Agreement in form and substance acceptable to the Committee) and (ii) to the extent that the Executive was entitled to exercise such Options hereunder at the date of the Executive's death.

(f)   <u>Adjustments upon Changes in Capitalization</u>.  If and to the extent specified by the Committee, the number of shares of Class A Common which may be issued pursuant to the exercise of Options shall be equitably adjusted for any stock dividend, stock split, recapitalization, merger, consolidation or other recapitalization; <u>provided</u>, that any Options to purchase fractional shares of Class A Common resulting from any such adjustment shall be rounded to the nearest whole share.  Adjustments under this <u>Section 2(f)</u> shall be made by the Committee in its reasonable discretion, whose determination as to what adjustments shall be made, and the extent thereof, shall be final, binding and conclusive.

3.   <u>Vesting</u>.

(a)   <u>Normal Vesting</u>.  The Tranche I Options are fully vested as of the date hereof.  The Tranche II Options shall vest on December 31, 2012 (the "<u>Vesting Date</u>").  Options which have vested pursuant to the terms hereof shall be referred to as "<u>Vested Options</u>", and any Options which have not vested pursuant to the terms hereof shall be referred to as "<u>Unvested Options</u>".

(b)   <u>Accelerated Vesting</u>.

(i)   Notwithstanding anything contained in <u>Section 3(a)</u> to the contrary, in the event that, prior to December 31, 2007, a Sale of the Company is consummated and the aggregate gross consideration to be received in connection with such sale by the holders of the Company's Common Stock equals or exceeds the Equity Value Target for the Valuation Date immediately preceding the date of such Sale of the Company, the portion of the Options which has not vested as of such date shall be deemed to have been immediately vested and exercisable as of the consummation of such Sale of the Company and such holders shall be given an opportunity to exercise such Options and be treated as a holder of Common Stock in connection with such transaction.

(ii)   Notwithstanding anything contained in <u>Section 3(a)</u> to the contrary, if, on each of the Valuation Dates, the Achieved Equity Value with respect to such Valuation Date (A) equals or exceeds 90% of the Equity Value Target for such Valuation Date, then 12.5% of the total Tranche II Options shall vest, or (B) equals or exceeds the applicable Equity Value Target, then 25% of the total Tranche II Options shall vest; <u>provided</u>, that if the Achieved Equity Value on any Valuation Date (the "<u>Current Valuation Date</u>") equals or exceeds the Equity Value Target and less than 25% of the total Tranche II Options vested on any

7

previous Acceleration Date, on such Current Valuation Date the Executive shall be vested in 25% of the total (but could have vested had the Equity Value Target been made) Options plus such percentage of the total Tranche II Options that did not so vest on any such previous Valuation Date(s).

> FOR EXAMPLE : If, on December 31, 2004, no Tranche II Options vested and on December 31, 2005, 12.5% of the total Tranche II Options vested, and as of December 31, 2006, the Equity Value Target therefor has been achieved by the Company, 62.5% of the Executive's total Tranche II Options granted as of the date hereof will become Vested Options on December 31, 2006 (i.e., 25% (representing Tranche II Options vesting for 2005) plus 25% (representing Tranche II Options which previously did not vest in 2004) plus 12.5% (representing Tranche II Options which previously did not vest in 2005)).

4.    Expiration.

(a)    Expiration of Vested Options.  Except as set forth in Section 4(b), Vested Options not exercised as of the Termination Date shall expire on the earliest to occur of (i) the date which is 90 days after termination of the Executive's employment with the Company for any reason (other than death or Disability in which case the Options shall expire on the date which is 120 days after the date of such termination), (ii) the consummation of a Sale of the Company, subject to Section 3(b) above and (iii) the Expiration Date.

(b)    Expiration of Unvested Options.   In the event that the Executive's employment with the Company is terminated for any reason, all Unvested Options as of the Termination Date shall automatically and immediately terminate and be permanently forfeited.

