# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| FRANK J. NAPOLITANO, JR. | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | NO. 07-CV-755 |
| | : | |
| vs. | : | |
| | : | |
| TOWN SPORTS INTERNATIONAL | : | |
| HOLDINGS INC. and TOWN SPORTS | : | |
| INTERNATIONAL, INC. | : | |
| | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Richard G. Tuttle
Archer & Greiner, P.C
Suite 1620
One South Broad Street
Philadelphia, PA  19107
(215) 963-3300
rtuttle@archerlaw.com

Counsel for Plaintiff
Frank J. Napolitano, Jr.

April 24, 2007

# TABLE OF CONTENTS

Preliminary Statement ................................................................. 1

Undisputed Facts ...................................................................... 3

ARGUMENT ............................................................................ 11

I.  Based on the undisputed facts of record, the plaintiff requests, and the Court is fully empowered to grant, a decree of specific performance under Count I of the complaint, requiring the defendants to honor plaintiff's exercise of his vested options ................................................................. 13

    A.  The plaintiff's application for specific performance is fully supported by decisions of the New York courts .................................. 13

    B.  Stock options granted in return for personal services are not among the class of options for which time of exercise is "of the essence" of the agreement ................................................................. 22

    C.  The 90-day notice provision is a condition subsequent, noncompliance with which may be excused by a court of equity where a forfeiture would otherwise result ...................................................... 24

    D.  Stock options have been specifically enforced by New York courts, after default, in circumstances much like those present in this case ................................................................. 27

    E.  A contract for personal services should not be interpreted by a court of equity to require forfeiture of benefits for a minor and technical violation of a condition subsequent ...................................... 29

II.  Based on the undisputed documentary record, the Court may, and should, declare the 90-day notice provision to be ambiguous, and should construe the clause in a manner that will avoid forfeiture ................................. 31

A. The 90-day forfeiture provision on which the defendants rely is
ambiguous ............................................................................................ 32

B. The Court determines whether the language in question is capable of
two different meanings, and therefore ambiguous ............................... 47

C. There are no disputes of material fact which, if resolved in favor of the
defendants, would eliminate the ambiguity in question, and, as a matter
of law, the Court may and should resolve the ambiguity to avoid
forfeiture ............................................................................................. 48

CONCLUSION ......................................................................................................... 53

# TABLE OF AUTHORITIES

## Cases

*220 West 42 Assoc. v. The Ronbet Newmark Co.*, 84  Misc. 2d 259, 264, 375
NYS2d 255, 260-61 (N.Y. Sup. 1975) ..................................................... 29

*Acadia Plastics v. Hutcheon*, 38 A.D.2d 584, 585, 328 N.Y.S.2d 220, 221 (2d
Dept. 1971) ............................................................................................. 20

*Baltimore Realty Corp. v. Alman*, 282 A.D. 714, 122 N.Y.S.2d 224 (2d Dept.
1953) .................................................................................................... 27-29

*Bensons Plaza v. A&P*, 44 N.Y.2d 791, 792-93, 377 N.E.2d 477, 478, 406
N.Y.S.2d 33, 34 (1978) ........................................................................... 50

*Birdsall v. Suit-Kote Corp.*, 241 A.D.2d 889, 890, 661 N.Y.S.2d 97, 98 (3d Dept.
1997) ....................................................................................................... 21

*Cho v. 401-403 57th St. Realty Corp.*, 300 A.D.2d 174, 752 N.Y.S.2d 55, 57 (1st
Dept. 2002) ............................................................................................. 14

*Claire v. Wigdor*, 24 A.D.2d 992, 993, 266 N.Y.S.2d 6, 8 (2d Dept. 1965) .......... 20

*Dickerson v. Appleton*, 123 A.D. 903, 905, 108 N.Y.S. 293, 295, *aff'd* 195 N.Y.
507, 88 N.E. 1117 (1907) ....................................................................... 21

*Eastern Shopping Ctrs., Inc. v. Trenholm Motels, Inc.*, 33 A.D.2d 930, 932, 306
N.Y.S.2d 354, 358 (3d Dept. 1970) ........................................................ 16

*Emigrant Mortg. Co. v. Berger*, 2006 WL 3626305 *2 (N.Y. Sup. Ct. 2006) ....... 17

*Eskimo Pie Corp. v. Whitelawn Dairies, Inc.*, 284 F. Supp. 987, 993 (S.D.N.Y.
1968) ....................................................................................................... 49

*Estate of Galewitz*, 3 A.D.2d 280, 295, 160 N.Y.S.2d 564, 580 (1st Dept. 1957)
................................................................................................................ 20

*Exelbert v. Hydrophilics Int'l, Inc.*, 43 A.D.2d 822, 351 N.Y.S.2d 145, 146-47 (1st Dept. 1974) ........................................................................................ 30

*F & F Restaurant Corp. v. Wells, Goode & Benefit, Ltd.*, 61 N.Y.2d 496, 502, 463 N.E.2d 23, 25, 474 N.Y.S.2d 707, 709 (1984) .................................................... 16, 27

*Fifty States Management Corp. v. Pioneer Auto Parks, Inc.*, 46 N.Y.2d 573, 577-78, 389 N.E.2d 113, 115, 415 N.Y.S.2d 800, 802 (1979) ................................. 16, 19

*Gerber v. Siegel*, 194 Misc. 966, 969, 87 N.Y.S.2d 597, 600 (N.Y. Sup. 1948) ........................................................................................................... 21

*Hartford Acc. & Indem. Co. v. Wosolowski*, 33 N.Y.2d 169, 172, 305 N.E.2d 907, 909-10, 350 N.Y.S.2d 895, 898 (1973) .................................................... 50

*Haslacha, Inc. v. Jubilee*, 2005 N.Y. Misc. LEXIS 1190 *4 (N.Y. Sup.) ............. 32

*Haymarket LLC v. D.G. Jewellery of Canada Ltd.*, 290 A.D.2d 318, 319, 736 N.Y.S.2d 356, 358 (1st Dept. 2002) ........................................................... 29

*Hebron v. Hebron*, 116 Misc.2d 803, 808, 456 N.Y.S.2d 957, 961 (N.Y. Sup. 1982) ............................................................................................................ 23

*In re Herzog,* 301 N.Y. 127, 137, 93 N.E.2d 336, 340 (1950) .............................. 32

*In re Spectrum Info. Technologies*, 190 B.R. 741, 747-52 (E.D.N.Y. Bnkrtcy. 1996) ............................................................................................................ 23

*J.N.A. Realty Corp. v. Cross Bay Chelsea, Inc.*, 42 N.Y.2d 392, 397-98, 366 N.E.2d 1313, 1316, 397 N.Y.S.2d 958, 960-61 (1977) ....... 17-20, 22, 24-26, 28, 29

*Karas v. Wasserman*, 91 A.D.2d 812, 458 N.Y.S.2d 280, 282 (3d Dept. 1982) ........................................................................................................... 20

*Lurzer GMBH v. American Showcase, Inc.*, 75 F. Supp. 2d 98, 102 (S.D.N.Y. 1998) ...................................................................................................... 32, 51

*Lyon v. Hersey*, 103 N.Y. 264, 270 (1886) .......................................................... 32, 51

*Manowitz v. Senter*, 62 A.D.2d 898, 906, 406 N.Y.S.2d 466, 470 (1st Dept. 1978) .................................................................................................................... 33

*Marwede v. Commercial Hotel*, 273 A.D.2d 984, 78 N.Y.S.2d 438, 439 (2d Dept. 1948) ............................................................................................................... 21

*Matter of Fontana D'Oro Foods Inc.*, 65 N.Y.2d 886, 888, 482 N.E.2d 1216, 1217, 493 N.Y.S.2d 300, 301 (1985) ........................................................... 20

*Motor Veh. Mfr. Ass'n v. State*, 75 N.Y.2d 175, 181, 550 N.E.2d 919, 922, 551 N.Y.S.2d 470, 473 (1990) ......................................................................... 14

*New York Guardian Mortgage Corp. v. Olexa*, 176 A.D.2d 399, 401-02, 574 N.Y.S.2d 107, 108-09 (3d Dept. 1991) ......................................................... 20

*R.W. Granger & Sons, Inc. v. City Sch. Dist.*, 296 A.D.2d 636, 637, 744 N.Y.S.2d 567, 568-69 (3d Dept. 2002) .............................................................. 19

*Schwartz v. Schwartz*, 153 A.D.2d 935, 937, 545 N.Y.S.2d 741, 743 (2d Dept. 1989) ............................................................................................................... 19

*Sidor v. Cohen*, 151 A.D.2d 660, 660-61, 543 N.Y.S.2d 98, 99 (2d Dept. 1989) ...................................................................................................................... 29

*Suits v. Suits*, 266 A.D.2d 813, 698 N.Y.S.2d 203 (4th Dept. 1999) ....................... 19

*Triggs v. Triggs*, 61 A.D.2d 911, 402 N.Y.S.2d 820, 821 (1st Dept. 1978) ............ 30

*Van Fleet v. Rhulen Agency, Inc.*, 180 A.D.2d 846, 848, 578 N.Y.S.2d 941, 943 (3d Dept. 1992) ...................................................................................................... 50

*Weinberger v. Van Hessen*, 260 N.Y. 294, 297-98, 183 N.E. 429, 430 (1932) ..... 16

*Willoughby Rehab. & Health Ctr. LLC v. Webster*, 31 A.D.3d 537, 818 N.Y.S.2d 590, 591 (2d Dept. 2006) ...................................................................................... 47

-v-

*Zaid Theater Corp. v. Sona Realty Co.*, 18 A.D.3d 352, 355, 797 N.Y.S.2d 434, 436 (1st Dept. 2005) .................................................................................. 32

*Zev v. Merman*, 73 N.Y.2d 781, 783, 533 N.E.2d 669, 669-70, 536 N.Y.S.2d 739, 739-40 (1998) .......................................................................................... 14, 15

**Statutes, Rules and Regulations**

26 U.S.C. § 422 .................................................................................................. 30

Fed. R. Civ. P. 56(a) .......................................................................................... 1

**Miscellaneous**

11 *Williston on Contracts*, § 30.5 (4th ed. 1999) ............................................. 47

11 *Williston on Contracts*, § 30:7 (4th ed. 1999) ............................................. 33, 51

15 *Williston on Contracts* § 46.12 (4th ed. 1999) ............................................ 17, 23

5 *Corbin on Contracts*, § 24.22 (1998 ed.) ....................................................... 33, 51

8 *Corbin on Contracts* § 39.10 (Rev. ed. 1999) .............................................. 25

8 *Corbin on Contracts* § 39.5 (Rev ed. 1999) .................................................. 25

Edward Yorio, *Contract Enforcement - Specific Performance and Injunctions*, § 12.2.1, pp. 313-14 (Little Brown & Co. 1989) ................................................. 22

Plaintiff Frank J. Napolitano, Jr., through his undersigned counsel, submits this Memorandum of Law in support of plaintiff's motion for summary judgment pursuant to Fed. R. Civ. P. 56(a).