(c)    Expiration Upon Termination for Cause.   Notwithstanding anything contained in this Agreement to the contrary, all Vested Options and Unvested Options granted to the Executive shall immediately expire and cease to be exercisable and all rights granted under this Agreement shall immediately expire in the event that the Executive is terminated for Cause by the Company at any time.

5.    Restrictions on Option Shares; Securities Laws Matters.

(a)    Right to Repurchase Option Shares.  In the event Executive's employment with the Company is terminated for any reason (including death or Disability), the Option Shares actually issued (whether held by Executive or one or more Permitted Transferees and including any Option Shares acquired subsequent to such termination of employment) will be subject to repurchase by the Company and the Investors pursuant to the terms and conditions of the Executive Stock Agreement.

(b)    Restrictions on Transfer.  The Executive hereby acknowledges and agrees that the Executive is a party to the Stockholders Agreement which governs and restricts the Executive's ability to transfer any Option Shares and other matters relating to the Executive as a stockholder of the Company.

8

(c)    <u>Securities Law Matters</u>.  The Executive hereby represents that upon exercising an Option, the Executive will be purchasing Option Shares for his own account and not on behalf of others.  The Executive hereby understands and acknowledges that federal and state securities laws govern and restrict the Executive's right to offer, sell or otherwise dispose of any Option Shares unless such offer, sale or other disposition thereof is registered under the Securities Act and state securities laws, or in the opinion of the Company's counsel, such offer, sale or other disposition is exempt from registration or qualification thereunder.  The Executive will not offer, sell or otherwise dispose of any Option Shares in any manner which would: (i) require the Company to file any registration statement with the Securities and Exchange Commission (or any similar filing under state law) or to amend or supplement any such filing or (ii) violate or cause the Company to violate the Securities Act, the rules and regulations promulgated thereunder or any other state or federal law.

(d)    <u>Restricted Securities</u>.  All Option Shares issued pursuant to the terms of this Agreement shall constitute "restricted securities," as that term is defined in Rule 144 promulgated by the Securities and Exchange Commission pursuant to the Securities Act, and may not be transferred except in compliance with the registration requirements of the Securities Act or an exemption therefrom.  The certificates representing the Option Shares will bear the legend set forth in Section 6(a) of the Executive Stock Agreement and Section 7 of the Stockholders Agreement.

(e)    <u>Listing, Registration, and Legal Compliance</u>.  If at any time the Committee, in its discretion, determines that the listing, registration, or qualification of the Option Shares upon any securities exchange or under any state or federal securities or other law or regulation, or the consent, or approval of any governmental regulatory body, is reasonably required as a condition to or in connection with the granting of Options or the purchase or issuance of Option Shares thereunder, no Options may be granted or exercised, in whole or in part, unless such listing, registration, qualification, consent, or approval shall have been effected or obtained free of any conditions not acceptable to the Committee.  The Executive agrees to supply the Company with such certificates, representations, and information as the Company shall request and shall otherwise cooperate with the Company in obtaining such listing, registration, qualification, consent, or approval.  The Company hereby agrees to make all such filings and registrations as reasonably required to effectuate the terms of this Agreement.  In the case of officers and other Persons subject to Section 16(b) of the Securities Exchange Act of 1934, as amended, the Committee may impose, at any time, any limitations upon the exercise of Options that, in the Committee's discretion, are necessary or desirable in order to comply with such Section 16(b) and the rules and regulations thereunder.

6.    <u>Amendment and Waiver</u>.  The Committee may amend or modify any Option; <u>provided</u>, that no amendment or modification shall impair the rights of Executive without the consent of Executive unless the holders of a majority of the aggregate number of Options (based upon the number of Option Shares to be obtained upon exercise) granted by the Company pursuant to all Option Agreements consent to such amendment in writing and such amendment affects all such holders similarly.

9

7.    Non-Compete; Nonsolicitation.

(a)    Noncompetition.