**<u>Preliminary Statement</u>**

The plaintiff was employed by a subsidiary of the defendants, TSI Highpoint, LLC ("Highpoint"), from January, 2000, through June 8, 2006, holding the titles of Vice President, and later, Senior Vice President. On May 31, 2000, the plaintiff was granted options to purchase stock in the (then) parent company, defendant Town Sports International, Inc. ("TSI"), and on July 23, 2003, the plaintiff was granted additional options for the same class of shares. As of February 4, 2003, the corporate group of which TSI was a member was reorganized, and defendant Town Sports International Holdings, Inc. ("TSI Holdings") was created. The plaintiff's options to purchase shares of TSI were converted to options to purchase shares of TSI Holdings.

The options were originally granted at an exercise price which reflected market value at the time of issuance, but over the years, as the plaintiff contributed his efforts and the corporate group prospered, the exercise price of the shares proved to be well below the fair market value of the stock. In other words, the

1

options worked exactly as the issuing companies hoped, serving as an incentive for continued effort by the plaintiff and other option holders.

Most of the plaintiff's options were fully vested, immediately exercisable, and indefeasible as of February 11, 2004. The plaintiff attempted to exercise those options shortly after he left his employment with Highpoint in June, 2006. Defendant TSI Holdings refused to sell plaintiff any shares subject to the options, claiming breach of a condition subsequent – a "catch." The defendants claim that the options had to be exercised within 90 days of the plaintiff's separation of "employment" with TSI Holdings, a company for which he never worked.

The plaintiff separated from Highpoint on June 8, 2006, and gave notice of his intent to exercise his options as of September 5, 2006. The defendants deny having received that notice, and the plaintiff concedes that the giving of the June, 2006 notice is currently a disputed fact.

It is undisputed, however, that the defendants received actual notice of the plaintiff's intent to exercise his options as of November 1, 2006, less than five months after his separation from Highpoint. The defendants have invoked the 90-day notice provision as a reason for rejecting the plaintiff's exercise of his vested options.

This litigation, and this motion, are brought to compel the defendants'

2

acceptance of the plaintiff's exercise of his options, all of which were an integral

part of plaintiff's compensation package for more than six years.  Under the decree

of specific performance proposed by the plaintiff, the defendants will suffer no

prejudice, and the plaintiff will purchase and pay for the shares which the

defendants freely encouraged him to buy.  Such a decree is fully supported by New

York law (the law which governs the option contracts in question), and there are no

disputed facts which would impede that step.  The Court may, and should, resolve

this litigation on undisputed facts at this early stage.

### **Undisputed Facts.**

Plaintiff Frank J. Napolitano, Jr., is an adult resident and citizen of

Pennsylvania.  Affidavit of Frank J. Napolitano, Jr. ("Napolitano Affid.") ¶ 1.

Defendant TSI Holdings is a Delaware corporation with its principal place of

business in the State of New York.  Napolitano Affid. ¶ 2.

Defendant TSI is a Delaware corporation with its principal place of business

in the State of New York.  Napolitano Affid. ¶ 3.

The defendants operate one of the nation's largest chains of sports and health

clubs, virtually all of which are located in the New York, Philadelphia, Boston and

Washington metropolitan areas.  Napolitano Affid. ¶ 4.  The defendants' clubs in

the New York area operate under the name "New York Sports Club." the clubs in

3

and near Philadelphia operate under the name "Philadelphia Sports Club," etc., and all share a similar logo. *Id.*

Plaintiff began work for Highpoint on January 6, 2000. Napolitano Affid. ¶ 5. His responsibilities, generally, were to participate in strategic planning for the corporate group of which Highpoint was a part; to lead the strategic planning group; to design club-centered programs for children, youth and families and other special projects; and to oversee market research and product development aimed at expanding the market for the services of the corporate group. *Id.* ¶ 6. The plaintiff's office was in Chalfont, Pennsylvania. *Id.* The plaintiff's salary was paid out of an account held by Highpoint, and his W-2's were issued by Highpoint. *Id.* None of plaintiff's cash compensation was paid directly by defendants TSI or TSI Holdings. *Id.*

Many of the plaintiff's activities were centered upon, and directly benefitted, the Philadelphia Sports Club at Highpoint (owned by Highpoint), because it was that location which served, in effect, as a laboratory for many of the programs for children, youth and families which the plaintiff and his colleagues at Highpoint were developing. *Id.* ¶ 7. For all of those reasons, it was entirely reasonable for the plaintiff to be employed by Highpoint rather than by either of the defendant companies headquartered in New York City.

The defendants will contend, and the plaintiff does not dispute, that the plaintiff provided continuous and substantial services for, and for the benefit of, defendant TSI. The plaintiff also provided services for, and for the benefit of, defendant TSI Holdings after its formation in 2004. The plaintiff served as, and was regarded as, one of the senior executives of the corporate group of which Highpoint, TSI and TSI Holdings were all a part.

For that reason, the plaintiff was offered and accepted options to purchase shares in TSI. Napolitano Affid. ¶ 8. Those options were offered pursuant to a stock option agreement dated May 31, 2000. *Id.* ¶ 8. Although the plaintiff has not retained a copy of that option agreement (the "Original TSI Option"), written evidence of its existence (in the form of a shareholders agreement which refers to the Original TSI Option) is attached as Exhibit C to the Napolitano Affidavit.

The Original TSI Option included a vesting schedule that was highly dependent upon the earnings of TSI. Napolitano Affid. ¶ 9. The shares would vest sooner if earnings goals were met or exceeded; they were to vest more slowly if earnings fell short of those goals. *Id.*

The Original TSI Option granted plaintiff the right to purchase 6,600 shares of class A common stock of TSI. Napolitano Affid. ¶ 10. In early 2004, the shareholders of TSI agreed to create a new holding company. They tendered their

5

shares in TSI to TSI Holdings, in exchange for an equivalent number of newly-issued shares of TSI Holdings. *Id.* By action of the shareholders and (overlapping) Boards of Directors of TSI Holdings and TSI, the plaintiff's Original TSI Option (and similar options granted to others) were replaced by equivalent options to purchase shares of TSI Holdings. *Id.* A copy of that new option (the "First TSI Holdings Option" or the "First Option"), dated February 4, 2004, is attached as Exhibit A to the Napolitano Affidavit.

The First TSI Holdings Option (Exhibit A) is one of the two contracts sought to be specifically enforced in this action. Under its terms, the plaintiff received the right to purchase 6,600 shares of TSI Holdings. Because TSI's earnings had exceeded the earnings goals set forth in the Original TSI Option, when the original options were converted to options to purchase shares of TSI Holdings, 3,960 of the 6,600 options were already vested. Napolitano Affid. ¶ 11. Under those vested options, now included within the First TSI Holdings Option, the plaintiff had the right to purchase the 3,960 shares at $75.00 per share.[1] See *id.* and Exhibit E to Napolitano Affidavit, Memorandum of Richard Pyle (defendants' Chief Financial Officer), dated February 11, 2004.

---

[1] The First Option also contained a grant of options to purchase 2,640 shares of common stock of TSI Holdings at $22.50 per share. Those options are not at issue in this suit.

6

The plaintiff received a second award of options on July 23, 2003. Under that option agreement (the "Second TSI Option"), the plaintiff received the right to purchase 1,000 shares of TSI. Napolitano Affid. ¶ 12. A copy of the Second TSI Option is attached as Exhibit D to the Napolitano Affidavit. Like the first group of options, the Second TSI Option was converted in February, 2004, into an option to purchase an equivalent number of shares of TSI Holdings. *Id.* A copy of the substitute option agreement (the "Second TSI Holdings Option" or the "Second Option") is attached to the Napolitano Affidavit as Exhibit B. The Second TSI Holdings Option (the second, and only other, contract sought to be specifically enforced in this litigation) granted plaintiff the right to purchase 1,000 shares of TSI Holdings at $144.00 per share. Napolitano Affid. ¶ 12. Options to purchase 200 of those 1000 shares were vested and indefeasible as of February 11, 2004 (see Exhibit E to Napolitano Affidavit), and vested and indefeasible as of plaintiff's separation from Highpoint in 2006.[2]

During 2005, senior management of TSI Holdings began to formulate plans to conduct an initial public offering of the company's shares. Napolitano Affid. ¶

---

[2] The options to purchase the remaining 800 shares are not at issue in this suit.