(i)    As an inducement to the Company to enter into this Agreement and grant the Options hereunder, the Executive agrees that, (A) during his period of employment with the Company and (B) in the event that the Executive resigns or Executive's employment is terminated by the Company for any reason, during the period which the Company is paying the Executive severance compensation (which shall be at a rate and an amount equal to the Executive's salary and all health and other insurance benefits received by the Executive immediately prior to the Termination Date), such period not to exceed one year (the "Noncompete Period"), he shall not directly or indirectly own, manage, control, participate in, consult with, render services for, or in any manner engage in, any business competing directly or indirectly with the business as now or hereafter conducted by the Company which are logical extensions of the Company's current business, within any metropolitan area in which the Company or any of its Subsidiaries engages or has definitive plans to engage in such business; provided, that (x) the Executive shall not be precluded from purchasing or holding publicly-traded securities of any such entity so long as the Executive shall hold less than 2% of the outstanding units of any such class of securities and has no active participation in the business of such entity and (y) the Company shall have notified the Executive of its agreement to provide such severance compensation (1) in the event of resignation, within five days of the Termination Date or (2) in the event of termination, on or before the Termination Date.  Notwithstanding anything contained herein to the contrary, the Executive's agreement set forth in clause (B) above shall not apply in the event that the Termination Date occurs after the fifth anniversary of the date of this Agreement.

(ii)    During the Noncompete Period, the Executive shall not directly or indirectly through another entity (i) induce or attempt to induce any employee of the Company or any of its Subsidiaries to leave the employ of the Company or any of its Subsidiaries, or in any way interfere with the relationship between the Company or any of its Subsidiaries and any employee thereof, (ii) hire any person who was an employee of the Company or any of its Subsidiaries at any time during Executive's employment period except for such employees who have been terminated for at least six months or (iii) induce or attempt to induce any customer, supplier, licensee, franchisor or other business relation of the Company or any of its Subsidiaries to cease doing business with such member, or in any way interfere with the relationship between any such customer, supplier, licensee, franchisor or business relation, on the one hand, and the Company or any of its Subsidiaries, on the other hand.

(iii)    The provisions of this Section 7(a) shall survive any termination of this Agreement.

(iv)    If, at the time of enforcement of this Section 7(a), a court of competent jurisdiction shall hold that the duration, scope or area restrictions stated herein are unreasonable under circumstances then existing, the parties hereto agree that the maximum duration, scope or area reasonable under such circumstances shall be substituted for the stated duration, scope or area and that such court shall be allowed to revise the restrictions contained herein to cover the maximum period, scope and area permitted by law.

(b)    <u>Confidential Information</u>.  The Executive acknowledges that he may have access to certain confidential, non-public and proprietary information (the "Confidential Information"), concerning the Company and its Subsidiaries and their respective officers, directors, stockholders, employees, agents and representatives and agrees that: (i) unless pursuant to prior written consent by the Company, the Executive shall not disclose any Confidential Information or the provisions of this Agreement or knowledge of this Agreement's existence to any Person for any purpose whatsoever unless compelled by court order of subpoena; (ii) the Executive shall treat as confidential all Confidential Information and shall take reasonable precautions to prevent unauthorized access to the Confidential Information; (iii) the Executive shall not use the Confidential Information in any way detrimental to the Company or any of its Subsidiaries and shall use the Confidential Information for the exclusive purpose of effecting his duties of employment with the Company; and (iv) the Executive agrees that the Confidential Information obtained during his employment with the Company shall remain the exclusive property of the Company, and the Executive shall promptly return to the Company all material which incorporates, or is derived from, all such Confidential Information upon termination of his employment with the Company.  The Executive shall be responsible for any breach of the terms of this <u>Section 7(b)</u> by any holder of the Option Shares.  It is hereby agreed that Confidential Information does not include information generally available and known to the public or obtained from a source not bound by a confidentiality agreement with the Company.