14.[3]  In contemplation of that step, the plaintiff began discussions with the Chief

Executive Officer of TSI Holdings, Robert Giardina, concerning the plaintiff's

anticipated role in the corporate group after the offering.  *Id.*  Mr. Giardina made it

clear that the plaintiff's services were valued and desired, but the parties were

unable to agree fully on a job description and compensation.  *Id.*   The plaintiff

agreed, however, to stay in his job through the end of the anticipated public

offering.  *Id.*

On or about June 2, 2006, under a plan of reorganization related to the initial

public offering, the authorized shares of class A common stock of TSI Holdings

were increased by a multiple of 14; that is, authorized shares of class A common

stock of TSI Holdings were split, 14 to 1 (the "stock split").  Napolitano Affid. ¶

15.

By operation of paragraph 2(f) of the First Option ("Adjustments upon

Changes in Capitalization"), and a similar paragraph 2(f) of the Second Option, and

by confirmatory action of the board of directors of TSI Holdings, the First and

Second Options were recalculated, both as to shares and price-per-share, to account

for the stock split.  Napolitano Affid. ¶ 16.

---

[3]  At the time, some of the company's debt securities were publicly traded, and for those
purposes the company was publicly traded and reporting, but there were no equity securities
available to the public.

As of June 8, 2006 (the date of his separation from employment with

Highpoint) plaintiff held vested options to purchase 55,440 shares of TSI Holdings

under the First Option, at a price per share of $5.36. As of the same date, plaintiff

held vested options to purchase 2,800 shares of TSI Holdings under the Second

Option, at a price per share of $10.29. Napolitano Affid. ¶ 17.

The First and Second Options include substantially identical provisions (in

each case, Section 4(a)) requiring exercise of vested options at the earliest of (1) 90

days after the "Executive's" termination of employment with TSI Holdings, (2) sale

of TSI Holdings, or (3) a date ten years after the original options which they

replaced. Napolitano Affid. Exhs. A and B, Section 4(a).

Plaintiff alleges in his complaint (paragraph 30) that he notified defendants

of his exercise of the First and Second Options on or before June 21, 2006,

effective September 5, 2006, and that defendants had actual and constructive notice

of plaintiff's intent to exercise both options. The defendants have denied receiving

that notice, however, and the plaintiff therefore concedes, for purposes of the

current motion only, that there will be a dispute of fact as to whether notice was

given or received.

In October, 2006, plaintiff learned that defendants claimed not to have

received plaintiff's notice of exercise, and on November 1, 2006, plaintiff provided

notice by electronic mail that he had provided notice of exercise, and continued to desire to exercise, the vested portions of the First and Second Options. Napolitano Affid. ¶ 18.

Defendants declined to sell shares of common stock of TSI Holdings in response to plaintiff's notice of exercise, claiming that the notice was not received within 90 days of termination of plaintiff's employment with TSI Holdings. Napolitano Affid. ¶ 19.

Plaintiff has fully performed the services required of him under the First and Second Options, and has tendered to the defendants, by check, the full amount of the purchase price of shares subject to those options. Napolitano Affid. ¶ 20.

Shares of TSI Holdings are currently trading in public markets at prices per share substantially in excess of the prices at which plaintiff is entitled to purchase such shares under the two options. Napolitano Affid. ¶ 21.

Plaintiff would suffer substantial loss and injury if his right to purchase shares under the First Option and the Second Option, at exercise prices of $5.29 per share and $10.29 per share, respectively, were not specifically enforced.

Defendants were not harmed or prejudiced by any alleged delay in receiving plaintiff's notice of exercise under the options, because the shares subject to those options were fully reserved for that purpose, and the accounting effect of the

10

discount had already been fully recorded. Napolitano Affid. ¶ 22. Option stock is sequestered and not available for sale to the public while related options are outstanding. *Id.*

The First Option and the Second Option were granted to plaintiff as compensation for labor. Napolitano Affid. ¶ 23. In good faith, in reliance upon the compensation provided under the First and Second Options, and through substantial efforts as an employee over more than six years, plaintiff added value to the defendant corporations and to the shares representing ownership of defendant TSI Holdings. *Id.* Plaintiff has fully and faithfully provided all of the consideration and performance required of him as an employee of Highpoint.

Plaintiff seeks a decree, in equity, of specific performance, requiring defendants to accept plaintiff's exercise of rights to purchase 55,440 shares of defendant TSI Holdings at $5.36 per share, and 14,000 shares of defendant TSI Holdings at $10.29 per share, in each case upon tender by plaintiff of the purchase price for such shares.

## ARGUMENT

Plaintiff seeks summary judgment on Count I - Specific Performance, both as to liability and remedy. Plaintiff also seeks partial summary judgment on Count II - Breach of Contract, as to liability only.

11

For ease of reference, the plaintiff will refer hereafter to the First Option and the Second Option in the singular as the "Stock Option Agreement." The agreements are essentially identical as to their terms (apart from price and number of shares covered), and the numbering of the sections and subsections is identical. Where it is necessary to refer to either agreement separately, plaintiff will make clear which agreement is involved.

Both agreements include the following choice of law provision (at Section 10(k)):

> All questions concerning the construction, validity and interpretation of this Agreement and the exhibits hereto will be governed by and construed in accordance with the domestic laws of the State of New York, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York.

The plaintiff will therefore focus each of his legal arguments upon the substantive rules of interpretation and enforcement of contracts enunciated by the New York courts.

12

I.    **Based on the undisputed facts of record, the plaintiff requests, and the Court is fully empowered to grant, a decree of specific performance under Count I of the complaint, requiring the defendants to honor plaintiff's exercise of his vested options.**

A.    **The plaintiff's application for specific performance is fully supported by decisions of the New York courts.**

The relief sought by the plaintiff on Count I of his complaint is simple:   a decree in equity declaring that he is permitted to exercise his stock options, and that the defendants are required to accept payment for the shares which are subject to those options.  The plaintiff, of course, tenders the exercise price for the shares as a condition of the decree he seeks.

The discussion that follows in this Part I will assume, *arguendo* only, that the Stock Option Agreement required the plaintiff to exercise his options within 90 days of his separation of employment with Highpoint.  The plaintiff wishes to be clear, however, that he does not believe that the 90-day provision applied to him at all, a case that he will make at some length in Part II.  Any reference in this Part I to the 90-day clause as a forfeiture provision merely assumes that it is.  In fact, it should be construed, under New York law, to avoid forfeiture.

Plaintiff is prepared to accept, provisionally, the applicability of the 90-day notice provision, for the simple reason that specific performance of the plaintiff's Stock Option Agreement is permitted, indeed encouraged, under New York law,

13

even assuming the applicability of the clause.

Under New York law, as elsewhere, an action for specific performance of a

contract is equitable in nature.  *Motor Veh. Mfr. Ass'n v. State*, 75 N.Y.2d 175,

181, 550 N.E.2d 919, 922, 551 N.Y.S.2d 470, 473 (1990); *Cho v. 401-403 57th St.*

*Realty Corp.*, 300 A.D.2d 174, 752 N.Y.S.2d 55, 57 (1st Dept. 2002).

In 1998, the New York Court of Appeals enunciated the factors governing

equitable enforcement of contracts in cases where the party resisting the claim

asserts a breach or violation of a contractual time limit:

> What constitutes a reasonable time for performance depends upon the
> facts and circumstances of the particular case ( see, *Ballen v. Potter*,
> 251 N.Y. 224, 167 N.E. 424; *Murray Co. v. Lidgerwood Mfg. Co.*,
> 241 N.Y. 455, 459, 150 N.E. 514).  Included within a court's
> determination of reasonableness are [1] the nature and object of the
> contract, [2] the previous conduct of the parties, [3] the presence or
> absence of good faith, [4] the experience of the parties and [5] the
> possibility of prejudice or hardship to either one, as well as [6] the
> specific number of days provided for performance ( see, *Murray Co. v.*
> *Lidgerwood Mfg. Co., supra*, at 459, 150 N.E. 514; *Ballen v. Potter*,
> *supra*; *76 N. Assocs. v. Theil Mgt. Corp.*, 114 A.D.2d 948, 495
> N.Y.S.2d 213; *Schoen v. Grossman*, 33 Misc.2d 490, 230 N.Y.S.2d
> 771 affd. 17 A.D.2d 778, 232 N.Y.S.2d 871; Pomeroy, *Specific*
> *Performance of Contracts* § 396 [3d ed.] ). The determination of
> reasonableness must by its very nature be determined on a case-by-
> case basis.

*Zev v. Merman*, 73 N.Y.2d 781, 783, 533 N.E.2d 669, 669-70, 536 N.Y.S.2d 739,

739-40 (1998).

14

In this case, all of the factors identified by the court in *Zev v. Merman* either favor specific enforcement or are neutral:

[1] *Nature and object of the contract* – The nature and the object of the contract was to compensate the plaintiff for personal services over a number of years.

[2] and [4]  *Previous conduct of the parties and experience of the parties* – Plaintiff fully delivered all of the performance contemplated by the agreements. There were no negotiations about the 90-day provision, or other specific advice to him that the 90-day provision was considered by the defendants to be applicable to him as an employee of Highpoint.

[3] *Presence or absence of good faith* – There is no evidence that either party is acting in bad faith.

[5] *Possibility of prejudice or hardship* – The plaintiff would suffer extreme prejudice and hardship from a denial of relief; the defendants will suffer no prejudice from the granting of relief.