(c)    <u>Inventions and Patents</u>.  The Executive hereby agrees that all inventions, innovations or improvements in the method of conducting the business (including improvements, ideas and discoveries, whether patentable or not) of the Company or any of its Subsidiaries whether prior to the date hereof or thereafter, in each case conceived or made by him in the course of his employment with the Company, belong to the Company and its Subsidiaries, except for such inventions, innovations and improvements that have become part of the public domain and are not entitled to statutory or common law protection.  The Executive will promptly disclose such inventions, innovation or improvements to the Board and perform all actions reasonably requested by the Board to establish and confirm such ownership by the Company or any of its Subsidiaries.

8.    <u>Withholding Tax Requirements</u>.

(a)    <u>Amount of Withholding</u>.  It shall be a condition to the exercise of any Option that Executive make appropriate payment or other provision acceptable to the Company with respect to any withholding tax requirement arising under applicable statutes or regulations from such exercise.  The amount of withholding tax required by statute or regulation, if any, with respect to any Option exercise (the "Withholding Amount") shall be reasonably determined by the Treasurer or other appropriate officer of the Company, and Executive shall furnish such information as such officer requests to make such determination.

(b)    <u>Withholding Procedure</u>.  If the Company determines that withholding tax is required by statute or regulation with respect to any Option exercise, the Company shall notify Executive of the Withholding Amount, and Executive shall pay to the Company an amount not less than the Withholding Amount.  In lieu of making such payment, the Executive may pay the Withholding Amount by either (i) delivering to the Company a number of Option Shares having an aggregate Fair Market Value as of the Measurement Date less than or equal to the

11

Withholding Amount, or (ii) directing the Company to withhold and not deliver or issue to the Executive a number of Option Shares, otherwise issuable upon the exercise of the Option, having an aggregate Fair Market Value as of the Measurement Date less than or equal to the Withholding Amount. Any shortfall between the Withholding Amount and the Fair Market Value of Option Shares delivered or withheld under the preceding sentence shall be paid by Executive in cash. All amounts paid to or withheld by the Company and the value of all Option Shares delivered to or withheld by the Company pursuant to this Section 8 shall be deposited in accordance with applicable law by the Company as withholding tax for Executive's account. If the Treasurer or other appropriate officer of the Company determines that no withholding tax is required with respect to the exercise of any Option, but it is determined subsequently that the exercise resulted in taxable income as to which withholding is required (as a result of a disposition of the Option Shares or otherwise), Executive shall promptly, upon being notified of the withholding requirement, pay to the Company (by means acceptable to the Company) the amount required to be withheld, and the Company may, at its election, condition any transfer of Option Shares issued upon exercise of the Option upon receipt of such payment.

(c) _Notification of Inquiries and Agreements_. Executive and each Permitted Transferee of the Executive shall notify the Company in writing within ten (10) days after the date Executive or any such Permitted Transferee (i) first obtains knowledge of any Internal Revenue Service inquiry, audit, assertion, determination, investigation, or question relating in any manner to the value of Options granted hereunder; (ii) includes or agrees (including, without limitation, in any settlement, closing, or other similar agreement) to include in gross income with respect to any Option granted under this Agreement (A) any amount in excess of the amount reported on Form 1099 or Form W-2 to the Executive by the Company, or (B) if the Executive received no such Form, any amount; or (iii) sells, disposes, or otherwise transfers Option Shares acquired pursuant to this Agreement. Upon request, Executive or any such Permitted Transferee shall provide to the Company any information or document relating to any event described in the preceding sentence which the Company (in its sole discretion) requires in order to calculate and substantiate any change in the Company's tax liability as a result of such event.

9. _Representations and Warranties of the Executive_. As an inducement to the Company to enter into this Agreement and grant the Options, the Executive hereby represents and warrants to the Company as follows:

(a) _Capacity and Power_. The Executive has full capacity, power and authority to execute and deliver this Agreement, to perform his or her obligations under this Agreement and to consummate the transactions contemplated hereby. This Agreement has been duly executed and delivered by the Executive and constitutes a valid and binding agreement, enforceable against him or her in accordance with its terms, subject to applicable bankruptcy, insolvency and other similar laws affecting the enforceability of creditors' rights generally, general equitable principles and the discretion of courts in granting equitable remedies.