[6]  *Specific number of days provided for performance* – A ninety day exercise period for stock worth approximately one million dollars is hardly lengthy or generous to the departing option holder.  The plaintiff notified the defendants of his intention to exercise, at the latest, within 145 days of his separation of

15

employment with Highpoint.  The plaintiff submits that the notice was received

within an eminently reasonable time.  *See Eastern Shopping Ctrs., Inc. v. Trenholm*

*Motels, Inc.,* 33 A.D.2d 930, 932, 306 N.Y.S.2d 354, 358 (3d Dept. 1970) (in

equity, notice of an exercise of an option must, in all cases, be afforded within a

reasonable time).[4]  Reasonableness is also evidenced by the fact that the defendants

suffered no prejudice of any kind as a result of the allegedly late notice.

A decree of specific performance should be limited to the rights a party

would have had if the agreement had been performed at the agreed time, *F & F*

*Restaurant Corp. v. Wells, Goode & Benefit, Ltd.,* 61 N.Y.2d 496, 502, 463 N.E.2d

23, 25, 474 N.Y.S.2d 707, 709 (1984), and the decree can be conditioned upon full

performance by the plaintiff. *Weinberger v. Van Hessen*, 260 N.Y. 294, 297-98,

183 N.E. 429, 430 (1932).

"[E]quity will often intervene to prevent a substantial forfeiture occasioned

by a trivial or  technical breach." *Fifty States Management Corp. v. Pioneer Auto*

---

[4] Notably, the Stock Option Agreement, Section 4(a), permits exercise within 120 days of termination by reason of "Disability," defined in Section 1 as "the inability due to illness [etc.] of the Executive to carry out his duties and obligations . . . for a period of at least 90 consecutive days . . . as determined by the Board in good faith."  Because "Disability" does not arise until the executive has already been out of work for three months, and because the exercise period only begins to run after "Disability" has been declared, the defendants could be without the services of an executive for more than 210 days, or approximately seven months, before knowing whether that executive's vested options would be exercised.  The Stock Option Agreement thus expressly contemplates a much longer period of uncertainty than the 145 day period at issue here.

*Parks, Inc.*, 46 N.Y.2d 573, 577-78, 389 N.E.2d 113, 115, 415 N.Y.S.2d 800, 802 (1979). Where the default is neither wilful nor gross, and where a forfeiture would be disproportionate to the default, equity may intervene. *Emigrant Mortg. Co. v. Berger*, 2006 WL 3626305 *2 (N.Y. Sup. Ct. 2006).

The plaintiff concedes that, with option contracts, time is ordinarily presumed to be of the essence. 15 *Williston on Contracts* § 46.12 (4th ed. 1999). Under New York equity practice, however, there is a very broad exception to that rule which is applicable here.

In New York, where an option holder has attempted a late exercise of an option, equity will order specific performance where the option holder has increased the value of the property subject to the option, and the grantor will not be prejudiced by the late exercise. *J.N.A. Realty Corp. v. Cross Bay Chelsea, Inc.*, 42 N.Y.2d 392, 397-98, 366 N.E.2d 1313, 1316, 397 N.Y.S.2d 958, 960-61 (1977). The New York Court of Appeals explained the rationale for that rule as follows:

> It is a settled principle of law that a notice exercising an option is
> ineffective if it is not given within the time specified (see, e.g.,
> Restatement, Contracts 2d [Tent Draft No. 1, 1964], § 64, subd [b];
> 1A Corbin, Contracts [1963], § 264; 1 Williston, Contracts [3d ed,
> 1957], § 87; *Sy Jack Realty Co. v Pergament Syosset Corp.*, 27 NY2d
> 449). "At law, of course, time is always of the essence of the contract"
> (De Funiak, Modern Equity, § 80, p 223). Thus the tenant had no legal
> right to exercise the option when it did, but to say that is simply to
> pose the issue; it does not resolve it. Of course the tenant would not be

17

asking for equitable relief if it could establish its rights at law.

The major obstacle to obtaining equitable relief in these cases is that default on an option usually does not result in a forfeiture . . . . The general rule is customarily stated as follows: "There is a wide distinction between a condition precedent, where no title has vested and none is to vest until the condition is performed, and a condition subsequent, operating by way of a defeasance. In the former case equity can give no relief. The failure to perform is an inevitable bar. No right can ever vest. *The result is very different where the condition is subsequent. There equity will interpose and relieve against the forfeiture.*" (*Davis v Gray*, 16 Wall [83 US] 203, 229-230.) . . . .

"[A]lthough the tenant has no legal interest in the renewal period until the required notice is given, yet an equitable interest is recognized and protected against forfeiture in some cases where the tenant has in good faith made improvements of a substantial character, intending to renew the lease, if the landlord is not harmed by the delay in the giving of the notice and the lessee would sustain substantial loss in case the lease were not renewed" (2 Pomeroy, Equity Jurisprudence [5th ed], § 453b, p 296).

*J.N.A. Realty Corp. v. Cross Bay Chelsea, Inc.*, 42 N.Y.2d at 396-98, 366 N.E.2d at 1316, 397 N.Y.S.2d at 960-61 (emphasis added)(held, specific performance of option agreement available where forfeiture would otherwise result).

Perhaps the most important aspect of *J.N.A. Realty* is that it *presumes* that time is of the essence for exercise of a contractual option and *presumes* that the optionee has failed to provide timely notice. Even in those circumstances, however, an option holder who has contributed value to the property subject to the option is

18

entitled to enforce the agreement by specific performance as if full compliance had been made.

*J.N.A. Realty* has been followed and applied by the New York courts in a variety of circumstances outside the context of real property leases.

In *R.W. Granger & Sons, Inc. v. City Sch. Dist.,* 296 A.D.2d 636, 637, 744 N.Y.S.2d 567, 568-69 (3d Dept. 2002), the plaintiff substantially performed a construction contract, but with a conceded delay of 15 days beyond contractual requirements. The court, citing *J.N.A. Realty*, held for the plaintiff, noting "to permit such an insignificant delay to constitute a basis for termination would amount to a forfeiture, which the courts in this state are loathe to enforce."

In *Schwartz v. Schwartz*, 153 A.D.2d 935, 937, 545 N.Y.S.2d 741, 743 (2d Dept. 1989), the court applied the principles of *J.N.A. Realty* to prevent an accidental extinguishment of a marital settlement agreement.

In *Suits v. Suits*, 266 A.D.2d 813, 698 N.Y.S.2d 203 (4th Dept. 1999), the court applied the doctrine enunciated in *J.N.A. Realty* to nullify the application of an acceleration clause in an installment note, where the debtor's breach had been minor and technical.[5]

_____

[5] The court in *Suits v. Suits* cited *Fifty States Mgmt. Corp. v. Pioneer Auto Parks, supra*, which, in turn, cited *J.N.A. Realty* with approval. *See Fifty States*

In *Karas v. Wasserman*, 91 A.D.2d 812, 458 N.Y.S.2d 280, 282 (3d Dept. 1982), the court cited *J.N.A. Realty* in support of its decision not to impose forfeiture where a party had defaulted on certain non-financial terms of a mortgage.

And in *New York Guardian Mortgage Corp. v. Olexa*, 176 A.D.2d 399, 401-02, 574 N.Y.S.2d 107, 108-09 (3d Dept. 1991), the court applied *J.N.A. Realty* to preserve a party's rights under a mortgage work-out agreement, where certain deadlines had not been met.

Additionally, *J.N.A. Realty* was, at bottom, a specific performance case. As the plaintiff will demonstrate below, specific performance has been decreed in a wide variety of cases involving options to purchase securities. Thus, there is no conceivable reason that the holding in *J.N.A. Realty* is not applicable here.

Specific enforcement by the New York courts of stock option agreements or other agreements to sell stock is, in a word, commonplace. *See Matter of Fontana D'Oro Foods Inc.*, 65 N.Y.2d 886, 888, 482 N.E.2d 1216, 1217, 493 N.Y.S.2d 300, 301 (1985); *Acadia Plastics v. Hutcheon*, 38 A.D.2d 584, 585, 328 N.Y.S.2d 220, 221 (2d Dept. 1971); *Claire v. Wigdor*, 24 A.D.2d 992, 993, 266 N.Y.S.2d 6, 8 (2d Dept. 1965); *Estate of Galewitz*, 3 A.D.2d 280, 295, 160 N.Y.S.2d 564, 580

---

*Mgmt. Corp.*, 46 N.Y.2d at 576-77, 415 N.Y.S.2d at 802, 389 N.E.2d at 115.

(1st Dept. 1957).

Additionally, where services have been rendered but the anticipated shares of

stock that were offered for those services have not been tendered in return, the

plaintiff who provided the services may obtain specific performance of the contract.

*See Marwede v. Commercial Hotel*, 273 A.D.2d 984, 78 N.Y.S.2d 438, 439 (2d

Dept. 1948)(remedy of specific performance available to compel delivery of shares

promised in connection with employment); *Dickerson v. Appleton*, 123 A.D. 903,

905, 108 N.Y.S. 293, 295, *aff'd* 195 N.Y. 507, 88 N.E. 1117 (1907)(right to

receive shares in exchange for services enforceable by specific performance where

services have already been rendered); *Gerber v. Siegel*, 194 Misc. 966, 969, 87

N.Y.S.2d 597, 600 (N.Y. Sup. 1948), *aff'd in relevant part,* 274 A.D. 1068, 86

N.Y.S.2d 456 (2d Dept. 1949) ("Plaintiff is entitled to relief by way of specific

performance for this is a business which he was associated with for a period of

years and which he personally helped to develop" – court enforced option to

purchase); *Birdsall v. Suit-Kote Corp.,* 241 A.D.2d 889, 890, 661 N.Y.S.2d 97, 98

(3d Dept. 1997) (employer's motion for summary judgment denied and employee's

suit for specific performance of stock options permitted to proceed).

As one commentator has noted,

[O]ther special circumstances may justify an award of specific

21

> performance . . . Specific relief has . . . been granted for promises to
> convey shares in a close corporation to an employee when the stock
> represented an award for past services.