(b) _No Conflict_. The execution, delivery and performance by the Executive of this Agreement and the transactions contemplated hereby and the fulfillment by him or her of and compliance by him or her with the terms and conditions of this Agreement do not and will not, violate or conflict with any terms or provisions of (i) any contract, deed, lease or other agreement to which he or she is a party or to which any of his or her assets are subject or (ii)any

12

judgment, decree, order, statute, rule or regulation applicable to, him or her or any of his or her assets, except for such violations which could not reasonably be expected to materially impair or delay his or her ability to consummate the transactions contemplated hereby. No consent, approval, order or authorization of, or registration, declaration or filing with, any government agency or public or regulatory unit, agency, body or authority with respect to him or her is required in connection with his or her execution, delivery or performance of this Agreement or the consummation of the transactions contemplated hereby other than any of the foregoing, the failure of which to receive or make, as the case may be, could not reasonably be expected to materially impair or delay his or her ability to consummate the transactions contemplated hereby.

10.    Miscellaneous.

(a)    Administration. Any action taken or decision made by the Company, the Board, or the Committee arising out of or in connection with the construction, administration, interpretation or effect of this Agreement shall lie within its reasonable discretion, as the case may be, and subject to Section 6, shall be final, conclusive, and binding on Executive and all Persons claiming under or through Executive. By accepting this grant, Executive and each Person claiming under or through Executive shall be conclusively deemed to have indicated acceptance and ratification of, and consent to, any action taken by the Company, the Board, or the Committee or its delegates with respect to this Agreement.

(b)    Rights of Executive. Nothing in this Agreement shall interfere with or limit in any way the right of the Company or any Subsidiary to terminate Executive's employment at any time (with or without Cause), or to confer upon Executive any right to continue in the employ of the Company or any Subsidiary for any period of time, or to continue to receive Executive's current (or other) rate of compensation. Except as otherwise provided herein, unless and until a certificate or certificates representing the Option Shares shall have been issued to Executive, Executive shall not be a stockholder or have any of the rights or privileges of a stockholder of the Company with respect to shares of Common Stock acquired upon exercise of the Option.

(c)    Indemnification. In addition to such other rights of indemnification as they may have as members of the Board, the members of the Board shall be indemnified by the Company against all costs and expenses reasonably incurred by them in connection with any action, suit or proceeding to which they or any of them may be party by reason of any action taken or failure to act under or in connection with this Agreement or any Option granted hereunder, and against all amounts paid by them in settlement thereof (provided such settlement is approved by independent legal counsel selected by the Company) or paid by them in satisfaction of a judgment in any such action, suit or proceeding; provided, that (i) any such Board member shall be entitled to the indemnification rights set forth in this Section 10(c) only if such member has acted in good faith and in a manner that such member reasonably believed to be in or not opposed to the best interests of the Company and, with respect to any criminal action or proceeding, had no reasonable cause to believe that such conduct was unlawful, and (ii) upon the institution of any action, suit or proceeding a Board member shall give the Company written notice thereof and an opportunity, at its own expense, to handle and defend the same before such Board member undertakes to handle and defend it on his own behalf.

13

(d)    <u>Severability</u>.  Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or any other jurisdiction, but this Agreement shall be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein.

(e)    <u>Entire Agreement</u>.  Except as otherwise expressly set forth herein, this Agreement, the Plan, the Stockholders Agreement, the Executive Stock Agreement, and the Registration Rights Agreement embody the complete agreement and understanding among the parties hereto with respect to the subject matter hereof and supersede and preempt any prior understandings, agreements or representations by or among the parties, written or oral, which may have related to the subject matter hereof in any way.  The parties hereto agree that, upon execution hereof, the Existing Option Agreement shall be cancelled in its entirety and be given no force and effect.

(f)    <u>Successors and Assigns</u>.  Except as otherwise provided herein, this Agreement shall bind and inure to the benefit of and be enforceable by the parties hereto and their respective successors and assigns.