Edward Yorio, *Contract Enforcement - Specific Performance and Injunctions,* §

12.2.1, pp. 313-14 (Little Brown & Co. 1989).

Thus, where the plaintiff meets all of the other requirements for specific

performance, and a decree of specific performance is necessary to avoid an

inequitable forfeiture, specific enforcement of a promise to convey stock is

generally available under New York law.

**B.    Stock options granted in return for personal services are
not among the class of options for which time of exercise is
"of the essence" of the agreement.**

There is one *dictum* by the court in *J.N.A. Realty* that requires separate

discussion.  In discussing equity's abhorrence of forfeitures, the court noted:

> [W]hen a tenant in possession under an existing lease has
> neglected to exercise an option to renew, he might suffer a forfeiture if
> he has made valuable improvements on the property.  This of course
> generally distinguishes the lease option, to renew or purchase, from the
> stock option or the option to buy goods.

*J.N.A. Realty Corp. v. Cross Bay Chelsea, Inc.*, 42 N.Y.2d at 397, 366 N.E.2d at

1316, 397 N.Y.S.2d at 961.

The key word in the court's discussion is "generally."  An ordinary

investment stock option is acquired for a price which is a fraction of the market

22

value of the shares to which it applies, and is exercisable for a short time period at a given price. The purchaser of the option pays full consideration for a gamble – the gamble that the option will be advantageous – in the money – before expiration of the exercise period. The seller of the option is making the opposite bet. Investment options were plainly the type of instrument that the Court of Appeals was addressing in its dictum in *J.N.A. Realty*, as the court's citation of Williston, *supra*, makes clear.

Stock options granted in exchange for services, however, involve very different economic considerations. The service provider seeks compensation for work performed and successful results; the purchaser of services seeks to create an incentive for the provider to remain in the relationship and work hard while he or she is there.

Under New York law, deferred compensation is a property right, that is, a protectable future expectation. *Hebron v. Hebron*, 116 Misc.2d 803, 808, 456 N.Y.S.2d 957, 961 (N.Y. Sup. 1982). Moreover, contracts for services cease to be executory when the services have been rendered, and thus, generally speaking, are not subject to be disavowal by the party which purchased those services. *In re Spectrum Info. Technologies*, 190 B.R. 741, 747-52 (E.D.N.Y. Bnkrtcy. 1996).

Plainly, where, as here, a provider of services has spent more than six years

23

endeavoring to increase the value of the shares to which his options apply, he has, within the language of *J.N.A. Realty*, an "equitable interest . . . protected against forfeiture . . ." 42 N.Y.2d at 398, 366 N.E.2d at 1316, 397 N.Y.S.2d at 961. That is, he "has in good faith made improvements [in the property represented by the shares] of a substantial character [and would] sustain substantial loss in case [late exercise of the option were to result in a forfeiture]." *Id.*

### C.    The 90-day notice provision is a condition subsequent, noncompliance with which may be excused by a court of equity where a forfeiture would otherwise result.

An even clearer indication, perhaps, of the applicability of the holding in *J.N.A. Realty* (as opposed to any *dicta* in the case) is that the 90-day forfeiture provision that the defendants seek to enforce in this case is the clearest imaginable example of a "condition subsequent," the application of which would result in an inequitable forfeiture. Here is how Corbin defines a condition subsequent:

> The distinction between a condition "precedent" and a condition "subsequent" as well as the difference between a condition and a promise or covenant, has been largely dealt with in the law of property . . . . If the fact is a condition "precedent" it must exist before title will vest in the grantee. If it is a condition "subsequent" the title already vested in the grantee will be divested upon its coming into existence. Whenever divesting of title operates as an unjust "forfeiture," the courts interpret a provision as a mere promise or covenant, for breach of which the remedy is damages or specific performance, rather than a "condition subsequent" which terminates an already created title or ownership.

8 *Corbin on Contracts* § 39.5 (Rev ed. 1999).[6]

By that standard, the 90-day forfeiture provision at issue here is manifestly a condition subsequent. All that remains of the parties' performance of the contract is the plaintiff's notice of exercise (which triggers, of course, an enforceable legal obligation on the part of the plaintiff to pay the exercise price), and the defendants' delivery of shares.

Corbin goes on to describe the reluctance of American courts to enforce a condition subsequent in circumstances such as those present in this case:

> [E]xpress conditions "subsequent" will be regarded with disfavor if they are such as to cause a forfeiture, that is, if they permit a party to keep benefits received under the contract without giving the agreed equivalent.

8 *Corbin on Contracts* § 39.10 (Rev. ed. 1999).

To reiterate, *J.N.A. Realty's* addressed a court of equity's proper approach to conditions subsequent, as follows:

> The general rule is customarily stated as follows: "There is a wide distinction between a condition precedent, where no title has vested and none is to vest until the condition is performed, and a condition subsequent, operating by way of a defeasance. In the former case equity can give no relief. The failure to perform is an inevitable bar.

---

[6] The Stock Option Agreement uses much the same language. Most of the plaintiff's options were "fully vested" as of the date of the agreement (see Napolitano Affid. Exhibit A, Section 3(a)), and only the condition subsequent represented by the 90-day provision purports to divest those options.

25

> No right can ever vest. *The result is very different where the condition*
> *is subsequent. There equity will interpose and relieve against the*
> *forfeiture".* (*Davis v Gray*, 16 Wall [83 US] 203, 229-230.)

*J.N.A. Realty*, 42 N.Y.2d at 397, 366 N.E.2d at 961, 397 N.Y.S.2d at 1316

(emphasis added).

In this case, the plaintiff's stock options were first granted in 2000 and 2003.

The exercise price was lower than the fair market value of the shares by 2004.

Napolitano Affid. ¶ 13. Thus, assuming the defendants legitimately read their

document as requiring exercise within 90 days of separation from employment with

a subsidiary, the defendants necessarily expected exercise by the plaintiff in the

latter half of 2006. With the option price greatly below the market value, there was

no reason for the defendants to expect that the plaintiff would not exercise his

options. No cash was paid to the company for the options, and no one was

gambling on market fluctuations to any meaningful extent. The options were not

investment options which may or not have been exercised depending on market

movement.

Late exercise (assuming the facts most favorable to the defendants) did not

prejudice the defendants, because the stock was sequestered while the options were

outstanding (Napolitano Affid. ¶ 22). Such a decree is consistent with the basic

principle of New York law that the plaintiff's rights under the contract should be

limited to those that he would have had if the agreement had been fully and timely performed by both parties. *F&F Restaurant Corp. v. Wells, Goode & Benefit, Ltd.*, 61 N.Y.2d 496, 462 N.E.2d 23, 474 N.Y.S.2d 707, 710 (1984).

In short, nothing about the proposed decree prejudices the defendants or requires them to accept a risk that they had not anticipated when the options were granted. Equity can protect the expectations of both sides, because a decree of specific performance can ensure that result.

Here, there is no dispute that the plaintiff performed services for several years for the defendants, and there is no dispute that most of the options represented by the Stock Option Agreement were fully vested as of 2004. *See* Napolitano Affid. Exh. E. The alleged 90-day time period for exercise was thus a condition subsequent, and the consequences for its non-fulfillment are subject to equitable considerations. The equities plainly favor the plaintiff.

### D.    Stock options have been specifically enforced by New York courts, after default, in circumstances much like those present in this case.

The decision in *Baltimore Realty Corp. v. Alman*, 282 A.D. 714, 122 N.Y.S.2d 224 (2d Dept. 1953), is a compelling indication that the plaintiff's Stock Option Agreement is specifically enforceable under New York law. In *Baltimore Realty*, the plaintiff sought specific enforcement of a stock sale agreement which

the defendant had purported to terminate when the plaintiff's second payment was late. The plaintiff in *Baltimore Realty*, like the plaintiff in this case, had acquired a substantial equitable interest in the shares at the time of the late payment. On those facts, the court permitted the plaintiff's claim for specific performance of the stock transfer agreement to proceed. *Baltimore Realty*, 282 A.D. at 714, 122 N.Y.S.2d at 224-25.

There can be no serious suggestion that a time set for payment for shares is any less "of the essence" than a time set for exercise of an option, because a permitted extension of either deadline creates a possibility of a change in share value, knowable by the allegedly defaulting party, during the period of delay.[7] The decision in *Baltimore Realty* makes clear that, at least where the court can judge relative prejudices in hindsight, untimely tender of performance under a stock option agreement is not disqualifying, for purposes of specific performance, if the equities favor the plaintiff.

---

[7] That is, the court in *J.N.A. Realty* acknowledged the general rule, in actions at law, that time limits set in option contracts are "of the essence." The court was nevertheless prepared to apply a presumption and rule against forfeiture in connection with a claim for specific performance, where the equities demanded. The key advantage of addressing such claims in equity is that the court can evaluate the known facts to determine whether there was any serious possibility that option deadlines were "gamed" by the allegedly defaulting party. The courts in *J.N.A. Realty* and *Baltimore Realty* concluded, in each case, that the equities favored the party seeking specific performance.

28

Notably, *Baltimore Realty* was cited with approval by the First Department in *Haymarket LLC v. D.G. Jewellery of Canada Ltd.*, 290 A.D.2d 318, 319, 736 N.Y.S.2d 356, 358 (1ˢᵗ Dept. 2002). In *Haymarket*, the court ordered specific performance of a contract to sell shares notwithstanding that the plaintiff did not meet a deadline for closing and payment. Again, there is no reason to believe that the parties viewed prompt payment as any less "of the essence" than any other term in their agreement, yet specific performance was ordered.[8]

*Sidor v. Cohen*, 151 A.D.2d 660, 660-61, 543 N.Y.S.2d 98, 99 (2d Dept. 1989), is to similar effect. There, the purchaser of stock tendered payment after the time set forth in the contract; the court nevertheless entered summary judgment in favor of the plaintiff, and ordered specific performance of the defendant's promise to convey the shares.