(g)    <u>Counterparts</u>.  This Agreement may be executed in separate counterparts each of which shall be an original and all of which taken together shall constitute one and the same agreement.

(h)    <u>Remedies</u>.  The parties hereto shall be entitled to enforce their rights under this Agreement specifically to recover damages by reason of any breach of any provision of this Agreement and to exercise all other rights existing in their favor.  The parties hereto agree and acknowledge that money damages may not be an adequate remedy for any breach of the provisions of this Agreement and that the Company and the Executive may in its sole discretion apply to any court of law or equity of competent jurisdiction for specific performance and/or injunctive relief (without posting a bond or other security) in order to enforce or prevent any violation of the provisions of this Agreement.

(i)    <u>Notices</u>.  All notices, demands or other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be deemed to have been given when delivered personally, mailed by certified or registered mail, return receipt requested and postage prepaid, or sent via a nationally recognized overnight courier, or sent via facsimile to the recipient.  Such notices, demands and other communications will be sent to the address indicated below:

<u>If to the Executive</u>:

The Address for the Executive listed on the signature page hereto.

14

<u>If to the Company, to:</u>

Town Sports International Holdings, Inc.
888 Seventh Avenue, 25th Floor
New York, New York 10106
Attention:  Richard Pyle
Facsimile No.:  (212) 246-8422

<u>With copies to (which shall not constitute notice to the Company):</u>

Bruckmann, Rosser, Sherrill & Co., Inc.
126 East 56th Street, 29th Floor
New York, New York 10022
Attention:  Rice Edmonds
Facsimile No.:  (212) 521-3799

Kirkland & Ellis LLP
Citigroup Center
153 East 53rd Street
New York, NY 10022-4611
Attention:  Eunu Chun, Esq.
Facsimile No.:  (212) 446-4900

Town Sports International Holdings, Inc.
888 Seventh Avenue, Suite 1801
New York, New York 10106
Attention:  General Counsel
Facsimile No.:  (212) 246-8422

or such other address or to the attention of such other Person as the recipient party shall have specified by prior written notice to the sending party.

(j)      <u>Waiver of Jury Trial</u>.  Each of the parties hereto waives any right it may have to trial by jury in respect of any litigation based on, arising out of, under or in connection with this agreement or any course of conduct, course of dealing, verbal or written statement or action of any party hereto.

(k)      <u>Governing Law</u>.  All questions concerning the construction, validity and interpretation of this Agreement and the exhibits hereto will be governed by and construed in accordance with the domestic laws of the State of New York, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York.

(l)      <u>Time if of the Essence; Computation of Time</u>.  Time is of the essence for each and every provision of this Agreement.  Whenever the last day for the exercise of any privilege or the discharge of any duty hereunder shall fall upon a Saturday, Sunday, or any date on which banks in New York, New York are authorized to be closed, the party having such

15

privilege or duty may exercise such privilege or discharge such duty on the next succeeding day which is a regular business day.

       (m)   <u>Descriptive Headings</u>.  The descriptive headings of this Agreement are inserted for convenience only and do not constitute a part of this Agreement.

*    *    *    *    *

IN WITNESS WHEREOF, the Company and Executive have executed this New Common Stock Option Agreement as of the date first above written.

TOWN SPORTS INTERNATIONAL HOLDINGS, INC.

BY: _____

Name: *RICHARD PYLE*

Title: *CFO*

TOWN SPORTS INTERNATIONAL, INC.

BY: _____

Name: *ROBERT S. HERBST*

Title: *VICE PRESIDENT*

_____
EXECUTIVE

Name:

Address: _____

_____

_____

IN WITNESS WHEREOF, the Company and Executive have executed this New 2003 Common Stock Option Agreement as of the date first above written.

TOWN SPORTS INTERNATIONAL
HOLDINGS, INC.

By:    _____
       Name:
       Title:

TOWN SPORTS INTERNATIONAL, INC.

By:    _____
       Name:
       Title:

_____
EXECUTIVE

Name:        Frank Napolitano

Address:     1237 Hoffman U.
             Ansler, PA 1900?