**E.    A contract for personal services should not be interpreted by a court of equity to require forfeiture of benefits for a minor and technical violation of a condition subsequent.**

Under New York equity practice, contracts sought to be specifically enforced are interpreted to avoid forfeiture. *220 West 42 Assoc. v. The Ronbet Newmark Co.*, 84 Misc. 2d 259, 264, 375 NYS2d 255, 260-61 (N.Y. Sup. 1975). It is entirely

---

[8] It bears repeating that *J.N.A. Realty* presumed that the exercise date for the option there at issue was "of the essence" of the contract. Specific performance is an available remedy *despite* that contractual stipulation.

appropriate, therefore, to interpret stock options awarded in exchange for personal services in a manner different from the interpretation that might be given an ordinary investment contract in which forfeiture of consideration is not at issue. Notably, this was not a "qualified" stock option, so the ninety day requirement imposed by 26 U.S.C. § 422 was not applicable.[9]

Here, the compensation contracted for since 2000 was the increase in value of shares of the TSI, and later TSI Holdings, as the plaintiff contributed his efforts to the management team of the corporate group. The defendants' insistence that a late exercise of options (even assuming it was) nullifies all of the value accrued by the plaintiff under the Stock Option Agreement with six years of effort would work a forfeiture, in every sense of the word. Moreover, that forfeiture would result after the plaintiff has contributed essentially all of the performance (other than payment of the exercise amounts) that was asked him. Equity may and should protect against such a result.

*Triggs v. Triggs*, 61 A.D.2d 911, 402 N.Y.S.2d 820, 821 (1st Dept. 1978), *aff'd*, 46 N.Y.2d 305, 308, 385 N.E.2d 1254, 413 N.Y.S.2d 325 (1978), is particularly instructive. There, the First Department affirmed the trial court's ruling

---

[9] *See Exelbert v. Hydrophilics Int'l, Inc.*, 43 A.D.2d 822, 351 N.Y.S.2d 145, 146-47 (1st Dept. 1974).

that where a contract was ambiguous as to whether the plaintiff's stock options were extinguished upon the occurrence of a particular event, a decree for specific performance of those options was appropriate.

The plaintiff respectfully incorporates by reference essentially the entire discussion set forth in Part II below concerning the ambiguity of the 90-day expiration clause at issue in this case. Equity may protect against a forfeiture even if the clause applied to the plaintiff in the manner suggested by the defendants, but the ambiguity of that clause makes equitable relief even more appropriate.

II.    **Based on the undisputed documentary record, the Court may, and should, declare the 90-day notice provision to be ambiguous, and should construe the clause in a manner that will avoid forfeiture.**

The plaintiff seeks partial summary judgment for liability on Count II of his complaint, which alleges breach of contract. Count II is based upon two contentions, only one of which is at issue on summary judgment. The plaintiff's first contention under Count II is that the defendants received actual notice of exercise within 90 days (a claim not now at issue). The plaintiff's second contention is that the 90-day notice clause is ambiguous, does not apply to these facts, and, as a result, the defendants have wrongfully failed to honor the plaintiff's exercise of vested options. The latter is the claim at issue in this motion.

31

Count II of the plaintiff's complaint sets forth a claim at law rather than equity, and in the event plaintiff's motion is successful, calculation of damages will remain. Because the plaintiff's motion on Count II does not demand declaration of a remedy, the determinations sought in this motion with respect to each of the two Counts are not inconsistent, and summary judgment, as sought herein, is proper on both Counts.

### A.    The 90-day forfeiture provision on which the defendants rely is ambiguous.

It is a settled principle in New York, as elsewhere, that the law (i.e., not only equity) disfavors forfeitures. *See In re Herzog,* 301 N.Y. 127, 137, 93 N.E.2d 336, 340 (1950)("It is axiomatic that the law disfavors forfeitures"); *Zaid Theater Corp. v. Sona Realty Co.,* 18 A.D.3d 352, 355, 797 N.Y.S.2d 434, 436 (1st Dept. 2005)("[I]it is well settled that the law does not favor forfeitures"); *Haslacha, Inc. v. Jubilee,* 2005 N.Y. Misc. LEXIS 1190 *4 (N.Y. Sup.) (same).

A long-established corrollary to the primary rule is that a contract will be construed, wherever possible, to avoid forfeiture. *Lyon v. Hersey,* 103 N.Y. 264, 270 (1886); *Lurzer GMBH v. American Showcase, Inc.,* 75 F. Supp. 2d 98, 102 (S.D.N.Y. 1998) (applying New York law and quoting *Lyon v. Hersey, supra.*). As Williston states the rule, "neither law nor equity favors a forfeiture, and contracts

32

will be most strongly interpreted against a forfeiture." 11 *Williston on Contracts*, §

30:7 (4th ed. 1999).

Corbin states the rule similarly, in a manner particularly applicable to this

case:

> There is a judicial preference for interpretations that do not result in
> forfeiture or a penalty.  Forfeiture is the denial to one party of the
> compensation contracted for when that party has either performed or
> prepared to perform.

5 *Corbin on Contracts*, § 24.22 (1998 ed.).

Additionally, an ambiguous compensation plan, like any contract, is

construed against the party that prepared it.  *Manowitz v. Senter*, 62 A.D.2d 898,

906, 406 N.Y.S.2d 466, 470 (1st Dept. 1978).

The 90-day forfeiture provision on which the defendants rely is ambiguous as

a matter of law, and must be construed in a manner that does not result in forfeiture.

The provision on which the defendants rely reads as follows:

> Expiration of Vested Options.  Except as set forth in Section 4(b),
> Vested Options not exercised as of the Termination Date [defined as
> "the date upon which Executive's employment with the Company
> terminates"] shall expire on the earliest to occur of (i) the date which is
> 90 days after termination of the Executive's employment with the
> Company for any reason (other than death or Disability in which case
> the Options shall expire on the date which is 120 days after the date of
> such termination), (ii) the consummation of a Sale of the Company,
> subject to Section 3(b) above and (iii) the Expiration Date.

33

See First TSI Holdings Option, Napolitano Affid. Exh.A, Sec. 4(a).

As noted, the "Company" is defined by the Stock Option Agreement as "Town Sports International Holdings, Inc.," *i.e.*, defendant TSI Holdings. The phrase "employment with the Company" is not defined or explained. Because the plaintiff was never employed by "the Company," the meaning of the phrase, in these circumstances, is ambiguous.

There are many compelling reasons that the 90-day expiration provision never applied to the plaintiff's vested options, and any one of those reasons would render the provision ambiguous. Collectively, they make it plain that there is *no* set of facts or circumstances which the defendants might prove that would make the clause *un*ambiguous, legally enforceable, and applicable to the plaintiff's options in a manner that would have resulted in their forfeiture. Those reasons are as follows:

**1.  The plaintiff was not an employee of "the Company," that is, TSI Holdings.**

The plaintiff was never "employed" by TSI Holdings, he was never an "employee" of TSI Holdings, and there was never any "employment" with TSI Holdings that would have been possible to terminate. The provision on which the defendants relied is either inapplicable or, at the very least, ambiguous and thus unenforceable as a forfeiture.

34

The plaintiff's paychecks and year-end W-2 reports were issued by TSI Highpoint, LLC, a limited liability company based in Bucks County, Pennsylvania. Napolitano Affid. ¶ 24. The plaintiff's W-2 (attached as Exhibit H to the Napolitano Affidavit) describes him as an "employee" of Highpoint. The plaintiff never received a paycheck or W-2 from TSI Holdings, or indeed from defendant TSI. Napolitano Affid. ¶ 6. The Stock Option Agreement does not suggest, anywhere, that the term "the Company" might be broader than a single entity, Town Sports International Holdings, Inc. Nor does the Stock Option Agreement contain any definition of "employment," notwithstanding the centrality of that word to the operation of agreement if the clause were interpreted as the defendants now contend.

## 2. **The defendants' recent motion for change of venue confirms that the plaintiff was never employed by TSI Holdings and employees of Highpoint are not employees of TSI Holdings.**

The defendants' motion for change of venue avers that the plaintiff was a "[TSI] International employee who worked part of the time out of [TSI] International Inc.'s office in New York, [and] part of the time out of the Highpoint Club in Pennsylvania." Memorandum of Law in Support of Defendants' Motion to Dismiss Pursuant to Rule 12(b)(6), Rule 12(b)(2) and Rule 12(b)(3) and to Change Venue Pursuant to Rule 12(b)(3) and 28 U.S.C. §§ 1404 and 1406," at 15.

35

The plaintiff's employer was Highpoint, and not defendant TSI (W-2's are conclusive evidence of that fact), but the disagreement only accentuates the problem with the defendants' case. Both sides agree that the plaintiff never worked for TSI Holdings.

The defendants also aver that TSI Holdings "has no business in Pennsylvania, maintains no offices in Pennsylvania, and no employees work in Pennsylvania." *Id.* at 13. As it happens, Highpoint employed not only the plaintiff, but more than 100 other employees during the period 2000 to 2006.[10] Napolitano Affid. ¶ 34. At least one of the persons currently employed by Highpoint during that period was, like plaintiff, a participant in the Plan, and she remains an employee of Highpoint and a participant in the Plan. *Id.*

Thus, if TSI Holdings has "no employees [who] work in Pennsylvania," it admits that at least one participant in the Plan (other than plaintiff) who now works for Highpoint is not an employee of TSI Holdings. Stated differently, TSI Holdings admits that, whatever its relationship with at least one Highpoint employee now participating in the Plan, that relationship is not one of employer-employee.

---

[10]   The plaintiff, of course, was employed in Pennsylvania. Of particular note, the plaintiff's W-2 for 2006 (attached as Exhibit H to the Napolitano Affidavit) reflects Pennsylvania state tax withholding. That amount is 3.07% of total compensation, precisely in line with the rate of individual income tax assessed in Pennsylvania in 2006.

The defendants' judicial admissions establish that there could be no "termination of the Executive's employment with the Company [TSI Holdings]" as that phrase is used in the Stock Option Agreement, because there was no employment to terminate.

The defendants have essentially conceded the plaintiff's principal factual point. The phrase at issue ("employment with the Company") is ambiguous as a matter of law, and must be interpreted to avoid forfeiture.

**3.  The Stock Option Plan pursuant to which the Stock Options were issued was itself ambiguous concerning the differences between an "executive" and "other key employees."**

The Stock Option Agreement, at Section 10(e), incorporates the provisions of the "Town Sports International Holdings, Inc. 2004 Common Stock Option Plan," (attached to the Napolitano Affidavit as Exhibit G)(the "Plan"). The Plan provides, in relevant part:

> "Participant" shall mean any executive or other key employee of the Company who has been selected to participate in the Plan by the Committee or the Board.

The undisputed facts make clear that, while the plaintiff may reasonably have been considered an "executive" of TSI Holdings, he was not an "employee" of TSI Holdings. The defendants will undoubtedly contend that, under the definition of "Participant," the plan applies to "any executive *or other key employee of the*

Company"; that an "executive" is therefore within the group of "employees"; that participation in the Plan is therefore limited to "employees"; and that, under the Stock Option Agreement, as it operated under the Plan, the plaintiff was a person whose "employment" with "the Company" ended in June, 2006.

The problem with such an argument is that participation in the Plan is not limited, and has not been limited, to employees of "the Company," its subsidiaries, and its affiliates. Indeed, the plaintiff is *now* a "Participant" in the Plan, under options issued to him on September 12, 2006 (after his separation of employment with Highpoint). A copy of that option agreement is attached as Exhibit F to the Napolitano Affidavit.

Additionally, Mark Smith, former CEO of TSI Holdings, is, according to the defendants' filings with the Securities and Exchange Commission, the holder of vested and unexercised options under the Plan, and he is not an employee of that company. Napolitano Affid. ¶ 27. He was however, an executive of TSI Holdings. *Id.*

Thus, to issue options to *non*-employees of the "Company," and to do so lawfully, the Board must necessarily read the definition of "Participant" in the disjunctive, and with an assumption that while most "executives" will be "employees" of "the Company," some will not.

38

To revisit the principal provision: a "Participant" is "any executive or other key employee of the Company." The best way to make sense of that provision, given the defendants' actions in issuing options to non-employee executives, is to acknowledge that certain non-employee "executives" – such as an executive employed by a subsidiary (plaintiff in his former role), a former Chairman of the Board (Mr. Smith), or an executive consultant (plaintiff in his current role) – are permissible "Participants," with Board approval.

Linguistically, that construction conforms to common sense. For example, a creator of a university scholarship might create a trust instrument which confers benefits upon "any resident of a reservation or other Native American." If an issue later arose concerning eligibility, and the grantor confirmed to the university that he or she intended that "*any* resident of a reservation," whether Native American or not, should be eligible for benefits, that construction of the trust document would hardly be unreasonable. It merely places greater emphasis upon "any" than it does upon "other."

Thus, TSI Holdings' construction of its own Plan, as evidenced by its conduct – permitting non-employee executives to receive stock options under the Plan – strongly supports the plaintiff's contention that a participant could be an eligible "executive" without having any "employment" with TSI Holdings capable

39

of termination.

### 4. The defendants knew how to distinguish an "Executive" from an "employee" in the drafting of stock options, and their failure to do so here supports the plaintiff's position.

The Second TSI Option was a re-issuance of an earlier option agreement, whereby options to purchase shares of TSI were replaced by options to purchase shares of TSI Holdings. Napolitano Affid. ¶ 12. The earlier agreement – the option agreement that was replaced – contained the following recital:

> WHEREAS, the Executive is currently a management employee of the Company [defined as Town Sports International, Inc.], and the Company desires to grant the Executive certain stock purchase options
> . . .

A copy of that "2003 Common Stock Option Agreement" is attached to the Napolitano Agreement as Exhibit D.

No such recital is contained in the replacement agreement (the Second Option, Napolitano Affid. Exh. B), where the plaintiff is described simply as "the Executive," notwithstanding that the replacement agreement shares much of its language with the earlier document. Moreover, the plaintiff is not described as an "employee" of "the Company" (TSI Holdings) anywhere in the Stock Option Agreement at issue in this case. Because the recital was inaccurate in the earlier agreement (the plaintiff was never an employee of TSI), the removal of the

40

provision indicates a consciousness on the part of the defendants that the plaintiff

was not an employee of TSI Holdings, the company issuing the options in question.

**5.   The defendants knew how to write a termination clause which encompassed executives employed by subsidiaries, and their decision not to include similar language within the 90-day clause suggests that the omission was intentional.**

In Section 4(c) of the Stock Option Agreement the defendants wrote the

following:

> Notwithstanding anything in this Agreement to the contrary, all Vested Options and Unvested Options granted to the Executive shall immediately expire and cease to be exercisable and all rights granted under this Agreement shall immediately expire in the event that the Executive is terminated for Cause by the Company at any time.

The agreement contains a definition of "Cause," which provides in relevant

part (emphasis added):

> "Cause" means any of the following with respect to the Executive: (i) a material breach of Executive's covenants under this Agreement or *any* other *Agreement with* the Company *or its Subsidiaries* . . . not cured within 15 days after receipt of written notice of such breach from the Company . . . (iii) the commission by Executive of [an] act causing material harm to the standing and reputation of the Company *or any of its Subsidiaries* . . . or (iv) . . . theft or . . . perpetration of a fraud . . . on the Company *or any of its Subsidiaries.*

Highpoint (the plaintiff's employer) was a "Subsidiary" of TSI Holdings

within the definition of that term included within the Stock Option Agreement (at

41

page 5). Given that the plaintiff was a party to an at-will employment "agreement" with Highpoint (a verbal agreement, confirmed by conduct), his breach of that agreement and failure to cure would have permitted "the Company" (TSI Holdings) to cause his employment with Highpoint and his participation in the Stock Option Agreement to be terminated.[11]

Thus, the defendants knew how to condition stock option benefits upon employment in good standing with a subsidiary. That they failed to take the simple step of requiring exercise within 90 days of "termination of employment with the Company *or any of its Subsidiaries*" certainly suggests that the omission of the phrase in the 90-day clause was advertent rather than inadvertent.

**6.   The provision for "expiration" of the options within 90 days "after termination of the Executive's employment with the Company" is not essential to the operation of the Stock Option Agreement.**

The defendants will presumably contend that a 90-day forfeiture provision is vital to operation of the Plan, and that the whole purpose of incentivizing continued employment will be undermined if the clause were not interpreted and enforced broadly.

The expiration clause, however, is phrased in the alternative: expiration occurs "on the earliest to occur of" three different events: (1) separation from

---

[11] Obviously, no such events occurred, and the clause never applied.

42

employment with "the Company," (2) a sale of the Company, or (3) the Expiration

Date, *i.e.*, ten years from the date of original issuance.

The simple refutation to an argument based upon necessity is that, as noted,

the plaintiff is now party to a stock option agreement with TSI Holdings, dated

September 12, 2006, three months after his separation from Highpoint.  That

agreement (Napolitano Affid. Exh. F), is subject to the Plan, and provides that the

options granted thereunder will expire on June 1, 2010, period.  If a "separation

from employment" clause enforcing an "employees only" policy for stock options

were essential to operation of the Plan, the Board could not have issued the options

that it issued to plaintiff in September, 2006.

### 7.  <u>The plaintiff's proposed interpretation does not render the 90-day termination clause surplussage.</u>

As in many corporate groups, employees of the affiliated companies under

the umbrella of TSI Holdings change jobs within the group.  Napolitano Affid. ¶

28.  It would have been entirely reasonable for the drafters of the Stock Option

Agreement to anticipate the possibility that the plaintiff, or any other non-employee

of TSI Holdings who signed a similar form of option, would, at some point, become

employed by TSI Holdings, and were that to have happened, the Plan, on its face,

would require that any "employee" must exercise an option within 90 days of

43

separation from TSI Holdings.  *See* Plan (Napolitano Affid. Exh. G), Section

6.5(b).  Such a clause would be essential to ensure that all W-2 employees of TSI

Holdings, whenever hired, be treated identically.  As drafted, the Stock Option

Agreement (Napolitano Affid. Exhs. A and B) anticipates that possibility and

addresses it in Section 4(a).  There is therefore no reason to conclude, as a matter of

law, that the clause would be surplussage if interpreted as plaintiff contends.

   **8.   The plaintiff's relationship with TSI Holdings did not change in any
formal respect on June 8, 2006.  The defendants' anticipated argument that
his "employment" with "the Company" ended on that date assumes the fact in
issue.**

   It is a reasonable, indeed unavoidable, assumption that drafters of contracts

for compensation for personal services in 21st Century America appreciate the

distinction between employees and non-employees.  Indeed, there does not seem to

be any third category.  *See, e.g.*, IRS Reg. 31.3401(c)-1 (26 C.F.R. 31.3401(c)-1).

The Stock Option Agreement must therefore be considered in that light.

   The plaintiff's relationship with TSI Holdings during the period February,

2004 to June, 2006 was that of an individual providing services and other

consideration (specifically, an agreement not to compete) to a juridic entity which

did not employ him.

   After June 8, 2006, when the plaintiff separated from employment with

44

Highpoint, plaintiff's relationship with TSI Holdings was exactly the same -- that of an individual providing services and other consideration (an agreement not to compete) to a juridic entity which did not employ him.

That is, the plaintiff remained bound by his covenant not to compete with TSI Holdings, and was (and still is) contractually obliged to provide consulting services to TSI Holdings through June 30, 2007.  Napolitano Affid. ¶ 30.

Where the issue is "termination" *vel non* of a relationship – and in this case it is – it is worth stressing that in every formal and practical sense of those words, the plaintiff's status vis-a-vis TSI Holdings has not changed since the Stock Option Agreement was executed in 2004.  He remains obliged to render to TSI Holdings, as a non-employee of TSI Holdings, whatever services TSI Holdings might reasonably request of him.  He remains obliged not to compete with TSI Holdings.

## 9. <u>There are important reasons that the parties would *not* have intended the 90-day provision to apply to the plaintiff in his status as a non-employee of TSI Holdings.</u>

As a strategic planner for the corporate group, the plaintiff worked with the defendants' former CEO, Mark Smith, and its current CEO, Robert Giardina, to evaluate and develop new lines of business, some of which would have been pursued, if at all, as joint ventures with companies outside the corporate group.  Napolitano Affid. ¶ 31.  Indeed, that approach was a marked emphasis of the

45

strategic planning group in which the plaintiff participated within the corporate group. *Id.*

Because the plaintiff had served as President of the International Health, Racquet and Sports Clubs Association before he joined the defendants' corporate group, and because the plaintiff had frequently expressed a desire to return to operations, Mr. Smith made clear, before 2004, that if a joint venture were formed with persons outside the TSI Holdings corporate group, the plaintiff would be a natural choice to manage any venture that he had helped conceive. Napolitano Affid. ¶ 32. Obviously, any such joint venture company would have been unlikely to have been a controlled subsidiary of TSI Holdings.

Under that circumstance, it would have been affirmatively *un*reasonable for the parties to presume that the plaintiff would be required to exercise (or lose) his vested stock options in TSI Holdings simply because he was (i) selected to represent TSI Holdings in the management of a joint venture in which TSI Holdings held a substantial stake, and therefore (ii) required to sever his employment with Highpoint. There would have been no conflict of interest which would have required such a result, and, as noted, the defendants have not restricted participation in the Plan to employees of companies within the corporate group.

There exist, therefore, objective facts which might well have caused *both*

46

parties to intend the construction for which the plaintiff now argues – namely, that

the 90-day notice provision was intended to apply narrowly, and only in case the

plaintiff ever became an actual W-2 employee of TSI Holdings and later separated

from that employment.

### B.     The Court determines whether the language in question is capable of two different meanings, and therefore ambiguous.

Under New York law, the Court has exclusive responsibility for determining

whether a contract is ambiguous.  *Willoughby Rehab. & Health Ctr. LLC v.*

*Webster,* 31 A.D.3d 537, 818 N.Y.S.2d 590, 591 (2d Dept. 2006).  In so doing, the

Court may consider any sources of information which may help it determine

whether the contract is, or is not, capable of two or more meanings.  In determining

whether ambiguity exists, "[t]he court must consider the words of the agreement,

including writings made a part of the contract by annexation or reference, the

alternative meanings suggested by counsel, and any extrinsic evidence offered in

support of those meanings."  11 *Williston on Contracts*, § 30.5 (4th ed. 1999).

The plaintiff respectfully submits that the factors discussed at length above

establish, unequivocally, that the provision on which the defendants relied to deny

the plaintiff the benefit of his vested options was, and is, ambiguous, and the Court

may so rule as a matter of law.  For the defendants to argue – assuming they do –

47

that "termination of employment" is unambiguous is simply to deny reality. Their own interpretation of the Plan has been inconsistent with the interpretation they urge, their Motion for Change of Venue reinforces the plaintiff's interpretation, and any number of alternative constructions call into question the interpretation they will propose.

> **C.    There are no disputes of material fact which, if resolved in favor of the defendants, would eliminate the ambiguity in question, and, as a matter of law, the Court may and should resolve the ambiguity to avoid forfeiture.**

The reason that the ambiguity of the 90-day notice clause confers upon plaintiff a right to seek summary judgment is that the defendants will not present, indeed could not conceivably present, objective evidence of the parties' intentions that will eliminate the ambiguity that plaintiff has identified.

At the time the Stock Option Agreement was prepared and executed, there were no discussions of any kind between the parties concerning the presence of the 90-day clause in the agreement, and no discussions between the parties about its meaning or applicability. Napolitano Affid. ¶ 33.

The defendants will undoubtedly point out that the plaintiff's conduct, as alleged in the complaint, suggests the plaintiff's implicit acknowledgment that the defendants' interpretation of the 90-day clause is correct. That is, the plaintiff's

initial notice of exercise (Complaint ¶ 30) advised TSI Holdings that the options would be exercised within 90 days of June 8, 2006, and the defendants may well attempt to attach some importance to that step.

The defendants' arguments, however, prove only that there is room for difference of opinion concerning the most reasonable interpretation of the language in question (*i.e.*, the very definition of ambiguity).  Plaintiff would have been foolish, indeed, not to have assumed that the defendants might wish to interpret the clause in a manner that would favor immediate exercise.  It was not necessary for the plaintiff to agree with the defendants' interpretation of the Stock Option Agreement to acknowledge that the better course was to exercise at the first opportunity after separation from Highpoint.  It was only as a result of the unfortunate disagreement over the effectiveness of the plaintiff's exercise in June, 2006, that the current dispute arises, and not from any acknowledgment, implicit or otherwise, that the defendants' interpretation of the Stock Option Agreement is correct.

In all events, from an evidentiary perspective, the plaintiff's subjective understanding (or, indeed, any party's subjective understanding) of the language in question is beside the point. *Eskimo Pie Corp. v. Whitelawn Dairies, Inc.*, 284 F. Supp. 987, 993 (S.D.N.Y. 1968) (applying New York law).

49

To defeat summary judgment on liability in this non-jury case, the defendants would have to present evidence which, if believed, shows the intention of *both* parties, at the time of signing, to subject the plaintiff's already-vested options[12] to the 90-day clause in question. There will be no such evidence.

Under New York law, "[w]hen a contract contains ambiguous language and the issue is to be resolved on the basis of the agreement alone, without reference to extrinsic evidence, the issue is to be determined by the courts as a matter of law." *Van Fleet v. Rhulen Agency, Inc.*, 180 A.D.2d 846, 848, 578 N.Y.S.2d 941, 943 (3d Dept. 1992).

The question of whether extrinsic evidence is considered in final interpretation – that is, whether the evidence, if believed, resolves the ambiguity – is likewise a question for the Court. The Court of Appeals' decision in *Hartford Acc. & Indem. Co. v. Wosolowski*, 33 N.Y.2d 169, 172, 305 N.E.2d 907, 909-10, 350 N.Y.S.2d 895, 898 (1973), makes clear that, unless evidence of the parties' intent were capable of resolving the ambiguity, the ambiguity may, and should, be resolved by the Court in accordance with New York's rules of contract construction. *Accord, Bensons Plaza v. A&P*, 44 N.Y.2d 791, 792-93, 377 N.E.2d

---

[12] As noted, most of the options granted under the First Option were already vested when the Stock Option Agreement was executed, and indeed the Stock Option Agreement recites that fact.

477, 478, 406 N.Y.S.2d 33, 34 (1978).

The phrase, "termination of employment with the Company," as used in the Stock Option Agreement, was not negotiated language, and there is simply no evidence on which a finding of mutual intention might be based. In such a circumstance, New York case law permits, indeed requires, the Court to construe the contract as a matter of law. The principal rule of construction applicable to this case is that ambiguous contractual provisions should be construed to avoid forfeiture. *Lyon v. Herseym supra; Lurzer GMBH v. American Showcase, Inc., supra;* 11 *Williston on* Contracts § 30.7 (4th ed. 1999); 5 *Corbin on Contracts*, § 24.22 (1998 ed.).

The construction that avoids forfeiture is to construe the three triggers governing expiration of the options as provisions which will take effect in the alternative and only if applicable, and to construe "employment" with TSI Holdings as referring narrowly to W-2 employment. As so construed, the 90-day provision would have applied, in the alternative, only if the plaintiff had accepted W-2 employment directly with TSI Holdings in New York. Since no such event ever happened, the remaining two expiration dates – the date of a sale of "the Company" or June 1, 2010 – will continue to apply, in the alternative, to ensure that the options will expire according to fixed standards.

51

With the ambiguous provision construed to avoid forfeiture, the Court may declare, on summary judgment, that the plaintiff's vested options were properly and timely exercised because his notice of exercise was delivered before a sale of TSI Holdings, and before the 10 year expiration dates of the respective option agreements. The defendants' refusal of that exercise was therefore a breach of contract, and may be so determined. A hearing on damages should follow.

## CONCLUSION.

For the foregoing reasons, the plaintiff's motion for summary judgment on Count I of the complaint should be granted. The plaintiff respectfully prays for an Order requiring the defendants to accept plaintiff's exercise of vested options under the First TSI Holdings Option and the Second TSI Holdings Option. Plaintiff also respectfully prays for an Order granting partial summary judgment for liability on his claim for breach of contract under Count II of the complaint.

Respectfully submitted,

_____
Richard G. Tuttle
Archer & Greiner, P.C
Suite 1620
One South Broad Street
Philadelphia, PA  19107
(215) 963-3300
rtuttle@archerlaw.com

Counsel for Plaintiff
Frank J. Napolitano, Jr.

April 24, 2007